**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

GENEVA COLLEGE; WAYNE L. HEPLER; )
THE SENECA HARDWOOD LUMBER )
COMPANY, INC., a Pennsylvania Corporation; )
WLH ENTERPRISES, a Pennsylvania Sole )
Proprietorship of Wayne L. Hepler; and )
CARRIE E. KOLESAR )
                                     )
        Plaintiff, )
                                     )
                                     )
        v. )  Case No. 2:12-cv-00207
                                     )
KATHLEEN SEBELIUS )
*in her official capacity as Secretary of the* )
*United States Department of Health and Human* )
*Services,* HILDA SOLIS )
*in her official capacity as Secretary of the* )
*United States Department of Labor,* TIMOTHY )
GEITHNER )
*in his official capacity as Secretary of the* )
*United States Department of the Treasury,* )
UNITED STATES DEPARTMENT OF )
HEALTH AND HUMAN SERVICES, )
UNITED STATES DEPARTMENT OF )
LABOR, UNITED STATES DEPARTMENT )
OF THE TREASURY )

## MEMORANDUM OPINION AND ORDER

Presently before the court is the Motion to Dismiss Plaintiffs' Amended Complaint (ECF

No. 39) and brief in support (ECF No. 40) filed by defendants Kathleen Sebelius, Hilda Solis,

Timothy Geithner, the United States Department of Health and Human Services ("HHS"), the

United States Department of Labor, and the United States Department of the Treasury

(collectively, "defendants"); the Response in Opposition (ECF No. 51) filed by plaintiffs Geneva

College ("Geneva"), Wayne L. Hepler ("Hepler"), The Seneca Hardwood Lumber Company,

Inc. ("SHLC"), WLH Enterprises ("WLH"), and Carrie E. Kolesar ("Kolesar" and together with

Geneva, Hepler, SHLC, and WLH, collectively "plaintiffs"); and defendants' reply (ECF No. 54.) Subsequent to the filing of defendants' motion, the court held a hearing on October 31, 2012, at which time the court heard argument and ordered the parties to submit supplemental briefing. (ECF Nos. 55 and 58.) The parties have kept the court well informed of recent decisions by other district courts and courts of appeals in similar cases around the country. The matter is now ripe for disposition, and for the reasons that follow, defendants' motion will be GRANTED IN PART and DENIED IN PART.

The present case is one of dozens of similar lawsuits currently pending in district courts and courts of appeals throughout the country. In each case, individuals and entities, both for-profit and nonprofit, are challenging the provision of the new federal health care law requiring health insurance plans to provide coverage for certain services, which defendants assert are appropriate for women's preventive care. Plaintiffs in this case, as discussed more fully below, are a private, nonprofit college, two for-profit entities, and individual owners of those entities. Plaintiffs object on religious grounds to being required to include coverage in their health plans for contraceptives such as ella and Plan B, sterilization procedures, and patient education and counseling for women of reproductive capacity (the "objected to services").

## I.     FACTUAL ALLEGATIONS DERIVED FROM THE AMENDED COMPLAINT WHICH MUST BE TAKEN AS TRUE FOR THE PURPOSE OF RESOLVING THE MOTION TO DISMISS

### A.     <u>Geneva</u>

Geneva is a nonprofit institution of higher learning established in Beaver Falls, Pennsylvania in 1848 by the Reformed Presbyterian Church of North America ("RPCNA"). (ECF No. 32 ¶¶ 11, 25.) Geneva's mission is "to glorify God by educating and ministering to a diverse community of students in order to develop servant-leaders who will transform society for

2

the kingdom of Christ." (Id. ¶ 25.) This mission is central to Geneva's institutional identity and activities. (Id. ¶¶ 27-29.) Geneva offers a traditional liberal arts and sciences curriculum as well as student programs and services that are rooted in the Christian faith. (Id. ¶ 26.) Pursuant to its mission and goals, Geneva has historically promoted a diverse student population and has opposed institutions (such as slavery) that it finds inimical to its beliefs. (Id. ¶¶ 34-35.)

Geneva is governed by a board of corporators and a board of trustees. (Id. ¶¶ 30-31.) Members of the board of corporators must be members of the RPCNA and members of the board of trustees must be members of either the RPCNA or some other Reformed or Evangelical Christian congregation. (Id. ¶ 30-31.) Geneva's faculty, staff and administration are drawn from among those who profess faith in Christ and who otherwise agree with the college's Christian convictions. (Id. at ¶ 32.) Geneva does not require its students to profess a particular faith, but it does give enrollment priority to evangelical Christians and requires all students to live by standards of Christian morality. (Id. at ¶ 33.)

Geneva and the RPCNA firmly believe "that the procurement, participation in, facilitation of, or payment for abortion [including the use of what it alleges are abortion-causing drugs like Plan B and ella] violates the Commandment against murder." (Id. ¶43.) Geneva identifies several texts, including the Ten Commandments, Scripture, the articulated statements of the RPCNA, and the Westminster Larger Catechism in support of its view that human life begins at the moment of fertilization, and that any destruction of a human life thereafter constitutes murder. (Id. ¶¶ 38-44.) Geneva's Student Handbook expressly provides that abortion "'will not be tolerated.'" (Id. ¶ 49.) In furtherance of its views on abortion, Geneva's students and staff participate in a host of pro-life activities both on and off campus. (Id. ¶¶ 45-48.)

Geneva provides health insurance to its employees and makes health insurance available to its students. (Id. ¶ 51.) Geneva's student health plan does not enjoy "grandfathered status"[1] and its current plan year began on August 1, 2012. (Id. ¶¶ 73-74.) With respect to its employee health plan, Geneva's contract for coverage explicitly excludes "'drugs used to abort a pregnancy.'" (Id. ¶50.) At the time suit was filed, Geneva's employee group health insurance plan was in its 2012 plan year, which began January 1, 2012 and concluded December 31, 2012. (Id. ¶¶ 52-53.) Geneva alleges that its current employee health plan remained grandfathered through the end of the 2012 plan year, but fears that it will not remain so in forthcoming years based upon financial pressures stemming from increased costs and decreased student enrollment. (Id. ¶¶ 54-57.)[2]

Geneva also fears that its employee health insurance plan could lose grandfathered status when its insurer attempts to enforce the provision excluding "'[a]ny drugs used to abort a pregnancy.'" (Id. ¶ 58.) This concern arose when Geneva learned that its employee health plan allegedly provided ulipristal ("ella"), levonorgestral ("Plan B"), and intrauterine devices ("IUDs") in the past without its knowledge. (Id.) Geneva instructed its insurer to stop providing these items on the grounds that they "can abort the pregnancy of an embryo after fertilization." (Id.) The insurer allegedly indicated that it would remove the coverage at some point during the 2012 calendar and plan year. (Id.) Geneva alleges that the rules promulgated by defendants (as explained in detail below) make it difficult to determine whether any changes to its employee health plan with respect to ella, Plan B, and IUDs will cause it to lose its grandfathered status.

[1] Grandfathered status is defined in 45 C.F.R. § 147.140; 26 C.F.R. § 54.9815-125T; and 29 C.F.R. § 2590.7151251, and provides that such plans do not have to provide coverage without cost sharing of "preventive health services," which plaintiffs allege includes "[a]ll Food and Drug Administration approved contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity." (ECF No. 32 ¶ 53.)
[2] If Geneva's health plan loses its grandfathered status, Geneva alleges that it will be forced to "violate its conscience" by having to provide insurance coverage for the objected to services in violation of its religious beliefs. (Id. ¶¶ 54-55.)

(Id. ¶¶ 59-63.) Geneva alleges, therefore, that the elimination of ella, Plan B, and IUDs from its health plan coverage will result in a loss of grandfathered status. (Id. ¶¶ 64-68.)[3]

## B.    The Heplers and SHLC

Hepler and his family (which includes Kolesar) (collectively the "Heplers"), are practicing Catholics who strive to follow Catholic beliefs and teachings in all areas of their lives, including the operation of their businesses. (Id. ¶¶ 75-77.) The Heplers have pursued this goal by building a chapel on their business premises, displaying religious imagery in their business, making charitable donations to Catholic causes, and providing health insurance to their families and Catholic employees consistent with their beliefs. (Id. ¶¶ 82-85.) The Heplers participate extensively in both Catholic and pro-life activities. (Id. ¶¶ 86-88.) Hepler and his thirteen children allege that they are committed to the Catholic church's teachings on human life and sexuality, including the church's position against abortifacients, contraceptives, and sterilization. (Id. ¶ 88.)

SHLC is owned and directed by Hepler, Kolesar, and six of Kolesar's adult siblings. (Id. ¶ 89.) Hepler owns a 58% share of SHLC and Kolesar and her six adult siblings each own a 6% share. (Id.) SHLC has twenty-two full-time employees, nineteen of whom (including Hepler and Kolesar's husband) are covered by the company's health insurance plan. (Id. ¶ 90.) Hepler also owns and operates a sawmill as the sole proprietorship WLH, which has six full-time employees, five of whom are covered under SHLC's health insurance plan. (Id. ¶ 91.)

Like Geneva, the Heplers allege that their sincerely held religious beliefs prohibit them from intentionally participating in, paying for, facilitating, or otherwise supporting the use of

---

[3] In supplemental briefing filed November 14, 2012, defendants concede that Geneva will likely lose its grandfathered status based upon future plan changes. (ECF No. 55 at 3.) For purposes of this discussion, therefore, the court concludes that Geneva's employee health plan will not retain grandfathered status.

abortifacient drugs, contraception, sterilization, and related education and counseling through the health insurance coverage that SHLC provides their families and employees. (Id. ¶¶ 77-82.) The SHLC health insurance plan is currently in its July 2012 plan year, and will begin its next plan year on July 1, 2013. (Id. ¶ 98.) Plaintiffs allege that SHLC's health insurance plan does not have grandfathered status. (Id. ¶ 97.) Pursuant to the Heplers' stated beliefs, SHLC's health insurance plan currently does not cover abortifacients, contraceptives and sterilization, and has not done so for several years. (Id. ¶¶ 94-99.) Hepler, Kolesar, SHLC and WLH allege that defendants' requirement that SHLC's nongrandfathered health plan provide coverage for the objected to services will force them to purchase a health plan that offers coverage for those services beginning in July 2013. (Id. ¶ 100.)

## II. THE RELEVANT STATUTES AND REGULATIONS CONCERNING THE OBJECTED TO SERVICES

### A. The Patient Protection and Affordable Care Act of 2010

On March 23, 2010, the Patient Protection and Affordable Care Act of 2010, Pub. L. No. 111-148, 124 Stat. 119 (Mar. 23, 2010) ("ACA") became law and an overhaul of the nation's healthcare system began. Section 1001 of the ACA includes specific measures related to preventive care for women, and provides in part:

(a) In general

A group health plan and a health insurance issuer offering group or individual health insurance coverage shall, at a minimum provide coverage for and shall not impose any cost sharing requirements for—

* * *

(4) with respect to women, such additional preventive care and screenings not described in paragraph (1) as provided for in comprehensive guidelines supported by the Health Resources and Services Administration ["HRSA"] for purposes of this paragraph.

42 U.S.C. § 300gg-13 (the "preventive care provision"). Because the ACA did not specifically identify which preventive care services would have to be provided without cost sharing, further rulemaking was necessary.

**B.       Preventive Care Services and Interim Final Regulations**

On July 19, 2010, defendants (the Departments of Health and Human Services, Labor, and Treasury) issued interim final regulations implementing the preventive care provision. Interim Final Rules for Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the ACA, (the "first interim final regulations"), 75 FED. REG. 41,726 (Jul. 19, 2010). The first interim final regulations require all group health plans and health insurance issuers offering nongrandfathered[4] group or individual health coverage to cover, without cost sharing, the preventive care services outlined in 42 U.S.C. § 300gg-13. Id. at 41,728. The first interim final regulations directed the Department of Health and Human Services, in conjunction with the Institute of Medicine ("IOM") to determine what preventive services are necessary and beneficial for women's health and well-being. Id. The IOM was to report its findings to the Health Resources and Services Administration ("HRSA"), which was to issue the necessary guidelines. The report issued by the IOM[5] on July 19, 2011 recommended that the HRSA guidelines include, *inter alia*: "[t]he full range of Food and Drug Administration [("FDA")]-approved contraceptive methods, sterilization procedures, and patient education and counseling for women with reproductive capacity." IOM Report at 10. FDA-approved

_____

[4] The preventive services provisions do not apply to health plans that are grandfathered. A plan is grandfathered if: (1) at least one person was enrolled on March 23, 2010; (2) the plan continuously covered at least one individual since that date; (3) the plan provides annual notice of its grandfathered status; and (4) the plan has not been subject to significant changes as outlined in the regulations. See 42 U.S.C. § 18011; 26 C.F.R. §§54.9815-1251T(a), (g); 29 C.F.R. §§ 2590.715-1251(a), (g); 45 C.F.R. §§ 147.140(a), (g).

[5] INST. OF MED., CLINICAL PREVENTIVE SERVICES FOR WOMEN: CLOSING THE GAPS, available at http://www.iom.edu/Reports/2011/Clinical-Preventive-Services-for-Women-Closing-the-Gaps.aspx (Last visited Feb. 21, 2013) ("IOM Report").

contraceptive methods include the objected to services, such as the drugs ella and Plan B, as well as IUDs.

C. **HRSA Guidelines**

On August 1, 2011, HRSA adopted guidelines pursuant to the IOM recommendations[6] and on August 3, 2011, again issued interim final regulations (the "second interim final regulations"). Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the ACA, 76 FED. REG. 46,621 (Aug. 3, 2011). The second interim final regulations carve out an exemption allowing certain religious employers to avoid providing insurance coverage for the objected to services. 76 FED. REG. at 46,626 (codified at 45 C.F.R. § 147.130(a)(1)(iv)(B)). The exemption defines religious organizations as those employers that meet the following criteria:

(1) The inculcation of religious values is the purpose of the organization;

(2) The organization primarily employs persons who share the religious tenets of the organization;

(3) The organization serves primarily persons who share the religious tenets of the organization;

(4) The organization is a nonprofit organization as described in section 6033(a)(1) and section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code of 1986, as amended.

The sections of the Internal Revenue Code cited in subsection (4) define nonprofit organizations as "churches, their integrated auxiliaries, and conventions or associations of churches," and "the exclusively religious activities of any religious order" that are exempt from taxation pursuant to 26 U.S.C. § 501(a).

D. **Temporary Enforcement Safe Harbor Provision**

---

[6] The HRSA guidelines are available at http://www.hrsa.gov/womensguidelines/ (last visited Feb. 21, 2013).

After allowing the public and interested groups to comment on the second interim final regulations, defendants adopted the definition of religious employer contained in those regulations without change on February 15, 2012. Group Health Plans and Health Issuers Relating to Coverage of Preventive Services Under the ACA, 77 FED. REG. 8,725, 8,727-28 (Feb. 15, 2012). The adopted final regulations (the "final regulations") contain a temporary enforcement safe harbor provision for nongrandfathered plans that do not qualify for the religious employer exemption. Id. HHS issued supplemental guidance ("HHS Guidance") with respect to the safe harbor provision.[7] The safe harbor provision provides that defendants will not take any enforcement action against an employer, a group health plan, or a group health insurance issuer with respect to nonexempt, nongrandfathered group health plans that fail to cover some or all of the recommended preventive services "until the first plan year that begins on or after August 1, 2013." HHS Guidance, at 3. To qualify for the safe harbor provision, an organization must meet the following criteria:

(1) The organization is organized and operates as a non-profit entity.

(2) From February 10, 2012 onward, contraceptive coverage has not been provided at any point by the group health plan established or maintained by the organization, consistent with any applicable State law, because of the religious beliefs of the organization.

(3) . . . [T]he group health plan established or maintained by the organization (or another entity on behalf of the plan, such as a health insurance issuer or third-party administrator) must provide [notice] to participants . . . which states that contraceptive coverage will not be provided under the plan for the first plan year beginning on or after August 1, 2012.

---

[7] HHS, Guidance on the Temporary Enforcement Safe Harbor for Certain Employers, Group Health Plans and Group Health Insurance Issuers with Respect to the Requirement to Cover Contraceptive Services Without Cost Sharing, at 3 (Feb. 10, 2012), available at http://cciio.cms.gov/resources/files/Files2/02102012/20120210-Preventive-Services-Bulletin.pdf (last visited Feb. 21, 2013).

(4) The organization self-certifies that it satisfies criteria 1-3 above, and documents its self-certification in accordance with the procedures detailed [elsewhere in the HHS Guidance].

HHS Guidance, at 3. A similar safe harbor provision also applies to student health insurance coverage provided by nonprofit institutions of higher education that satisfy similar criteria. 77 FED REG. at 16,504.

### E.    Advance Notice of Proposed Rulemaking

Following the adoption of the final regulations and the HHS Guidance in February 2012, defendants issued an Advance Notice of Proposed Rulemaking ("ANPRM") on March 21, 2012. Certain Preventive Services Under the ACA, 77 FED. REG. 16,501 (Mar. 21, 2012). The ANPRM seeks additional public comments and sets forth "questions and ideas" on how to best provide women with access to contraceptive services without cost-sharing, while accommodating the religious liberty concerns articulated by nonexempt religious organizations. Id. at 16,503. By its own terms, the ANPRM aims to "protect . . . religious organizations from having to contract, arrange, or pay for contraceptive coverage." Id. The ANPRM provided a ninety-day comment period ending June 19, 2012. Id.

### F.    Updated Guidance

The HHS updated its guidance bulletin (the "Updated HHS Guidance") on August 15, 2012 by clarifying three points: "(1) that the safe harbor is also available to non-profit organizations with religious objections to some but not all contraceptive coverage . . .; (2) that group health plans that took some action to try to exclude or limit contraceptive coverage that was not successful as of February 10, 2012, are not for that reason precluded from eligibility for the safe harbor . . .; and (3) that the safe harbor may be invoked without prejudice by non-profit

organizations that are uncertain whether they qualify for the religious employer exemption."[8] The safe harbor is aimed at providing an additional year—until the first plan year beginning on or after August 1, 2013—for health plans and health insurance issuers to comply with the preventive care requirement. Updated HHS Guidance at 3.

### G.     Proposed Rules

On February 6, 2013, defendants issued proposed rules (the "proposed rules") broadening the universe of organizations eligible for an exemption from the contraceptive requirement. Coverage of Certain Preventive Services Under the Affordable Care Act, 78 FED. REG. 8,456, 8,462 (Feb. 6, 2013). In the proposed rules, defendants proposed an accommodation for religious organizations that object to providing contraceptive coverage, including religious institutions of higher education. The proposed rules exclude from the contraceptive requirement those organizations that meet certain criteria: (1) "The organization opposes providing coverage for some or all of the contraceptive services required to be covered under [the final regulations] on account of religious objections;" (2) "The organization is organized and operates as a nonprofit entity;" (3) "The organization holds itself out as a religious organization;" and (4) "The organization self-certifies that it satisfies the first three criteria. 78 FED. REG. at 8,462. In an effort to also accommodate those plan beneficiaries who may not share the beliefs of the organizations claiming the accommodation, the proposed rules also set forth proposed ways "to provide women with contraceptive coverage without cost sharing and to protect eligible organizations from having to contract, arrange, pay, or refer for contraceptive coverage to which they object on religious grounds." Id. at 8,462-64.

---

[8] Department of Health and Human Services, Revised Guidance on the Temporary Enforcement Safe Harbor for Certain Employers, Group Health Plans and Group Health Insurance Issuers with Respect to the Requirement to Cover Contraceptive Services Without Cost Sharing, at n.1, available at http://cciio.cms.gov/resources/files/prev-services-guidance-08152012.pdf (last visited Feb. 21, 2013) ("updated HHS Guidance").

## III.    CLAIMS PRESENTED IN THE AMENDED COMPLAINT

### A.    <u>Substantial Burdens</u>

Plaintiffs allege that the statutory scheme outlined above violates their religious beliefs by requiring them to provide coverage for the objected to services. (ECF No. 32 ¶ 110-11.) Consequently, Geneva (as a large employer) will allegedly be burdened by potentially being subject to fines or monetary penalties of at least $500,000 per year if it fails to include insurance coverage for the objected to services or, in the alternative, if it ceases to provide health insurance. (<u>Id.</u> ¶¶ 112-16.) Plaintiffs also allege that the Heplers, SHLC, and WLH are being forced to choose between providing health insurance that is inconsistent with their beliefs or providing no insurance at all, a choice that puts them at a competitive disadvantage and forces their employees to purchase health insurance, which includes coverage for the objected to services, on their own. (<u>Id.</u> ¶¶ 116-22.) Plaintiffs allege that the requirement to provide health insurance coverage for the objected to services (what plaintiffs refer to generally as the "mandate") imposes substantial burdens on their religious beliefs, and that they are unable to avoid such burdens by self-insuring. (<u>Id.</u> ¶¶ 124-126.) Plaintiffs allege that they are not eligible for the religious employer exemption provided in the HRSA Guidelines, 76 FED. REG. at 46,626, because it is unclear how defendants will interpret or determine each of the requirements. (ECF No. 32 ¶¶ 127-39.)[9]

Based upon the uncertainty, plaintiffs allege several hardships that will be incurred as a result of the mandate. Geneva alleges that it would have to change its religious affiliation, admissions, employment, and service programs to fall within the scope of the mandate's religious employer exemption. (<u>Id.</u> ¶ 140.) Geneva also alleges that the mandate would burden its

---

[9] It must be noted that Geneva's claims were asserted prior to the issuance of the February 2013 proposed rules.

employee and student recruitment and retention efforts by making health insurance coverage uncertain. (Id. ¶¶ 146-47.) Plaintiffs allege that the mandate fails to protect their statutory and constitutional rights to not provide or facilitate the provision of the objected to services. (Id. ¶ 141-43.) Plaintiffs assert that the mandate impermissibly coerces them to provide coverage for the objected to services in violation of their sincerely held religious beliefs, lest they be subject to substantial fines. (Id. ¶¶ 144-45, 148-52.)

### B. The Mandate's Applicability

Plaintiffs allege that the mandate does not apply equally to all members of religious groups because it provides for numerous exemptions, and therefore the ACA is not a law of general applicability. (Id. ¶¶ 153-57.) According to plaintiffs, the offer of compromise[10] made by President Obama in a press conference on February 12, 2012 does not apply to Geneva because the offer is not contained in any rule or guidance made final by defendants; and does not apply to the Heplers, SHLC, and WLH because they are not nonprofit organizations. (Id. ¶¶ 158-60.) Geneva asserts that it is subject to the mandate's requirement that its health insurance plans provide coverage for the objected to services beginning in its January 2013 plan year. (Id. ¶ 163.)

Geneva disputes whether its employee health plan will maintain its grandfathered status when its insurer removes abortifacients from its coverage during this plan year. (Id. ¶ 165.) Geneva alleges that even if its employee health plan retains grandfathered status, maintaining that status will cause it substantial harm by preventing it from making any necessary changes to that plan in response to changing financial conditions. (Id. ¶¶ 165-69.) This uncertainty regarding grandfathered status will allegedly make it difficult for Geneva to know whether, and on what

---

[10] The compromise allegedly would allow religious nonprofit organizations to comply with the mandate by requiring their insurers to provide the preventive services coverage for "free." (ECF No. 32 ¶ 158.)

terms, it may offer health insurance, and will require it to plan for its employees' health insurance needs without certainty about the law. (Id. ¶¶ 170-71.)

Geneva disputes that it can comply with the HHS Guidance regarding the temporary safe harbor, because it cannot self-certify that it "did not offer non-abortifacient contraception and sterilization after February 10, 2012." (Id. ¶ 174.) Even if Geneva could avoid any burden based upon the safe harbor, it alleges that it will still be harmed for several reasons: (1) the HHS Guidance is vague, so Geneva may still not qualify; (2) the safe harbor provision can be revoked at any time; (3) at the end of the extension, the mandate will still apply; and (4) even if the safe harbor applied, its effect would still leave Geneva in violation of the mandate, despite defendants' promise not to enforce it. (Id. ¶ 175.) Because the February 2013 proposed rules were issued after the parties filed their briefs, neither defendants nor Geneva addressed their impact. The Heplers, SHLC, and WLH allege that the safe harbor does not apply to them because SHLC and WLH, the employers, are for-profit entities. (Id. ¶ 176.)

### C.   Claims for Relief

Based upon the above allegations, plaintiffs seek declaratory and injunctive relief with respect to twelve claims for relief. Counts I through VI are claims asserted by Geneva: count I alleges a violation of the Religious Freedom Restoration Act of 1993, 42 U.S.C. § 2000bb ("RFRA"); count II alleges a violation of the Free Exercise Clause of the First Amendment; count III alleges a violation of the Establishment Clause of the First Amendment; count IV alleges a violation of the Free Speech Clause of the First Amendment; count V alleges a violation of the Due Process Clause of the Fifth Amendment; and count VI alleges a violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 551, et seq. Counts VII through XII

allege the same violations as Counts I through VI, with respect to Hepler, Kolesar, SHLC, and WLH.

## IV.    MOTION TO DISMISS STANDARD

### A.    Lack of Justiciability Based Upon Standing or Ripeness

Claims must be dismissed if the plaintiff lacks standing to assert them or if the claims are not ripe. The standing doctrine requires plaintiffs to show a valid "case or controversy" exists as required by Article III and imposes a constitutional limit on who may bring suit. The Pitt News v. Fisher, 215 F.3d 354, 359 (3d Cir. 2000). To establish standing, plaintiffs must plead that they have: (1) suffered an injury-in-fact; (2) that is fairly traceable to defendant's challenged actions; and (3) that is likely redressable by a favorable decision. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992). The United States Supreme Court in Lujan defined the injury-in-fact requirement as "an invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) 'actual or imminent, not 'conjectural' or 'hypothetical.''" Id. at 560. An alleged injury must be "'certainly impending' to constitute injury in fact." Whitmore v. Arkansas, 495 U.S. 149, 158 (1990) (citing Babbitt v. Farm Workers, 442 U.S. 289, 298 (1979)). The "underlying purpose of the imminence requirement is to ensure that the court in which suit is brought does not render an advisory opinion in 'a case in which no injury would have occurred at all.'" Animal Legal Def. Fund, Inc. v. Espy, 23 F.3d 496, 500 (D.C. Cir. 1994) (quoting Lujan, 504 U.S. at 564 n.2).

In Abbott Laboratories v. Gardner, 387 U.S. 136, 149 (1967), the United States Supreme Court set forth the two fundamental considerations in determining ripeness: (1) "the fitness of the issues for judicial decision;" and (2) "the hardship to the parties of withholding court consideration." 387 U.S. at 149. In the context of a pre-enforcement declaratory judgment action,

the Court of Appeals for the Third Circuit refined the <u>Abbott Laboratories</u> test, requiring courts to consider: (1) the adversity of the parties' interests; (2) the conclusiveness of the judgment with respect to the legal relationship between the parties; and (3) the practical help or utility of the judgment. <u>Step-Saver Data Sys., Inc. v. Wyse Tech.</u>, 912 F.2d 643, 647 (3d Cir. 1990).

**B.**    **<u>Failure to State a Claim</u>**

A motion to dismiss tests the legal sufficiency of the complaint. <u>Kost v. Kozakiewicz</u>, 1 F.3d 176, 183 (3d Cir. 1993). In deciding a motion to dismiss, the court is not opining on whether the plaintiff will be likely to prevail on the merits; rather, when considering a motion to dismiss, the court accepts as true all well-pled factual allegations in the complaint and views them in a light most favorable to the plaintiff. <u>U.S. Express Lines Ltd. v. Higgins</u>, 281 F.3d 383, 388 (3d Cir. 2002). While a complaint does not need detailed factual allegations to survive a Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)") motion to dismiss, a complaint must provide more than labels and conclusions. <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007). A "formulaic recitation of the elements of a cause of action will not do." <u>Id.</u> (citing <u>Papasan v. Allain</u>, 478 U.S. 265, 286 (1986)). "Factual allegations must be enough to raise a right to relief above the speculative level" and "sufficient to state a claim for relief that is plausible on its face." <u>Id</u>. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Ashcroft v. Iqbal</u>, 129 S. Ct. 1937, 1949 (2009) (citing <u>Twombly</u>, 550 U.S. at 556).

> The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully.. . . Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'"

Id. at 1949) (quoting Twombly, 550 U.S. at 556) (internal citations omitted).

Two working principles underlie Twombly. Id. First, with respect to mere conclusory statements, a court need not accept as true all the allegations contained in a complaint. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. (citing Twombly, 550 U.S. at 555.) Second, to survive a motion to dismiss, a claim must state a plausible claim for relief. Id. at 1950. "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. (citing 490 F.3d at 157-58). "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged - but it has not 'show[n]- that the pleader is entitled to relief.'" Id. (quoting Fed. Rule Civ. Proc. 8(a)(2)). A court considering a motion to dismiss may begin by identifying pleadings that are not entitled to the assumption of truth because they are mere conclusions.

> While legal conclusions can provide the framework of the
> complaint, they must be supported by factual allegations. When
> there are well-pleaded factual allegations, a court should assume
> their veracity and then determine whether they plausibly give rise to an
> entitlement to relief.

Id.

If further amendment of the complaint "would fail to state a claim upon which relief could be granted," then amendment would be futile and the plaintiff's claim must be dismissed with prejudice. In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1434 (3d Cir. 1997) (citing Glassman v. Computervision Corp., 90 F.3d 617, 623 (1st Cir. 1996)).

## V.	DISCUSSION

A.    **Geneva's Claims - Justiciability**

1.    **Standing**

Defendants challenge this court's jurisdiction to hear Geneva's claims pursuant to the justiciability doctrine of standing;[11] and maintain that Geneva is eligible for the nonenforcement safe harbor provision, which will shield it from the objected to requirements until at least August 1, 2013. Defendants also point to the ANPRM as evidence that Geneva will almost certainly never be subject to the mandate. Geneva responds that the safe harbor and ANPRM are not sufficient guarantees to deprive it of standing, particularly in light of the relaxed standing requirement applied in cases implicating the First Amendment. Geneva argues that it is currently suffering injury-in-fact as it faces uncertainty in preparation and substantial planning costs for upcoming plan years. Defendants' motion challenges Geneva's claims on the basis of standing due to an alleged lack of injury in fact.

a.    The Safe Harbor Provision and Imminent Injury

Defendants rely principally on McConnell v. Federal Election Commission, 540 U.S. 93, 226 (2003), overruled on other grounds by Citizens United v. Federal Election Commission, 558 U.S. 310 (2010), to support their claim that enforcement of the mandate is "too remote temporally" to constitute an imminent injury. McConnell, however, involved a situation in which the challenged policy would, if at all, only be enforced five years in the future. Id. Even under the safe harbor provision,[12] Geneva's health plans will now both be subject to the mandate in its

[11] Defendants initially sought dismissal of Hepler's, Kolesar's, SHLC's, and WLH's claims based upon standing and ripeness grounds, arguing that SHLC's health plan enjoys grandfathered status. (ECF No. 40 at 27-28.) Defendants, however, subsequently acknowledged that SHLC's plan is no longer grandfathered. (ECF No. 54 at 11 n.1.) Defendants also acknowledged that Geneva's employee health plan will also lose its grandfathered status in the upcoming plan year. (ECF No. 55 at 2.)
[12] Geneva no longer appears to maintain that it is not subject to the safe harbor provision, as set forth in the Updated HHS Guidance. A reading of that guidance indicates that despite the fact that Geneva's employee health plan did provide some contraceptives in the past, it can still claim protection under the safe harbor provision. See Updated

present form in less than a year. Its student health plan will be subject to the mandate's requirements on August 1, 2013, and its employee health plan will be subject to those requirements on January 1, 2014. This time frame does not strike the court as being "too remote temporally" to circumvent the imminent injury requirement.

Plaintiffs point to several court decisions in support of their imminent injury argument. Most persuasive is <u>Florida ex rel. Attorney General v. United States Department of Health and Human Services</u>, 648 F.3d 1235, 1243 (11th Cir. 2011), <u>overruled on other grounds by</u> <u>Nat'l Fed'n of Indep. Bus. v. Sebelius</u>, 132 S. Ct. 2566 (2012), in which the defendants (the same departments and individuals as in the present case) conceded that a delay of more than two years constituted imminent harm for standing purposes. In <u>Belmont Abbey College v. Sebelius</u>, 878 F. Supp. 2d 25, 35 (2012), the United States District Court for the District of Columbia found that "the safe harbor merely delays enforcement by one year; it does not (in and of itself) reduce the certainty of the impending injury." <u>Id.</u> Pursuant to the reasoning set forth in <u>Belmont Abbey</u>, and the concession by defendants in this case, Geneva alleged an injury that is not too remote to preclude standing.

b.    <u>The ANPRM and Certainly Impending Injury</u>

Although Geneva established that an injury may be imminent, the standing doctrine also requires that that injury be concrete and certainly impending. Defendants point to the ANPRM to support their claim that "there is **no reason** to suspect that Geneva will be required to sponsor a health plan that covers certain contraceptive services in contravention of its religious beliefs once the enforcement safe harbor expires. And any suggestion to the contrary is **entirely speculative**

---

HHS Guidance, at 1 n.1 (indicating that the safe harbor extends to those organizations with religious objections to the mandate "(2) that [have] group health plans that took some action to try to exclude or limit contraceptive coverage that was not successful as of February 10, 2012, are not for that reason precluded from eligibility for the safe harbor").

at this point." (ECF No. 40 at 17) (emphasis added). Geneva responds that the mandate is the current law, notwithstanding defendants' assurances that its requirements will eventually be changed. Geneva alleges that it is suffering current harm with respect to its need to prepare for future plan years, the financial costs associated with planning, and its current difficulties in recruiting employees and students due to the uncertainty surrounding its health insurance.

        c.      Other Decisions Addressing the Same Standing Arguments

At least two courts, including one court of appeals that reviewed the lower court decisions in Belmont Abbey, 878 F. Supp. 2d at 36-37 (finding that religiously-affiliated college lacked standing), and Wheaton College v. Sebelius, No. 12-1169, 2012 WL 3637162, at *4-7 (D. D.C. Aug. 24, 2012) (finding that religiously-affiliated college lacked standing despite allegations that the college could face ERISA lawsuits over contraceptive coverage), rejected the same arguments raised by defendants and found that religiously-affiliated institutions had standing in similar circumstances. See Wheaton College v. Sebelius, 703 F.3d 551, 552-53 (D.C. Cir. 2012) (holding the appeals in Wheaton College and Belmont Abbey in abeyance and finding that both institutions "clearly had standing" at the time the suits were filed); Roman Catholic Archdiocese of N.Y. v. Sebelius, No. 12-2542, 2012 WL 6042864, at *19-20 (E.D. N.Y. Dec. 4, 2012) (finding that a nonprofit religious organization had adequately pled a certainly impending injury based upon specific allegations of preparation costs and how funds were reallocated because of the contraceptive requirement); but see Univ. of Notre Dame v. Sebelius, No. 12-253, 2012 WL 6756332, at *4 (N.D. Ind. Dec. 31, 2012) (finding that religiously-affiliated university lacked standing despite allegations that the safe harbor period did not provide sufficient planning time); Zubik v. Sebelius, No. 12-0676, 2012 WL 5932977, at *11 (W.D. Pa. Nov. 27, 2012) (finding that nonprofit religious organizations lacked standing despite allegations

that the safe harbor period did not provide sufficient planning time, and that the organizations would be unable to enter into union negotiations, set tuition rates, and make teacher retention decisions).

### d.    Standing Determined at Time Suit Filed

Standing is determined based upon "the facts of the case as they existed at the time the lawsuit was filed." Clark v. McDonald's Corp., 213 F.R.D. 198, 227 (D. N.J. 2003) (citing Lujan, 504 U.S. at 570 n.4). Standing is distinguishable from mootness and ripeness, both of which can strip a court of jurisdiction after a case has already been filed. The subsequent events and assurances upon which defendants heavily rely, therefore, do not remove Geneva's standing as measured at the time this case was filed in February 2012.

Viewing Geneva's claim of standing as of the date the suit was originally filed, it becomes clear that it acted in response to an injury that was imminent and almost certain to occur. In the amended complaint, Geneva acknowledges that its health care plans will likely lose their grandfathered status beginning in the present plan year, and will thus be subject to the ACA's requirements. (ECF No. 32 ¶¶ 57-68, 73.)  As an employer of more than fifty full-time employees, Geneva must provide health insurance that includes coverage for the objected to requirements. (Id. ¶ 101.) If Geneva fails to provide such coverage, it will be subject to financial penalties of at least $500,000 per year. (Id. ¶ 112-15.) Geneva alleges that the religious employer exemption is inapplicable to it as an organization that does not primarily serve those of its own faith or inculcate religious values. (Id. 127-29.) Geneva acknowledges that it was not eligible for the temporary enforcement safe harbor as of the time the suit was filed, since the original HHS Guidance did not exempt organizations like Geneva that had provided contraceptive coverage. (Id. ¶ 174.)

In addition to claims of future harm, Geneva alleges several current injuries that it believes are sufficient to establish standing, and relies on Lac Du Flambeau Band of Lake Superior Chippewa Indians v. Norton, 422 F.3d 490 (7th Cir. 2005), to support its argument that "the present impact of a future though uncertain harm may establish injury in fact for standing purposes." Id. at 498. Geneva alleges that it requires substantial lead time to prepare for future health care plan years (ECF No. 32 ¶¶ 56-57, 171); that it is suffering monetary harm in planning for the contraceptive requirement (Id. ¶ 180); and that its employee and student recruitment efforts have been burdened as a result of uncertainty surrounding its health care plans (Id. ¶¶ 146-47). In support of its argument, Geneva notes that defendants have acknowledged the importance of planning with respect to future health insurance plan years. 75 Fed. Reg. at 41,730 (noting that "requirements in these interim final regulations require significant lead time in order to implement"). Courts have held that suffering monetary harm is sufficient to constitute injury-in-fact for standing purposes, and that "injury-in-fact is not Mount Everest." Danvers Motor Co., Inc. v. Ford Motor Co., 432 F.3d 286, 293-94 (3d Cir. 2005). The Supreme Court has also acknowledged that burdens on recruitment efforts are sufficient to give rise to standing. Pierce v. Soc'y of the Sisters of the Holy Names of Jesus and Mary, 268 U.S. 510, 536 (1925). Considering the circumstances that existed at the time Geneva filed suit, it is apparent that Geneva "clearly had standing" at that time. See Wheaton College v. Sebelius, 703 F.3d at 552.

## 2. Ripeness[13]

---

[13] It is possible that the February 2013 proposed rules may render Geneva's claims moot when they become final. Sossamon v. Lone Star State of Tex., 560 F.3d 316, 325 (5th Cir. 2009) (finding that "[a] case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur"). With respect to mootness, a court's "decisions are concerned in large part with the determination whether any effective purpose can still be served by a specific remedy." 13B Charles Alan Wright, Arthur R. Miller, Edward H. Cooper, Richard D. Freer, Joan E. Steinman, Catherine T. Struve, & Vikram David Amar, Federal Practice and Procedure § 3533.1 (3d ed. 2008). Mootness deprives the court of its ability to act because "'the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome'"

Geneva must also establish that its claims are presently ripe for judicial review. Ripeness "prevent[s] the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies," and "protect[s] the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." Nat'l Park Hospitality Ass'n v. Dep't of the Interior, 538 U.S. 803, 807-08 (2003) (citing Abbott Laboratories v. Gardner, 387 U.S. 136, 148-49 (1967)). Underpinning the ripeness doctrine are considerations of "whether the facts of the case are 'sufficiently developed to provide the court with enough information on which to decide the matter conclusively,' and whether a party is 'genuinely aggrieved so as to avoid expenditure of judicial resources on matters which have caused harm to no one.'" Khodara Envtl., Inc. v. Blakey, 376 F.3d 187, 196 (3d Cir. 2004) (citing Peachlum v. City of York, Pa., 333 F.3d 429, 433-34 (3d Cir. 2003)). Unlike standing which is determined as of the time the case commenced, ripeness may consider events which have occurred after the filing of the complaint. See Buckley v. Valeo, 424 U.S. 1, 114-17 (1976)

Geneva acknowledges that Step-Saver provides the appropriate test for ripeness in this case, but it urges the court to apply a "relaxed standard" to their claims because they present a facial challenge involving First Amendment rights. (ECF No. 51 at 14) (citing Peachlum, 333 F.3d at 435). The proposed standard aims to quell concerns that "a person will merely comply with an illegitimate statute rather than be subjected to prosecution." Peachlum, 333 F.3d at 435. Geneva's argument was raised in Persico v. Sebelius, No. 12-123, 2013 WL 228200, at *10-11

City of Erie v. Pap's A.M., 529 U.S. 277, 287 (2000) (quoting Cnty. Of Los Angeles v. Davis, 440 U.S. 625, 631 (1979)). Once intervening circumstances eliminate the "case or controversy" requirement, the case becomes moot and a court may no longer decide it. DeFunis v. Odegaard, 416 U.S. 312, 315-17 (1974). Because the proposed rules are not yet finalized and published in the Code of Federal Regulations, the court must address the justiciability of Geneva's claims pursuant to the doctrine of ripeness and not mootness.

(W.D. Pa. Jan. 22, 2013), and the court found <u>Peachlum</u> to be inapplicable to challenges to the mandate for three reasons.

First, the plaintiffs in <u>Persico</u> (a Catholic Bishop and the Roman Catholic Diocese of Erie, Pennsylvania) did not assert a facial challenge to the mandate; rather, they challenged the law as applied. <u>Id.</u> at *10 (acknowledging that a law may be facially challenged on grounds that the law is impermissibly overbroad). Second, <u>Peachlum</u> was inapposite to the plaintiffs' situation. In <u>Peachlum</u>, the court recognized a relaxed ripeness standard in situations where "even the remotest threat of prosecution" exists. <u>Peachlum</u>, 333 F.3d at 435. The relaxed standard did not apply, however, to cases where there is "a promise not to prosecute." <u>Id.</u> In <u>Persico</u>, the government repeatedly offered its assurances that the ongoing regulatory process ensured that the law would almost certainly never be enforced against the plaintiffs. <u>Persico</u>, 2013 WL 228200, at *12.[14] These assurances were "effectively a promise . . . by the Defendants not to prosecute the Mandate in its current form." <u>Id.</u> at *11. Finally, that case did not present the same situation as in <u>Peachlum</u>, where the issues were "predominantly legal," and required no further factual development. Those same reasons are arguably applicable to Geneva's situation and as further discussed below, the legal landscape faced by Geneva changed after this case was filed. Under the February 2013 proposed rules, Geneva may be exempted from compliance in the near future. Under these circumstances, the relaxed standard does not apply.

---

[14] In their moving papers, defendants acknowledge that "[i]n light of the forthcoming amendments, . . . there is **no reason** to suspect that Geneva will be required to sponsor a health plan that covers certain contraceptive services in contravention of its religious beliefs once the enforcement safe harbor expires." (ECF No. 40 at 17) (emphasis added). Defendants acknowledge that "the issue here is not just that the regulations will not be enforced against Geneva right away, but that these regulations **almost certainly will never be enforced against Geneva**" and note that the law is "**virtually certain** to change." (ECF No. 54 at 2-3) (emphasis added). Finally, defendants acknowledge "in the context of this litigation and elsewhere . . . defendants **will never enforce the regulations in their current form against entities like [Geneva]**." (ECF No. 60 at 2, n.3) (collecting voluminous examples of the assurances provided by defendants and others in the executive branch (including President Obama) that entities like Geneva will not have to pay for the preventive care services as required in the ACA) (emphasis added).

a.    Adversity of Interest

To satisfy the first prong of the Step-Saver framework, "the party seeking review need not have suffered a 'completed harm' to establish adversity of interest . . . it is necessary that there be a substantial threat of real harm and that the threat '**must remain** 'real and immediate' throughout the course of the litigation.'" Presbytery of N.J. of Orthodox Presbyterian Church v. Florio, 40 F.3d 1454, 1463 (3d Cir. 1994) (internal citations omitted) (emphasis added). "[A] potential harm that is 'contingent' on a future event occurring will likely not satisfy this prong of the ripeness test." Pittsburgh Mack Sales & Serv. v. Int'l Union of Operating Engineers, Local Union No. 66, 580 F.3d 185, 190 (3d Cir. 2009) (citing Step-Saver, 912 F.2d at 647-48). If a subsequent event removes the potential harm, then the controversy becomes speculative and the claim is no longer ripe. Zubik, 2012 WL 5932977, at *7 (citing Presbytery of N.J., 40 F.3d at 1463).

Geneva maintains that its position is sufficiently adverse because it is challenging the law as it currently stands. (ECF No. 51 at 15-16.) It argues that the only remaining question is whether defendants will follow through on their promises to change the regulations. While Geneva is correct that the regulations embodying the mandate are final, and that "weighs in favor of justiciability," Nebraska v. United States Dep't of Health and Human Services, 877 F. Supp. 2d 777, 801 (D. Neb. 2012), those regulations are interim and defendants are taking substantial steps to exempt entities like Geneva from the mandate's requirements. Put differently, Geneva's concerns are based on a contingency that will be eliminated if the February 2013 proposed rules are finalized in the regulations.

Defendants insist that the mandate as it currently stands will never be enforced against institutions similar to Geneva. The temporary enforcement safe harbor already precludes

enforcement of the mandate until at least August 1, 2013 for Geneva's student health plan and January 1, 2014 for its employee plan. The February 2013 proposed rules go further and if they become final would exempt Geneva from having to include the coverage for the objected to services in its health plans. 78 FED. REG. at 8,462. Geneva appears to come within the requirements for exemption in the proposed rules. First, Geneva vigorously opposes provision of coverage for the objected to services on religious grounds, (ECF No. 32 ¶ 43); second, Geneva operates as a nonprofit entity, (Id. ¶ 11); and finally, Geneva holds itself out as a religious organization, as evidenced by its mission, which is "to glorify God by educating and ministering to a diverse community of students in order to develop servant-leaders who will transform society for the kingdom of Christ." (Id. ¶ 25.) The proposed rules appear to exempt institutions like Geneva from the mandate—provided Geneva complies with the fourth requirement for exemption, self-certifying that it meets the first three requirements.

When an agency expressly assures that it will not enforce regulations against a party, there is no adversity of interest. Salvation Army v. Dep't of Cmty. Affairs of State of N.J., 919 F.2d 183, 192-93 (3d Cir. 1990). Here, the proposed rules appear to exempt Geneva from complying with the mandate and, if they become final, will eliminate any remaining adversity of interest. Ohio Forestry Ass'n, Inc. v. Sierra Club, 523 U.S. 726, 735 (1998) (finding a claim unripe when "the possibility that further consideration will actually occur before [the regulation] is implemented is not theoretical, but real").

This conclusion comports with the findings of the majority of courts which addressed this issue in the context of religiously-affiliated colleges and universities. See Persico, 2013 WL 228200, at *13 (collecting cases). One court which found that a religious organization's claims were ripe, Roman Catholic Archdiocese of N.Y., 2012 WL 6042864, at *23, did not have before

it the February 2013 proposed rules that if adopted should ensure that "defendants will never enforce the regulations in their current form against [Geneva]." (ECF No. 60 at 5.) Based upon the most recent developments, this court, like the Court of Appeals for the District of Columbia Circuit in Wheaton College, will "take the government at its word" that it will, in good faith, finalize the proposed rules before the expiration of the safe harbor period—meaning prior to August 2013.[15] 703 F.3d at 552. The court concludes that Geneva's claims, even though ripe when this case was filed, are not ripe now due to an insufficient adversity of interest.

b.     Conclusiveness of Judgment

The conclusiveness inquiry requires the court to determine whether there is a "'real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical set of facts.'" Step-Saver, 912 F.2d at 649 (citing Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 241 (1937)). Without such consideration, a declaratory judgment becomes nothing more than a contingency itself, and "applying it to actual controversies which subsequently arise would be an 'exercise in futility.'" Armstrong World Indus., Inc. v. Adams, 961 F.2d 405, 412 (3d Cir. 1992) (citing Step-Saver 912 F.2d at 648).

Geneva argues that the appropriate inquiry with respect to conclusiveness is whether its claims are "predominantly legal." (ECF No. 51 at 16-17) (citing Presbytery of N.J., 40 F.3d at 1463-64.) It notes that the factual record in this case, like most First Amendment cases, is largely undisputed. Geneva points out that government agencies cannot avoid review by simply holding out the possibility of regulatory change. (ECF No. 51 at 18) (citing CSI Aviation Services, Inc. v.

---

[15] If the court's understanding about the impact of the February 2013 proposed rules on Geneva's statutory and constitutional rights is incorrect or if the proposed rules are not timely finalized, Geneva should file a motion for reconsideration.

United States Dept. of Transp., 637 F.3d 408, 410 (D.C. Cir. 2011) (rejecting a "trust us—we'll fix it later" approach to rulemaking)). There, however, is an active rulemaking process underway at this time that will likely moot Geneva's claims.

Defendants are taking concrete steps to ensure that the law will be changed to reflect the concerns expressed by Geneva and other nonprofit entities that are similarly situated. Those procedures are expected to be concluded before the expiration of the safe harbor period. Geneva's contention that the mandate's requirements are "final rules" was made without the benefit of the proposed rules and ignores the nature of the second interim final regulations. See Colo. Christian Univ., No. 11-3350, 2013 WL 93188 at *7, n.9 (D. Colo. Jan. 7, 2013). In Colorado Christian University the court pointed out that "Defendants only finalized the religious employer exemption as an amendment to the interim final rule," not the mandate as a whole. Id. (citing 77 FED. REG. at 8,730). The requirements being challenged are not finalized; and the safe harbor, ANPRM, and recent proposed rules are affirmative steps taken to amend the rules as they currently stand. The mandate's requirements remain in flux, and judicial review at this time could be an "exercise in futility" and a waste of judicial resources. Armstrong, 961 F.2d at 412.

c.    Practical Utility or Help

The third prong of the Step-Saver framework requires the court to consider whether a declaratory judgment would be useful to the parties. A useful judgment is one that clarifies the legal relationships between the parties and allows the plaintiff to "make responsible decisions about the future." Step-Saver, 912 F.2d at 649. Because the rules in place are in the process of being amended to exempt Geneva from having to comply with the mandate's requirements, judicial intervention at this time will not assist the parties in any meaningful way.

Geneva alleges that a decision in this case would allow it to make informed decisions about planning for future health care plan years, and to better understand the impact the mandate's requirements will have on employment and student recruitment. Unfortunately, any decision made by this court will likely be irrelevant in light of the ongoing rulemaking process. "The mere fact that a declaratory judgment would be useful to assist Plaintiffs in making their upcoming operational decisions is insufficient to overcome the fact that no actual controversy . . . exists between the parties." Zubik, 2012 WL 5932977, at *9. Because defendants represent that the final regulations will address the concerns of colleges like Geneva and the February 2013 proposed rules reflect that Geneva would be covered by an exemption, a decision rendered by this court on Geneva's claims will not serve any practical utility.

Based upon consideration of the factors set forth in Step-Saver, the court concludes that Geneva's claims are not ripe for review at this time, and defendants' motion to dismiss with respect to Geneva's claims shall be GRANTED without prejudice.

Geneva argues in the alternative that defendants' promises of future change make this a mootness, rather than a ripeness question. Because the recent proposed rules are not yet final, the court cannot conclude at this time that the issues raised are moot. If defendants do not live up to their promises, this action may become ripe again; thus, to the extent that the court will dismiss Geneva's claims, it will do so without prejudice. See note 13, supra.

**B.**     **Claims Asserted by Hepler, Kolesar, SHLC and WLH**

**1.**     **Religious Freedom Restoration Act Claims of Hepler, Kolesar, SHLC and WLH**

It is undisputed that the Hepler and Kolesar have standing to pursue their claims. The court must consider whether SHLC and WLH (the "Hepler Entities" and together with Hepler

and Kolesar, the "Hepler plaintiffs") have standing and whether the Hepler plaintiffs stated cognizable claims under the RFRA. Pursuant to the RFRA, the government may not "substantially burden a person's exercise of religion, 'even if the burden results from a rule of general applicability.'" Gonzales v. O Centro Espirita Beneficiente Uniao do Vegetal, 546 U.S. 418, 424 (2006) (quoting 42 U.S.C. § 2000bb-1(a)). The government may, however, substantially burden the exercise of religion if the burden: "(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(b). The simple language of the RFRA belies the challenge of applying it to the Hepler plaintiffs in the present case. The Hepler plaintiffs bear the initial burden under the RFRA of establishing "that application of the offensive law or policy would substantially burden a sincere, religious exercise." Conestoga Wood Specialties Corp. v. Sebelius, No. 12-6744, 2013 WL 140110 at *9 (E.D. Pa. Jan. 11, 2013) (citing Norwood v. Strada, 249 F. App'x 269, 271 (3d Cir. 2007)).

a.      Standing to Assert Claims Under the RFRA

It goes without saying that the individual members of the Hepler family are "persons" as defined by the RFRA. The more difficult issue arises with respect to whether the Hepler Entities are "persons" that can exercise religion in the context of the RFRA. Neither the Supreme Court nor the Court of Appeals for the Third Circuit has had an opportunity to decide whether a secular, for-profit corporation or entity can exercise religion. Other district courts which addressed this question in the context of challenges to the ACA have considered the question as it applies to both the RFRA and the First Amendment Free Exercise Clause. Tyndale House Publishers, Inc. v. Sebelius, No. 12-1635, 2012 WL 5817323 at *5 n.9 (D. D.C. Nov. 16, 2012)

(acknowledging that courts employ Free Exercise Clause jurisprudence in interpreting RFRA claims).

Defendants argue that a secular, for-profit corporate entity cannot exercise religion because once such an entity enters the regulated commercial market, its owners' beliefs do not trump the regulatory scheme to which all other commercial entities are subject. Defendants point out that corporate entities that have been found to exercise religion have always done so in the context of advancing a religious purpose; and the Hepler Entities did not espouse a religious purpose that would place them in this category.

According to the Hepler plaintiffs, a closely-held, family-owned corporation and its religious owners are virtually indistinguishable, and therefore the corporation can effectively exercise the owners' religion. The Hepler plaintiffs rely on the recent Supreme Court decision in Citizens United (extending the First Amendment right to freedom of speech to corporate entities) for the proposition that secular corporations can exercise religion because the First Amendment rights of individuals and corporations are coextensive.[16] The Hepler plaintiffs point out that denying corporations free exercise rights would require owners like the Heplers to compartmentalize their religious beliefs, thus preventing them from running their businesses according to their deeply held religious principles.

The RFRA itself does not define "person" as used in the statute. In supplemental briefing, the Hepler plaintiffs suggest that the court apply the definition of "person" as set forth in 1 U.S.C. § 1, which provides that "[i]n determining the meaning of any Act of Congress, **unless**

_____

[16] The First Amendment provides: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof, or abridging the freedom of speech . . ." U.S. CONST. amend. I. In this context, religious freedom and freedom of speech are placed on equal footing and should therefore be interpreted together, based upon the shared "nature, history, and purpose" of First Amendment freedoms. First Nat'l Bank of Boston v. Bellotti, 435 U.S. 765, 778 n.14 (1978) (distinguishing the First Amendment protections granted to corporations from limitations on corporate rights imposed by other constitutional provisions due to differences among the amendments).

**the context indicates otherwise** . . . the words 'person' and 'whoever' include corporations . . . as well as individuals." 1 U.S.C. § 1 (emphasis added). On its face, this definition allows the Hepler Entities to assert a right to exercise religion in the RFRA context. The court, however, concludes that it need not address head-on the issue whether all for-profit corporations may exercise First Amendment free exercise rights, because SHLC may assert the RFRA and First Amendment claims on behalf of its owners, the Heplers.

Two decisions from the Court of Appeals of the Ninth Circuit guide this court's holding that a for-profit, secular corporation has standing to assert the religious exercise claims of its owners in certain circumstances: Equal Employment Opportunity Commission v. Townley Engineering & Manufacturing Co., 859 F.2d 610 (9th Cir. 1988), and Stormans, Inc. v. Selecky, 586 F.3d 1109 (9th Cir. 2009). The Hepler plaintiffs rely heavily on Townley and Stormans in arguing that a closely-held corporation may assert its owners' free exercise and RFRA rights where the corporate entity "'is merely the instrument through and by which [the owners] express their religious beliefs.'" Stormans, 586 F.3d at 1120 (quoting Townley, 859 F.2d at 619-20). A district court addressing a challenge similar to the present case also found Townley and Stormans persuasive in finding that a secular, for-profit corporation may assert its owners' free exercise rights. Tyndale House, 2012 WL 5817323, at *5-7.

Townley involved a closely-held corporation that manufactured and sold mining equipment. Townley, 859 F.2d at 611. The company was 94% owned by Jake and Helen Townley, who sought to operate the business on the basis of their Christian faith, and who were "'unable to separate God from any portion of their daily lives, including their activities at the Townley company.'" Id. at 612. Townley sought a religious exemption from Title VII of the Civil Rights Act allowing it to require employees to attend weekly devotional services. Id. The

court of appeals explicitly declined to "address the abstract issue whether a for-profit corporation has rights under the Free Exercise Clause independent of those of its shareholders and officers;" rather, the court held that the company had standing to assert the rights of Jake and Helen Townley. Id. at 619-20, n.15.

The Court of Appeals for the Ninth Circuit recently relied on Townley in a case with facts quite similar to the present circumstances. In Stormans, the owner of a pharmacy challenged a Washington state regulation that required pharmacies to provide Plan B to customers despite religious and moral objections. Stormans, 586 F.3d at 1116-17. The pharmacy in Stormans was a fourth-generation family-owned company in which the shareholders and directors were all members of the same family. Id. at 1120. The owners alleged, and the court agreed, that the pharmacy was "an extension of the beliefs of the members of the Stormans family, and that the beliefs of the Stormans family [were] the beliefs of [the pharmacy]." Id. The court held that "Stormans, Inc. does not present any free exercise rights of its own different from or greater than its owners' rights. We hold that, as in Townley, Stormans has standing to assert the free exercise rights of its owners." Id.

SHLC pled ample facts necessary for this court to conclude that it has standing to assert its owners' rights in the First Amendment and RFRA context. As was the case in Stormans, SHLC is a closely-held corporation,[17] whose shareholders are Hepler and seven of his children. (ECF No. 32 ¶ 89.) Those eight individuals also constitute SHLC's board of directors. (Id.) With respect to WLH, however, there is no legal separation between it and its owner, Hepler. WLH's claims are actually Hepler's claims, as a sole proprietorship does not have standing to bring suit

---

[17] Pennsylvania law defines a "closely held corporation" as a "business corporation that: (1) has not more than 30 shareholders; or (2) is a statutory close corporation." 15 PA. CONS. STAT. § 1103. A "statutory close corporation" is a corporation that elects to become subject to the provisions of the Pennsylvania close corporation law, 15 PA. CONS. STAT. § 2301 et seq. Id.

in its own right. 1 WILLIAM MEADE FLETCHER, FLETCHER CYCLOPEDIA OF THE LAW OF CORPORATIONS § 23 (2012), available at Westlaw FLETCHER-CYC (citing Dolby v. Worthy, 173 P.3d 946 (Wash. App. 2007)). Hepler, who is already a party to this suit, may assert in his own name the claims asserted by WLH. WLH, which is not a separate legal entity, will be dismissed as a named plaintiff.

The Hepler plaintiffs allege that "[t]he Heplers believe that it would be immoral and sinful for them to intentionally participate in, pay for, facilitate, or otherwise support abortifacient drugs, contraception, sterilization, and related education and counseling, through the inclusion of such items in health insurance coverage they offer at their businesses." (Id. ¶ 80.) The complaint further alleges the extent to which the Heplers strive to incorporate their religious beliefs into every aspect of their business, including: (1) "providing health insurance coverage to their family members and other Catholic employees in a form that is consistent with those employees' religious beliefs" (Id. ¶82); (2) "display[ing] religious imagery at the offices of SHLC Hardwood, . . . building a Catholic chapel in SHLC Hardwood's retail store" (Id. ¶ 84); and (3) "direct[ing] their businesses to engage in charitable donations towards Catholic efforts." (Id. ¶ 85.)

Like the corporate owners in Townley, Hepler and Kolesar argue that they are unable to separate their Catholic beliefs into different spheres of their lives, and thus their exercise of religion and their business activities are one and the same. (ECF No. 51 at 24.) The present facts are much stronger than those in Stormans, in which the plaintiffs offered no evidence of how their faith was incorporated into the running of the pharmacy business. Taken together, the above-cited examples of the interrelatedness between SHLC, WLH and the Heplers' beliefs lead

the court to conclude that SHLC established standing to assert the First Amendment and RFRA claims of its owners.

Defendants argue that a secular, for-profit corporation accepts limitations on its activities when it enters the commercial market, and that a corporation cannot "impose its owners' religious beliefs on its employees." (ECF No. 40 at 24) (citing United States v. Lee, 455 U.S. 252, 261 (1982). Defendants conclude, therefore, that SHLC's status as a secular, for-profit corporation and WLH's status as a secular, for-profit employer prevent them from claiming the religious employer exemptions that are available to other entities. (Id.) As noted, however, WLH is not a separate legal entity and its claims may be directly asserted by Hepler.

Defendants are correct that SHLC does not operate as a "religious organization" as defined by the Court of Appeals for the Third Circuit. See LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n, 503 F.3d 217, 226 (3d Cir. 2007) (outlining several factors courts consider in determining whether an entity qualifies as a religious organization). Nevertheless, courts should not focus on the particular category of entity seeking First Amendment protection, but should instead look at "whether [a challenged statute] abridges [rights] that the First Amendment was meant to protect." First Nat'l Bank of Boston v. Bellotti, 435 U.S. 765, 776 (1978) (addressing free speech rights). The court finds further support for this argument in Citizens United. Although that decision addressed corporate rights in the context of speech, the Court in Citizens United acknowledged that categorizing entities for the purpose of prohibiting some forms of First Amendment expression while allowing others is prohibited. Citizens United, 130 S. Ct. at 898, 905-06 (rejecting the argument that media corporations are entitled to greater First Amendment protections than other corporations). The Court also explicitly acknowledged that "First Amendment protection extends to corporations." Id. at 899. This court will not draw such

distinctions in the present case, particularly where crucial First Amendment rights are at stake and where there is no contextual distinction in the language of the First Amendment between freedom of speech and freedom to exercise religion. At this stage, the court finds that SHLC pleaded sufficient facts for the court to find that it has standing to assert its owners' RFRA and First Amendment claims.

b.    Substantial Burden

Having found that Hepler, Kolesar and SHLC have standing to assert their claims under the RFRA, the court must now determine whether the mandate's requirements impose a substantial burden on the their exercise of religion. Under the RFRA, exercise of religion is defined as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000bb-2 (citing 42 U.S.C. § 2000cc-5). Other courts have been clear that "it is not the province of the court to tell the plaintiffs what their religious beliefs are, i.e. whether their beliefs about abortion should be understood to extend to how they run their corporations or the like, or to decide whether such beliefs are fundamental to their belief system." Hobby Lobby Stores, Inc. v. Sebelius, 870 F. Supp. 2d 1278, 1293 (W.D. Okla. 2012). Therefore, the court must tread lightly when considering whether the mandate's requirements substantially burden the exercise of religion by the Hepler plaintiffs.

A challenged law substantially burdens the free exercise of religion if it compels plaintiffs "to perform acts undeniably at odds with fundamental tenets of their religious beliefs." Wisconsin v. Yoder, 406 U.S. 205, 218 (1972). A substantial burden also exists where a law "put[s] substantial pressure on an adherent to modify his behavior and violate his beliefs." Thomas v. Review Bd. of Ind. Emp't Sec. Div., 450 U.S. 707, 717-18 (1981).  Even "onerous" financial costs can rise to the level of a substantial burden. Jimmy Swaggart Ministries v. Bd. of

36

Equalization of Cal., 493 U.S. 378, 392 (1990) (declining to find a substantial burden, but recognizing that one could exist under certain circumstances).

Courts addressing similar challenges to the mandate's requirements have "simply assume[d] that a law substantially burdens a person's exercise of religion when that person so claims." Legatus v. Sebelius, No. 12-12061, 2012 WL 5359630 at *6 (E.D. Mich. Oct. 31, 2012).[18] Given such a low standard, the Hepler plaintiffs' complaint sufficiently sets forth allegations to plausibly show a substantial burden on their exercise of religion.

Defendants do not question the sincerity of the individual Hepler plaintiffs' religious beliefs, but they do dispute whether the mandate's requirements impose a substantial burden on the exercise of those beliefs. Defendants argue that the mandate's requirements do not burden the Hepler plaintiffs' exercise of religion because the regulations only apply to group health plans and health insurance issuers, not to individuals. Without a direct requirement that the individual Hepler plaintiffs provide insurance coverage for the objected to services, defendants maintain that any burden is too attenuated to be cognizable under the RFRA. The Hepler plaintiffs respond that even indirect compulsion is sufficient under the RFRA if it requires them to abandon their religious beliefs and provide the objectionable coverage in fear of being subject to financial penalties. The Hepler plaintiffs reject defendants' argument that a burden on SHLC is not a burden on the individual owners and employees, as in this case the individual Hepler plaintiffs are essentially providing themselves and their own families with the objectionable coverage.

---

[18] The court in Legatus pointed to language from three court decisions in support of its conclusion: Lee, 455 U.S. at 257 ("We therefore accept appellee's contention that both payment and receipt of social security benefits is forbidden by the Amish faith"); May v. Baldwin, 109 F.3d 557, 563 (9th Cir. 1997) ("we will assume that undoing May's dreadlocks imposes a substantial burden on his exercise of Rastafarianism"); Hamilton v. Schriro, 74 F.3d 1545, 1552 (8th Cir. 1996) ("we assume that the regulations and policies at issue in the present case substantially burden Hamilton's exercise of his religion"); see also Hunter v. Baldwin, 78 F.3d 593, 593 (9th Cir. 1996) ("With respect to Hunter's facial challenge to the regulation, we assume that the regulation could be applied in a way to substantially burden a prisoner's free exercise of religion").

The Hepler plaintiffs rely upon several Supreme Court decisions that they argue support their claims that they have suffered a substantial burden under the RFRA.[19] First, in <u>Wisconsin v. Yoder</u>, 406 U.S. 205, 234-35 (1972), the Supreme Court held that a state compulsory education law imposing criminal fines for failing to remain in school until age sixteen violated the free exercise rights of the Old Order Amish. In <u>Sherbert v. Verner</u>, 374 U.S. 398, 410 (1963), the Supreme Court held that a state could not withhold unemployment benefits from a worker who refused employment on grounds that working on Saturdays violated the worker's religious beliefs. Finally, in <u>Thomas v. Review Board</u>, 450 U.S. at 719, the Supreme Court again found that a state could not deny unemployment benefits to a worker who terminated his employment because his religious beliefs forbade his participation in the production of tanks. The Hepler plaintiffs maintain that these decisions support their argument that even indirect burdens on religious exercise are substantial enough to be cognizable under the RFRA.

The Hepler plaintiffs are faced with having to choose between violating their deeply held religious beliefs and being forced to cause SHLC to terminate their health insurance coverage, which they also allege would burden their religious exercise. (ECF No. 32 ¶¶ 116-24.) This kind of Hobson's choice is similar to that faced by the plaintiff in <u>Sherbert</u>, who was "force[d] . . . to choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion in order to work, on the other hand." <u>Sherbert</u>, 374 U.S. at 404. Here, the Hepler plaintiffs are unable to enjoy the benefits of providing the Heplers and their families health insurance that is free of the coverage for the objected to services. Like in <u>Yoder</u>, the Hepler plaintiffs allege that they would be subject to a financial

---

[19] The Court of Appeals for the Third Circuit has instructed that courts should look to free exercise decisions issued prior to <u>Employment Division, Department of Human Resources of Oregon v. Smith</u>, 494 U.S. 872 (1990), when interpreting the RFRA, since it was enacted to codify the standard established in <u>Smith</u>. <u>Conestoga</u>, 2013 WL 140110, at *10 n.13 (citing <u>Adams v. Comm'r of Internal Revenue</u>, 170 F.3d 173, 176 (3d Cir. 1999)).

penalty if they were forced to drop the SHLC health insurance plan and compensate the Hepler Entities' employees for the purchase of their own equivalent plans. (ECF No. 32 ¶ 123.) In the context of a small, closely-held corporation and a sole proprietorship, these choices and the attendant consequences can have a significant impact on the health of those businesses and their owners.

Thomas is also instructive with respect to defendants' argument that the burden on the Hepler plaintiffs is too attenuated to be substantial. In addressing whether a pacifist's objection to war was too remote from his former occupation assembling tanks, the Supreme Court noted that "Thomas drew a line, and it is not for [the Court] to say that the line he drew was an unreasonable one." Thomas, 450 U.S. at 715. The Court instructed that "[c]ourts should not undertake to dissect religious beliefs" when analyzing substantial burden questions. Id. In the present case, SHLC purchases insurance for its employees and provides that coverage to WLH's employees. Thus, the coverage is provided to the Heplers and their families, who object to providing coverage which violates their exercise of religion. At this early stage in proceedings, it is not for this court to prevent the Hepler plaintiffs from acting upon the sincerely held religious beliefs of the Heplers.

It is also important to note that the Hepler plaintiffs' position with respect to the mandate's requirements is more subtle than many courts have recognized. (ECF No. 62 at 3) Compare Tyndale House, 2012 WL 5817323, at *13 ("[t]he plaintiffs' specific objection is not simply to the use of the contraceptives at issue, but to 'providing coverage for abortifacients and related education and counseling in [plaintiffs'] health insurance plan"); Grote Indus., LLC v. Sebelius, No. 12-134, 2012 WL 6725905 at *6 (S.D. Ind. Dec. 27, 2012) ("[w]e acknowledge that Plaintiffs object not just to the **use** of contraceptives, but to the **coverage** itself" (emphasis in

original)) with Conestoga, 2013 WL 140110, at *13 ("the core of the [plaintiffs'] religious objection is the effect of particular contraceptives on a fertilized egg"); O'Brien v. United States Dep't of Health and Human Services, No. 12-476, 2012 WL 4481208 at *6 (E.D. Mo. Sept. 28, 2012) ("[t]he burden of which plaintiffs complain is that funds, which plaintiffs will contribute to a group health plan, might, after a series of independent decisions by health care providers and patients covered by [plaintiffs'] plan, subsidize someone else's participation in an activity that is condemned by plaintiffs' religion"). The Hepler plaintiffs object to providing coverage for abortifacients, not the payment for or use of such items. The objection, therefore, is less attenuated than defendants argue.

The Heplers explicitly object to the requirement that they through the Hepler Entities provide the objectionable coverage to themselves and their families. (ECF No. 32 ¶ 80.) Regardless of who purchases the insurance in question in this case—whether it be SHLC (acting on behalf of the Heplers), or the Heplers themselves—that insurance will necessarily include coverage for the objected to services, thus imposing a substantial pressure on the Heplers to "modify [their] behavior and to violate their beliefs" by either giving up their health insurance generally or providing the objectionable coverage. Thomas, 450 U.S. at 718. This is a quintessential substantial burden. The allegations in the amended complaint are sufficient for the court to conclude that the Hepler plaintiffs have shown a plausible claim under the RFRA.

c.    Compelling Government Interest/Least Restrictive Means

Since the Hepler plaintiffs set forth a plausible claim that the mandate's requirements impose a substantial burden on their exercise of religion, the burden shifts to defendants to show that the mandate's requirements serve "interests of the highest order." Yoder, 406 U.S. at 215. Defendants argue that the mandate's requirements serve two complementary compelling

interests—namely the need to promote public health and the need to promote gender equality. Few would argue that promoting the public health is not a compelling government interest. <u>See Mead v. Holder</u>, 766 F. Supp. 2d 16, 43 (D. D.C. 2011) (acknowledging that, in the context of the ACA, "the Government clearly has a compelling interest in safeguarding the public health by regulating the health care and insurance markets"). The Hepler plaintiffs do not appear to seriously dispute that public health and gender equality can, in certain circumstances, be compelling government interests.

The Hepler plaintiffs instead argue that defendants' proffered interests are too vague and general to satisfy a strict scrutiny analysis. In construing RFRA claims, courts must look "beyond broadly formulated interests justifying the general applicability of government mandates and [scrutinize] the asserted harm of granting specific exemptions to particular religious claimants." <u>O Centro</u>, 546 U.S. at 431. Under the RFRA, the government must "demonstrate that the compelling interest test is satisfied through application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened." <u>Id.</u> at 420 (citing 42 U.S.C. § 2000bb-1(b)). Defendants in the present case will have difficulty showing that failure to exclude SHLC from the objected to requirements will "seriously compromise [the government's] ability to administer this program." <u>Id.</u> at 435.

In <u>O Centro</u>, the Supreme Court found that the government failed to make a showing that a ban on the use of a hallucinogenic substance served a compelling interest as applied to a Native American tribe that used the substance as part of its religious services. <u>Id.</u> at 439. The Court relied heavily on similar religious exemptions granted with respect to the use of peyote by "hundreds of thousands" of members of the Native American Church, and found that such broad exemptions weighed heavily against finding a compelling interest. <u>Id.</u> at 433-34. In light of the

41

myriad exemptions to the mandate's requirements already granted—including the most recent developments that will—if implemented—further increase the number of exempt entities—and conceding that the requirement does not include small employers similarly situated to SHLC, the requirement is "woefully underinclusive" and therefore does not serve a compelling government interest. Republican Party of Minn. v. White, 536 U.S. 765, 780 (2002).

The Hepler plaintiffs and several other courts addressing similar challenges to the mandate's requirements pointed out that over 190 million individuals have already been exempted from the mandate's requirements as a result of the grandfathering provisions in the ACA. E.g. Newland v. Sebelius, 881 F. Supp. 2d 1287, 1298 (D. Colo. 2012) ("[t]he government has exempted over 190 million health plan participants . . . from the preventive care coverage mandate"); Tyndale House, 2012 WL 5817323, at *18 ("Indeed, the 191 million employees excluded from the contraceptive coverage mandate include those covered by grandfathered plans **alone**." (emphasis in original)). Defendants argue that the grandfathering provision is merely temporary, and is aimed at easing in the requirements imposed by the ACA. While true, the mere fact that defendants granted such a broad exemption in the first place severely undermines the legitimacy of defendants' claim of a compelling interest.

In addition to the grandfathering exemption, the ACA recognizes an exemption for members of a "religious sect or division" that objects to accepting public or private insurance funds. 26 U.S.C. § 5000A(d)(2)(A). Defendants exempted more traditional religious employers from the requirement, under pressure from other religious groups. 76 FED. REG. at 46,626. SHLC itself even qualifies to be excused from providing any kind of health insurance insofar as it is defined as a small employer under the ACA. See 42 U.S.C. § 18024(b)(2). As a small employer, SHLC is exempt from the requirement that it provide health insurance to its employees at all. 26

U.S.C. § 4980H(c)(2)(A) (requiring that employers with fifty or more full-time employees provide health coverage). Finally, in response to intense public pressure, defendants proposed rules that will further exclude nonprofit religious institutions like Geneva from the mandate's requirements. 78 FED. REG. at 8,462. In light of the myriad exemptions, the "[requirement] cannot be regarded as protecting an interest 'of the highest order,'" particularly in a case like this where "it leaves appreciable damage to that supposedly vital interest unprohibited." Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 547 (1993). The large swath of the population that remains unaffected by the mandate's requirements belies any notion that the government's interests are as compelling as defendants argue. Because defendants failed to establish that the mandate's requirements do not serve a compelling interest as applied to the Hepler plaintiffs, the court need not address whether the mandate is the least restrictive means, and the Hepler plaintiffs' claims under the RFRA may proceed.

### 2. The Hepler Plaintiffs' First Amendment Claims

Having already decided that SHLC has standing to assert the Heplers' First Amendment claims, the court will now individually address those claims.

#### a. Free Exercise Clause Claim

The Free Exercise Clause of the First Amendment provides "Congress shall make no law . . . prohibiting the free exercise [of religion]." U.S. CONST. amend. I. The "RFRA and the Free Exercise Clause create different standards for the protection of religion and . . . RFRA's substantive protections extend far beyond what the Free Exercise Clause requires." Hankins v. Lyght, 441 F.3d 96, 112 (2d Cir. 2006) (Sotomayor, J., dissenting). Although the Hepler plaintiffs set forth sufficient facts to establish a claim for relief under the RFRA, they must still satisfy the pleading standard with respect to the Free Exercise Clause. The Free Exercise Clause

43

of the First Amendment "does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).'" <u>Emp't Div., Dep't of Human Res. of Ore. v. Smith</u>, 494 U.S. 872, 879 (1990) (quoting <u>Lee</u>, 455 U.S. at 263 n.3). The requirements of "[n]eutrality and general applicability are interrelated." <u>Lukumi</u>, 508 U.S. at 531. A law is not neutral if its object "is to infringe upon or restrict practices because of their religious motivation." <u>Id.</u> at 533. Laws are not generally applicable if they selectively "impose burdens only on conduct motivated by religious belief." <u>Id.</u> at 543. If a law is found to be neutral and generally applicable, then it must only withstand rational basis review; otherwise, it must withstand strict scrutiny. <u>Fraternal Order of Police Newark Lodge No. 12 v. City of Newark</u>, 170 F.3d 359, 362 (3d Cir. 1999)

Defendants argue that the Hepler plaintiffs' free exercise claims must fail because the mandate's requirements are neutral and generally applicable. With respect to neutrality, defendants note that the requirements do not, on their face, refer to any religious practice—and that the only mention of religion in the regulations relates to the religious exemption—which they argue reflects an effort to accommodate religion, not target it. (ECF No. 40 at 33-34.) Defendants maintain that the requirement is generally applicable because it does not pursue its purpose "only against conduct motivated by religious belief." (<u>Id.</u> at 33) (citing <u>Lukumi</u>, 508 U.S. at 545.)

The Hepler plaintiffs respond that the requirement is underinclusive in light of the myriad exemptions provided which exempt "191 million" people from the requirement. The Hepler plaintiffs note that the government has "discretion" to broaden the religious exemption to include the Hepler plaintiffs, but has not done so. The Hepler plaintiffs conclude that this failure to

44

exempt them is based upon the "Government's theological notion that employers are only religious if they are churches who stay in their own four walls and focus on self-serving purposes." (ECF No. 51 at 35.)

The Hepler plaintiffs rely on two decisions of the Court of Appeals for the Third Circuit to support their argument. First, in Blackhawk v. Pennsylvania, 381 F.3d 202 (3d Cir. 2004), a Native American who owned black bears sought a religious exemption from the permit fee required by the state. The permit statute allowed exemptions for zoos, nationally recognized circuses, and in cases "'where hardship or extraordinary circumstance warrants,' so long as the waiver is 'consistent with sound game or wildlife management activities.'" Id. at 205 (citing 34 PA. CONS. STAT. § 2091(d)). In addressing the plaintiff's free exercise claim, the court of appeals acknowledged that a law "fails the general applicability requirement if it burdens a category of religiously motivated conduct but exempts or does not reach a substantial category of conduct that is not religiously motivated and that undermines the purposes of the law to at least the same degree as the covered conduct that is religiously motivated." Id. at 209 (citing Lukumi, 508 U.S. at 543-46.) The Blackhawk court found that the "individualized, discretionary" permit requirements in that case contained "secular exemptions that preclude[d] the fee scheme from satisfying the requirement of general applicability." Id. at 213. The scheme in Blackhawk did not include a categorical exemption for religiously-motivated conduct.

In Fraternal Order of Police, the court of appeals determined that a police department policy prohibiting the wearing of beards was unconstitutional where exemptions were granted for officers with special medical needs or undercover assignments, but not for officers whose religion required that they wear a beard. Fraternal Order of Police, 170 F.3d at 367. The court of appeals rejected the notion that only policies involving "individualized exceptions" could be

subject to free exercise attack and noted that "[i]f anything, this concern is only further implicated when the government does not merely create a mechanism for individualized exemptions, but instead, actually creates a **categorical exemption** for individuals with a secular objection but not for individuals with a religious exemption." Id. at 365 (emphasis added). The court found that "the medical exemption raises concern because it indicates that the Department has made a value judgment that secular (i.e., medical) motivations for wearing a beard are important enough to overcome its general interest in uniformity but that religious motivations are not." Id. at 366.

There is little doubt that the mandate's requirements are facially neutral in the sense that they are directed toward benefiting the public health, and are not explicitly targeted at any particular religious conduct. The court's analysis, however, must extend beyond the face of the regulations in question. The Court of Appeals for the Third Circuit has acknowledged that

> the Free Exercise Clause's mandate of neutrality toward religion prohibits government from 'deciding that secular motivations are more important than religious motivations.' . . . Accordingly, in situations where government officials exercise discretion in applying a facially neutral law, so that whether they enforce the law depends on their evaluation of the reasons underlying a violator's conduct, they contravene the neutrality requirement if they exempt some secularly motivated conduct but not comparable religiously motivated conduct.

Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly, 309 F.3d 144, 165-66 (3d Cir. 2002). The process of implementing the objected to requirements has been replete with examples of the government impermissibly exercising its discretion by exempting vast numbers of entities while refusing to extend the religious employer exemption to include entities like SHLC.

The primary example of the "categorical exemption" rejected in Fraternal Order of Police in the present case is the grandfathering provision in the ACA, which exempts as many as 191 million entities from the mandate's requirements. The grandfathering exemption impacts secular

employers to "at least the same degree"—and likely far more—than religious objections from entities like SHLC. Blackhawk, 381 F.3d at 209. The fact that the government saw fit to exempt so many entities and individuals from the mandate's requirements renders their claim of general applicability dubious, at best. Elsewhere in their briefing, defendants respond that the number of grandfathered plans will continue to decrease as time goes on. Even if this comes to fruition (which is not a certainty), the secular exemption for employers with fewer than fifty full-time employees that choose not to provide any insurance coverage remains. 26 U.S.C. § 4980H(c)(2)(A). Taken together, these categorical exemptions for secular entities and individuals raise a concern that the mandate's requirements are not generally applicable.

In addition to the secular exemptions, the government continues to engage in an impermissible "religious gerrymander" by extending exemptions to an increasing number of religiously-affiliated entities. Although the court of appeals in Blackhawk and Fraternal Order of Police was not faced with the situation where, as here, some religious conduct is exempted, the fact that defendants continue to carve out exemptions, see generally 78 Fed. Reg. 8,456, while subjecting SHLC and other similarly-situated close corporate entities to the mandate's requirements, raises a suggestion of "discriminatory intent" against close corporate entities seeking to advance the religious beliefs of their owners. Fraternal Order of Police 170 F.3d at 362. On the present record, this court finds that the Hepler plaintiffs raised plausible claims that the sheer number of exemptions—both secular and religious—to the mandate's requirements burdened their free exercise rights to an extent sufficient to trigger strict scrutiny. The court already analyzed the mandate's requirements under the compelling government interest test in the RFRA context and found that they do not survive strict scrutiny; therefore, for the same

reasons, the First Amendment claim is sufficient, and the motion to dismiss this claim must be denied.

b.      Establishment Clause Claim

The Establishment Clause of the First Amendment provides that "Congress shall make no law respecting an establishment of religion." U.S. CONST. amend. I. The "clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." Larson v. Valente, 456 U.S. 228, 244 (1982). For a challenged statute to be valid under the Establishment Clause it (1) "must have a secular legislative purpose;" (2) "its principal or primary effect must be one that neither advances nor inhibits religion;" and (3) it "must not foster 'an excessive entanglement with religion.'" Lemon v. Kurtzman, 403 U.S. 602, 612-13 (1971) (quoting Walz v. Tax Comm'n of City of N.Y., 397 U.S. 664 (1970)). A law that aids one religion over another or prefers one religion over another is subject to strict scrutiny. Larson, 456 U.S. at 246. The Hepler plaintiffs maintain that the religious employer exemption to the mandate's requirements impermissibly favors certain religious employers over others and fosters excessive entanglement with religion by requiring the government to "explore a religious organization's purpose in impermissible ways." (ECF No. 51 at 36.) Other courts addressing similar arguments have rejected them. O'Brien, 2012 WL 4481208, at *9-10; Grote Indus., 2012 WL 6725905, at *8-9.

The religious employer exemption to the mandate's requirements does not run afoul of the Establishment Clause because it does not make distinctions based upon religious affiliation. Instead, as defendants point out, the "criteria for the exemption focus on the purpose and composition of the organization, not on its sectarian affiliation. The exemption is available on an

equal basis to organizations affiliated with any and all religions." (ECF No. 40 at 35-36.) This kind of regulation has been found acceptable in the Establishment Clause context.

In <u>Walz</u>, the Supreme Court concluded that a religious exemption to property tax requirements did not violate the Establishment Clause because the exemption "has not singled out one particular church or religious group or even churches as such; rather, it has granted exemption to all houses of religious worship within a broad class of property owned by non-profit, quasi-public corporations." <u>Id.</u> at 672-73. Likewise, in <u>Droz v. Commissioner of Internal Revenue Service</u>, 48 F.3d 1120, 1124 (9th Cir. 1995), the Court of Appeals for the Ninth Circuit found that a religious exemption from the requirement that individuals pay Social Security taxes, 26 U.S.C. § 1402(g), withstood an Establishment Clause challenge. The court of appeals concluded that the statute did not facially discriminate among religions, despite the fact that "some individuals receive exemptions, and other individuals with identical beliefs do not." <u>Id.</u> Challenges to a state law similar to the mandate have likewise survived Establishment Clause analysis.[20]

The religious employer exemption to the mandate's requirements does not single out one particular religious denomination or religion. The religious employer exemption at issue in the present case is more akin to the situation in <u>Droz</u>, where even those who share beliefs may be

---

[20] In <u>Catholic Charities of Diocese of Albany v. Serio</u>, 859 N.E. 2d 459, 468-69 (N.Y. 2006), the New York Court of Appeals rejected an Establishment Clause challenge to a state law which contained provisions similar to the mandate. The state law provides that "[e]very contract which provides coverage for prescription drugs shall include coverage for the cost of contraceptive drugs or devices approved by the [FDA]." N.Y. INSURANCE LAW §4303(cc) (McKinney 2012). The same provision includes an exemption for religious employers where: "(i) The inculcation of religious values is the purpose of the entity. (ii) The entity primarily employs persons who share the religious tenets of the entity. (iii) The entity serves primarily persons who share the religious tenets of the entity. (iv) The entity is a nonprofit organization as described [in the Internal Revenue Code]." <u>Id.</u> In addressing the Establishment Clause challenge, the court rejected the plaintiffs' argument "that the legislation is invalid under <u>Larson</u> because it distinguishes between religious organizations that are exempt from the contraception requirements and those that are not." <u>Diocese of Albany</u>, 859 N.E. 2d at 468. The court concluded that "this kind of distinction—not between denominations, but between religious organizations based on the nature of their activities—is not what <u>Larson</u> condemns." <u>Id.</u> at 468-69.

differently impacted. For example, the Hepler plaintiffs likely share beliefs with entities that are exempted from the requirement, but such a situation is not prohibited by the Establishment Clause. Like in <u>Droz</u>, this kind of an impact does not violate the government neutrality requirement of the Establishment Clause.

The crucial distinction between the present case and <u>Larson</u> is that the Minnesota legislators who drafted the income reporting law at issue in that case explicitly sought to exclude a Roman Catholic Archdiocese from the scope of the act, and accordingly drafted the law. <u>Larson</u>, 456 U.S. at 254. Other legislators sought to include those "religious organizations which are soliciting on the street and soliciting by direct mail, but who are not substantial religious institutions in . . . our state." <u>Id.</u> (quoting the transcript from legislative discussions). The Hepler plaintiffs adduce no factual allegations about such an insidious purpose with respect to the religious exemption in the present case. Without such allegations, the religious employer exemption has neither the purpose nor effect of discriminating among religious denominations, and is therefore not the type of "'religious gerrymandering'" sought to be avoided in <u>Larson</u>. <u>Id.</u> at 255 (quoting <u>Gillette v. United States</u>, 401 U.S. 437, 452 (1971)).

With respect to excessive entanglement, the Hepler plaintiffs maintain that the religious employer exemption requires the government to explore impermissibly a religious organization's purpose when determining eligibility for the exemption. In the present case, neither the Hepler Entities nor the Heplers would be subject to governmental exploration insofar as neither SHLC nor WLH is a nonprofit entity, as required by 45 C.F.R. § 147.130(a)(1)(iv)(B)(4) (requiring that an employer be a nonprofit organization as set forth in the Internal Revenue Code at 26 U.S.C. § 6033(a)(1)). Because the Heplers and the Hepler Entities are individuals and for-profit entities, respectively, no further government investigation would be required to determine their

ineligibility for the religious employer exemption. On that basis alone, the Hepler plaintiffs cannot assert that the religious exemption fosters an excessive entanglement with religion.

To the extent that the Hepler plaintiffs present a facial challenge to the religious employer exemption, there is still not the necessary "excessive" entanglement to violate the Establishment Clause. The Supreme Court has stated that "[n]ot all entanglements" violate the Constitution and courts "have always tolerated some level of involvement between the two." Agostini v. Felton, 521 U.S. 203, 233 (1997). "Entanglement must be 'excessive' before it runs afoul of the Establishment Clause." Id. (quoting Bowen v. Kendrick, 487 U.S. 589 at 615-17 (1988)).

In Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos, 483 U.S. 327 (1987), the Supreme Court held that religious employer exemptions do not necessarily violate the Establishment Clause. At issue in Amos was the religious employer exemption to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-1(a). The Court held that "[i]t cannot be seriously contended that [the religious employer exemption] impermissibly entangles church and state; the statute effectuates a more complete separation of the two and . . . easily passes muster under the third part of the Lemon test." Id. at 339.[21]

The religious employer exemption in the present case will likely involve a review of an organization's membership composition and possibly its mission statement. Courts frequently undertake a similar review when determining the applicability of the religious employer exemption under Title VII. Cf. LeBoon, 503 F.3d at 226 (requiring courts to examine, inter alia, an entity's nonprofit status; whether the entity has a religious purpose; whether it includes

---

[21] Likewise in Diocese of Albany, the New York Court of Appeals upheld essentially the same religious employer exemption as in the present case. In Diocese of Albany the court noted that "legislative accommodation to religious believers is a long-standing practice completely consistent with First Amendment principles." 859 N.E. 2d at 469. Accord Forest Hills Early Learning Ctr. v. Grace Baptist Church, 846 F.2d 260, 262-64 (4th Cir. 1988) (upholding a state law granting a licensing exemption to religious day care providers).

religious instruction in its curriculum; and whether its membership includes individuals of the same faith). The risk of entanglement in the present case is not excessive, because the government is not providing anything to the covered organizations. <u>Contra</u> <u>Bowen</u>, 487 U.S. 589 at 616-17 (finding no Establishment Clause violation where government grant program provided funding for adolescent pregnancy and sexuality services at some religiously-affiliated organizations, even though the program required government oversight involving review of program materials and periodic site visits). Instead, the oversight in the present situation requires entities seeking the religious employer exemption to satisfy requirements that are very similar to those seeking exemptions from Title VII. <u>See</u> <u>LeBoon</u>, 503 F.3d 226. Entities seeking an exemption under the proposed rules must self-certify[22] that they meet the requirements as set forth in the regulations. 78 FED. REG. at 8,462. These requirements do not rise to the level of governmental intrusion into the "day-to-day operation" of the exempt organizations. <u>Bowen</u>, 487 U.S. at 616. Consequently, the religious employer exemption does not violate the Establishment Clause, and defendants' motion must be GRANTED with respect to any claim asserted under the Establishment Clause.

c.      <u>Free Speech Clause Claim</u>

---

[22] The regulations define "self-certification" as follows:

> Each organization seeking accommodation under the proposed rules would be required to self-certify that it meets the definition of eligible organization, following a self-certification process similar to that under the temporary enforcement safe harbor. . . . The organization would not be required to submit the self-certification to any of the Departments. The organization would maintain the self-certification (executed by an authorized representative of the organization in its records for each plan year to which the accommodation applies and make the self-certification available for examination upon request so that regulators, issuers, third party administrators, and plan participants and beneficiaries may verify that an organization has qualified for an accommodation, while avoiding any inquiry into the organization's character, mission, or practices.

78 FED. REG. at 8,462.

The Hepler plaintiffs argue that the mandate's requirements compel them to subsidize speech, in the form of education and counseling, "in favor of items to which they object." (ECF No. 51 at 37.) The Hepler plaintiffs do not, however, appear to contend that providing or using the objected to services is a form of expressive conduct, as has been argued in other challenges to the mandate's requirements. See O'Brien, 2012 WL 4481208, at *11 (noting that "plaintiffs argue that the regulations require plaintiffs to subsidize other private individuals' speech and to subsidize 'conduct [that] is inherently expressive'"). Defendants respond that the regulations do not dictate the content of the education or counseling, and therefore the mandate's requirements neither favor nor disfavor the use of the objected to services. (ECF No. 54 at 18.)

The First Amendment prohibits the government from compelling individuals to express views with which they disagree. United States v. United Foods, Inc., 533 U.S. 405, 410 (2001). Likewise, the government may not compel individuals to subsidize speech to which they object. Abood v. Detroit Bd. of Ed., 431 U.S. 209 (1977). Assuming, as the Hepler plaintiffs allege, that their faith requires them to provide health insurance and that they remain subject to the mandate's requirements in choosing to provide health care to their employees, the present case does not rise to the level of compelled speech. The Hepler plaintiffs rely on Abood and United Foods for the proposition that "compelled speech jurisprudence is triggered when the government forces a speaker to fund objectionable speech." (ECF No. 51 at 37.) In Abood, the Supreme Court addressed a challenge to a provision of a public school collective bargaining agreement requiring nonunion teachers to pay service charges equal to the amount of dues paid by union members. 431 U.S. at 212. The union used the service charge to fund "ideological activities unrelated to collective bargaining." Id. at 236. The Supreme Court held that the union could not compel the nonunion individuals to "contribute to the support of an ideological cause

[they] may oppose as a condition of holding a job as a public school teacher." Id. at 234-35. The Supreme Court next addressed compelled speech in the context of commercial speech in United Foods. 533 U.S. at 408. The challenge in that case was to a federal statute that required handlers of fresh mushrooms to pay an assessment to a trade association, which was used generally to fund advertising for the mushroom industry. Id. The Court found that the assessment violated the First Amendment insofar as it compelled the producers to subsidize speech with which they disagreed, even though the payments were not necessary to remain a part of a larger group or organization. Id. at 413-15.

To the extent that the Hepler plaintiffs in the present case are being called upon to fund speech—in the form of education and counseling—the content of that speech is not defined by the mandate's requirements. Unlike in Abood and United Foods, the Hepler plaintiffs did not make factual allegations to show that they are being forced to "pay special subsidies for speech on the side that [the government] favors." United Foods, 533 U.S. at 411. The funded speech in Abood and United Foods was directed at supporting a particular viewpoint. In Abood, teachers were forced to fund union political speech espousing ideological views that the plaintiffs did not support. Abood, 431 U.S. at 236. In United Foods, the plaintiffs funded general advertising with which they did not agree. United Foods, 533 U.S. at 413. Despite the Hepler plaintiffs' contention that the mandate requires them to fund speech "in favor of items to which they object," (ECF No. 51 at 37), the Hepler plaintiffs made no factual allegations indicating that the "unscripted conversation between a doctor and a patient" will advocate either for or against the provision of contraceptives. O'Brien, 2012 WL 4481208, at *12.

In the present case, the Hepler plaintiffs remain free to express their views about the objected to services, to refrain from using them, and to encourage others to follow suit. The

mandate's requirements have no impact on their speech. To the extent that the discussions between doctors and patients include discussions about the objected to services, those conversations are incidental to the doctor/patient relationship. The Hepler plaintiffs remain free to advocate for their religious beliefs. The Hepler plaintiffs' free speech claims must be dismissed.

### 3. The Hepler Plaintiffs' Fifth Amendment Due Process Claim

The Due Process Clause of the Fifth Amendment provides: "No person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. CONST. amend. V. The Hepler plaintiffs claim that the mandate's requirements are unconstitutionally vague under the Due Process Clause of the Fifth Amendment because they "create[] a standardless, blank check for Defendants to discriminatorily select whatever they want to call 'religious' and offer or withhold whatever accommodation they choose." (ECF No. 51 at 37.) A law is unconstitutionally vague when it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." United States v. Williams, 553 U.S. 285, 304 (2008). Courts have held that "'perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity.'" Holder v. Humanitarian Law Project, 130 S. Ct. 2705, 2719 (2010) (quoting Williams, 553 U.S. at 304). Due process analysis is further relaxed in cases where, as here, a challenged statute imposes civil rather than criminal penalties. Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 498-99 (1982).

Despite the Hepler plaintiffs' contentions, the amended complaint makes clear that they have a sophisticated understanding of how the mandate will impact SHLC's health plan. E.g. (ECF No. 32 ¶¶ 97, 100, 116, 130, 143, 176.) This understanding belies the Hepler plaintiffs'

allegation that the mandate is vague as applied to their situation. Parker v. Levy, 417 U.S. 733, 756 (1974) ("One to whose conduct a statute clearly applies may not successfully challenge it for vagueness"); U.S. Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers AFL-CIO, 413 U.S. 548, 579 (1973) ("Surely, there seemed to be little question in the minds of the plaintiffs who brought this lawsuit as to the meaning of the law, or as to whether or not the conduct in which they desire to engage was or was not prohibited by the Act."). Based upon the Hepler plaintiffs' understanding of the mandate's requirements and how they will impact SHLC's health plan, it can hardly be contended that those requirements do not provide "fair notice" of prohibited conduct. Williams, 553 U.S. at 304. While the Hepler plaintiffs may disagree with what is required under the mandate, there does not seem to be a sufficient basis for the due process claim.

The Hepler plaintiffs attack the standards by which the mandate's requirements are applied, calling them a "blank check" for defendants to decide who is religious or not. The Hepler plaintiffs' argument appears to be that Congress exceeded its authority to delegate legislative power with respect to defining who is religious. The Hepler plaintiffs, however, cite no court decisions to support their argument that Congress exceeded its authority by delegating to HRSA the authority to define and implement the directives of 42 U.S.C. § 300gg-13. The Supreme Court has acknowledged that "Congress simply cannot do its job absent an ability to delegate power **under broad general directives**." Mistretta v. United States, 488 U.S. 361, 371-73 (1989) (emphasis added) (upholding the constitutionality Congress's delegation of authority "to promulgate sentencing guidelines for every federal criminal offense to an independent Sentencing Commission"). When delegating legislative authority, Congress must simply set forth an "'intelligible principle'" to which the regulating body must conform. Id. at 372. In the present

case, the ACA makes clear the specific recommendations which are to be implemented as part of the rulemaking process. In 42 U.S.C. § 300gg-13(a)(4), Congress made a valid delegation of authority by identifying the kinds of items to be covered, and directing defendants to develop guidelines and regulations necessary to carry out that directive. Certainly this qualifies as a "broad general directive" permitted under Mistretta. The Hepler plaintiffs' argument to the contrary amounts to little more than legal conclusions that are not sufficient to survive a motion to dismiss.

### 4. The Hepler Plaintiffs' APA Claims

The Hepler plaintiffs' final claims allege several violations of the APA. First, the Hepler plaintiffs allege that defendants took administrative action in violation of the notice and comment requirements; second, they allege that defendants' actions were arbitrary and capricious under the APA; and third, they maintain that the mandate's requirements violate existing law. (ECF No. 32 ¶¶ 288-299.) Section 706 of the APA provides:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—
> . . .
> (2) hold unlawful and set aside agency action, findings and conclusions found to be—
> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
> . . .
> (D) without observance of procedure required by law[.]

5 U.S.C. § 706(2)(A), (D). The rulemaking provisions of the APA require that agencies provide notice of a proposed rule, invite and consider public comments, and adopt a final rule that includes a statement of basis and purpose. 5 U.S.C. § 553(b), (c).

### a. Notice and Comment Requirements

Defendants maintain that the issuance of the challenged regulations was procedurally proper, and support their argument by maintaining that defendants sought comments on the second interim final regulations, 76 FED. REG. 46,621, based upon express statutory authority. Defendants point out that they "carefully consider[ed] thousands of comments" before they adopted the final regulations with the safe harbor provision and that they allowed for further amendment to accommodate religious objections. (ECF No. 40 at 41) (citing 77 FED. REG. at 8,726-27). In the alternative, defendants assert that even if they did not properly administer the notice and comment requirements, they showed good cause sufficient to overcome those requirements.

The Hepler plaintiffs counter by arguing that defendants never actually considered the objections, thus violating the requirements of 5 U.S.C. §§ 553 (b) and (c). The Hepler plaintiffs identify several facts which allegedly show that defendants did not adequately consider the objections submitted during the notice and comment period. The Hepler plaintiffs point to the ACA requirement of a one-year delay before the mandate's requirements take effect, and that defendants published the provisions as interim final rules on August 1, 2011, one year before "[m]any college student policy years begin." (ECF No. 51 at 40) (citing 76 FED. REG. at 46,624). Therefore, the Hepler plaintiffs allege that defendants had no intention of considering the objections, since defendants sought to have final regulations in place in time for the 2012-2013 school year. (Id.) (citing 76 FED. REG. at 46,624). The Hepler plaintiffs argue that defendants were forced to issue the ANPRM in 2012 based upon the comments that they allegedly ignored prior to finalizing the rules in August 2011. (Id.)

Courts have held that statutory authorization can permit an agency to circumvent the normal APA notice and comment requirements.[23] Methodist Hosp. of Sacramento v. Shalala, 38 F.3d 1225, 1237 (D.C. Cir. 1994). In a case where the statute authorizing administrative action allowed an agency to "'promulgate interim final regulations to implement'" the regulations in question, the court found that kind of permissive language is not sufficient, on its own, to supersede the notice and comment requirements. See Coalition for Parity, Inc. v. Sebelius, 709 F. Supp. 2d 10, 19 (D. D.C. 2010) (declining to rely solely on statutory authorization and engaging in a good cause analysis). Another court interpreted that language as giving the agency discretion to issue an interim rule without a notice and comment period. Nat'l Women, Infants, and Children Grocers Ass'n v. Food and Nutrition Serv., 416 F. Supp. 2d 92, 105 (D.D.C. 2006) (quoting 42 U.S.C. § 1758).

In National Women, however, the court looked at the statutory language in the context of the agency's argument that it bypassed the notice and comment requirements for good cause. Nat'l Women, 416 F. Supp. 2d at 105-08 (finding good cause after considering the agency's four proffered reasons for its action: (1) the statutory language of 42 U.S.C. § 1758 permitting the agency to promulgate interim final rules; (2) Congressionally-imposed deadlines on the agency to implement a complex regulation; (3) the agency's compelling need to provide guidance to states that would otherwise have had to comply with the statute without that guidance; and (4) the challenged rule was an interim rule). Addressing the defendant's good cause argument at the summary judgment stage, the court in National Women acknowledged that "'good cause inquiry

---

[23] The APA acknowledges that Congress may modify the notice and comment requirements, but it provides that a "[s]ubsequent statute may not be held to supersede or modify this subchapter . . . except to the extent that it does so expressly."). 5 U.S.C. § 559. Therefore, the APA only allows for express congressional modifications. There were no express congressional modifications implicated in this case.

is inevitably fact- or context-dependent.'" Id. at 104-05 (quoting Mid-Tex Elec. Coop., Inc. v. Fed. Energy Regulatory Comm'n, 822 F.2d 1123, 1132 (D.C. Cir. 1987)).

Defendants argue that they established good cause in the present situation because statements in the Federal Register indicate that the public interest benefits by having final regulations in place for the start of the 2012-2013 school year, since many college health plans begin in August. 76 FED. REG. at 46,624. Defendants argue that the rules issued in August 2011 were merely interim final rules, and explicitly allow for further comment. Id. Although these factors could weigh in favor of a good cause finding, they may not rise to the level of good cause as set forth in National Women. Specifically, defendants' rationale as set forth in the Federal Register did not indicate that Congress imposed a stringent deadline or indicate that the rules were necessary to provide much-needed guidance to other entities. At this stage in the proceedings, it is not appropriate for the court to weigh the parties' arguments with respect to a showing of good cause without further development of the factual record. The Hepler plaintiffs set forth sufficient factual allegations to support a plausible claim that the notice and comment requirements of the APA were violated, and that claim will survive the motion to dismiss.

b.     Arbitrary or Capricious

The APA allows courts to set aside agency action that is found to be arbitrary or capricious. Fed. Commc'n Comm'n v. Fox Television Stations, Inc., 556 U.S. 502, 513 (2009). An agency action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto Ins. Co., 463 U.S. 29, 44

(1983). A court's review of agency action is "narrow;" it may "'not substitute its judgment for that of the agency,'" and it "should 'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.'" Id. at 513-14 (quoting Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 286 (1974)). The same deferential review applies even in cases where an agency has reversed course. Id. at 514. When promulgating regulations, an agency must "examine the relevant data and articulate a satisfactory explanation for its action." Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43. The Court of Appeals for the Third Circuit has noted that "[f]ailure of the agency to address an important aspect of the issue under consideration may be fatal to its conclusion." Shane Meat Co., Inc. v. United States Dep't of Defense, 800 F.2d 334, 336 (3d Cir. 1986). The burden of proving that an agency action is arbitrary or capricious falls upon the party challenging the action. McKinley v. United States, 828 F. Supp. 888, 892 (D. N.M. 1993) (citing Park Cnty. Res. Council v. United States Dept. of Agric., 817 F.2d 609 (10th Cir. 1987)).

The Hepler plaintiffs argue that defendants failed to consider comments expressing potential First Amendment and RFRA problems with the religious employer exemption and failed to explain the reason for doing so. In the amended complaint, the Hepler plaintiffs allege that defendants' "issuance of the Mandate was arbitrary and capricious within the meaning of 5 U.S.C. § 706(2)(A) because the Mandate fails to consider the full extent of its implications and it does not take into consideration the evidence against it." (ECF No. 32 ¶ 294.) The Hepler plaintiffs, however, provide no factual allegations to support their conclusions, and they carry the burden on this claim. McKinley, 828 F. Supp. 822. On this basis alone, the Hepler plaintiffs failed to state a claim sufficient to survive defendants' motion to dismiss.

Even if the Hepler plaintiffs' arbitrary and capricious challenge to the regulations at issue was allowed to proceed, statements in the Federal Register providing defendants' rationale for the religious exemption contradict their argument.[24] Specifically, defendants point to the statements that they "carefully considered whether to eliminate the religious employer exemption or to adopt an alternative definition of religious employer, including whether the exemption should be extended to a broader set of religiously-affiliated sponsors of group health plans and group insurance coverage." 77 FED. REG. at 8,727. Defendants enacted the temporary enforcement safe harbor in response to those comments, providing extra time for further rulemaking. Id. Defendants noted that a broader exemption "would lead to more employees having to pay out of pocket for contraceptive services, thus making it less likely that they would use contraceptives," and undermining the purposes articulated in the second interim final regulations. Id. at 8,728. Those purposes in the second interim final regulations included the need to "reasonably balance the extension of any coverage of contraceptive services . . . to as many women as possible, while respecting the unique relationship between certain religious employers and their employees in certain religious positions." 76 FED. REG. at 46,623.

It is noteworthy that defendants broadened the scope of employers that may seek an exemption from the mandate's requirements. Defendants maintain that the expanded religious employer definition in the proposed rules "is intended to allow health coverage established or maintained or arranged by nonprofit religious organizations, including nonprofit religious institutional health care providers, educational institutions, and charities, with religious objections to contraceptive coverage to qualify for an accommodation." 78 FED. REG. at 8,462.

---

[24] The statements made by defendants and published in the Federal Register are subject to judicial notice. Pennsylvania v. Lockheed Martin Corp., 684 F. Supp. 2d 564, 567 n.2 (M.D. Pa. 2010) (citing 44 U.S.C. § 1507 ("[t]he contents of the Federal Register shall be judicially noticed . . .")).

Ongoing proposed changes to the regulations reflect that defendants considered public comment and are attempting to accommodate certain comments within the context of achieving the stated overall goal of the requirements. While defendants changed course and expanded the number of exempt employers, that conduct does not reduce the deference afforded those changes. Fox Television Stations, 556 U.S. at 514. The February 2013 proposed rules illustrate the defendants' consideration of objections. Under those circumstances, defendants' path "may reasonably be discerned" Id. at 513-14.

In connection with the second interim final regulations defendants point to the following statements contained in the Federal Register to show they considered conscience protections under the First Amendment and the RFRA:

> Nothing in these final regulations precludes employers or others from expressing their opposition, if any, to the use of contraceptives, requires anyone to use contraceptives, or requires health care providers to prescribe contraceptives is against their religious beliefs. These final regulations do not undermine the important protections that exist under conscience clauses and other religious exemptions in other areas of Federal law. Conscience protections will continue to be respected and strongly enforced.

77 FED. REG. at 8,729. Defendants, however, acknowledged with respect to the proposed rules that the concerns of for-profit entities will not be considered:

> [Defendants] do not propose that the definition of eligible organization extend to for-profit secular employers. Religious accommodations in related areas of federal law, such as the exemption for religious organizations under Title VII of the Civil Rights Act of 1964, are available to nonprofit religious organizations but not to for-profit secular organizations.

78 FED. REG. at 8,462. Defendants' rationale for not permitting a for-profit entity to be an eligible organization does not, of course, comport with the court's conclusions set forth in this opinion. This court cannot, however, substitute its judgment for that of the rulemaking agency when reviewing a claim under the arbitrary and capricious standard. Fox Television Stations, 556

U.S. at 513. While the court may disagree with the conclusion that for-profit entities can never raise conscience issues under the RFRA and the First Amendment, that disagreement is not a sufficient basis upon which to set aside the rules under the APA. To the extent, therefore, that the Hepler plaintiffs failed to carry their burden of pleading sufficient facts to survive defendants' motion to dismiss with respect to their arbitrary and capricious claim, that claim must be dismissed.[25]

c.    <u>Contrary to Law</u>

The Hepler plaintiffs allege that the mandate's requirements violate several provisions of existing law, specifically: (1) the ACA's ban on providing abortion services, which is set forth in § 1303(b)(1)(A) of the ACA (42 U.S.C. §§ 18023(b)(1)(A)(i) and (ii)); (2) the Weldon Amendment to the Consolidated Appropriations Act of 2012, P.L. 112-74, §§ 506, 507, 125 Stat. 786, 1111 (Dec. 23, 2011)[26] (providing that federal agencies may not discriminate against an institutional or individual health care entity if that entity "does not provide, pay for, provide coverage of, or refer for abortions"); and (3) the Church Amendment to the ACA, 42 U.S.C. § 300a-7(d) (providing an exemption from any program administered by HHS for any individual who believes that participation in such a program would violate his or her religious beliefs or moral convictions). (ECF No. 32 ¶¶ 296-99.) Since the mandate requires health plans to cover emergency contraception, the Hepler plaintiffs contend that the mandate, in essence, requires coverage of abortions in violation of the above laws.

---

[25] Because review under the APA's arbitrary and capricious standard is necessarily fact-intensive, dismissal of the Hepler plaintiffs' arbitrary and capricious claim is without prejudice to its reassertion if the factual record is developed with respect to that claim. See Shane Meat, 800 F.2d at 336 (emphasizing that arbitrary and capricious analysis requires the court to find "a rational connection between the facts found and the decision made").

[26] The amended complaint actually cites to an earlier version of the Weldon Amendment. Consolidated Security, Disaster Assistance, and Continuing Appropriations Act of 2009, P.L. 110-329, 122 Stat. 3574 (Sept. 30, 2008). The cited-to section, however, does not contain the quoted language, but the Hepler plaintiffs' briefing refers to the 2012 version of the statute, which does contain the quoted language. Therefore, the court will rely upon the current version of the statute.

Defendants respond that the Hepler plaintiffs lack prudential standing under the APA to challenge § 1303(b)(1) of the ACA, because they do not fall within the "zone of interests" to be protected by the statute. (ECF No. 40 at 42) (citing <u>Ass'n of Data Processing Serv. Orgs., Inc. v. Camp</u>, 397 U.S. 150, 153 (1970)). Section 1303(b)(1) of the ACA provides:

> Notwithstanding any other provision of this title . . . (i) nothing in this title . . . shall be construed to require a qualified health plan to provide coverage of [abortion services] as part of its essential health benefits for any plan year; and (ii) . . . the issuer of a qualified health plan shall determine whether or not the plan provides coverage of [abortion services] as part of such benefits for the plan year.

42 U.S.C. § 18023(b)(1)(A).

Defendants point out that § 1303(b)(1) applies to health insurance issuers[27] that offer qualified health plans,[28] as those terms are defined in the ACA. The Hepler plaintiffs cannot allege that they are a health insurance issuer, insofar as they are engaged in the business of selling lumber products, not insurance. 42 U.S.C. § 300gg-91(b)(2). The Hepler plaintiffs are also not eligible to purchase health insurance coverage under a qualified plan through an Exchange,[29] since qualified plans will not be available until January 1, 2014. 42 U.S.C. § 18031(b)(1). Because § 1303(b)(1) does not apply to either the Hepler plaintiffs (as they are not an insurance issuer) or to SHLC's

---

[27] A health insurance issuer "means an insurance company, insurance service, or insurance organization . . . which is licensed to engage in the business of insurance in a State . . . Such term does not include a group health plan." 42 U.S.C. § 300gg-91(b)(2).

[28] A "qualified health plan" is defined at 42 U.S.C. § 18021(a)(1), and includes health plans that, among other requirements, has been certified by the health insurance exchange "through which such plan is offered," and is offered by a licensed health insurance issuer. 42 U.S.C. § 18021(a)(1)(A), (C). Health insurance exchanges are defined at 42 U.S.C. § 18031, which provides that each state shall create a health insurance exchange no later than January 1, 2014, which: "(A) facilitates the purchase of qualified health plans; (B) provides for the establishment of a Small Business Health Options Program . . . that is designed to assist qualified employers in the State who are small employers in facilitating the enrollment of their employees in qualified health plans offered in the small group market . . ." 42 U.S.C. § 18031. A qualified employer in this context is defined as "a small employer that elects to make all full-time employees of such employer eligible for 1 or more qualified health plans offered in the small group market through an Exchange that offers qualified health plans." 42 U.S.C. § 18032(f)(2)(A). Finally, a "small employer" is defined as "an employer who employed an average of at least 1 but not more than 100 employees on business days during the preceding calendar year and who employs at least 1 employee on the first day of the plan year." 42 U.S.C. § 18024(b)(2).

[29] <u>See</u> footnote 28.

employee health insurance plan (which is not a qualified plan obtained through an Exchange), they lack standing to challenge its alleged violation.

Although the Hepler plaintiffs currently lack standing to challenge § 1303(b)(1), they could potentially fall within the zone of interests intended to be protected by that statute at some point in the future. As an employer with fewer than 100 employees, SHLC is a "small employer" potentially eligible to purchase health insurance through an exchange beginning in January 2014. 42 U.S.C. § 18024(b)(2). In the event that SHLC chooses to purchase its health insurance through an exchange, and if that qualified plan provides coverage for the objected to services, SHLC could potentially have the requisite standing at that time. At this stage, however, the Hepler plaintiffs did not indicate that they intend to take any of the above actions. Because the Hepler plaintiffs lack standing at this time to argue that the mandate is contrary to law as violating § 1303(b)(1) of the ACA, the claim will be dismissed without prejudice.

The Hepler plaintiffs' argument with respect to the Weldon Amendment fails to state a claim for which relief can be granted. The Weldon Amendment provides:

> None of the funds made available in this Act may be made available to a Federal agency or program, or to a State or local government, if such agency, program, or government subjects any institutional or individual health care entity to discrimination on the basis that the health care entity does not provide, pay for, provide coverage of, or refer for abortions.

Weldon Amendment, § 507(d)(1). The Hepler plaintiffs' Weldon Amendment claim must fail because they do not point to a definition of abortion that would be applicable to that statute.

The Hepler plaintiffs allege that the objected to services constitute abortion, as that term is defined by their religious beliefs. (ECF No. 32 ¶¶ 105-08, 242, 254.) Statutory terms, however, are to be construed as a matter of law. Gov't Employees Ins. Co. v. Benton, 859 F.2d 1147, 1149 (3d Cir. 1988) (statutory construction is a question of law when defining terms). Plaintiffs do not

provide any legal definition of "abortion," but rest on their allegation that some of the contraceptive products cause abortions. Defendants, on the other hand, point to regulations in the context of Title X, 42 U.S.C. § 300a-6, which do not include emergency contraception in the definition of abortion (Title X grantees are not permitted to use abortion as a family planning tool, but may use emergency contraception). See Health and Human Services, Office of Population Affairs Memorandum, available at http://www.hhs.gov/opa/title-x-family-planning/initiatives-and-resources/documents-and-tools/opa-97-02.html (noting that "Title X grantees should consider the availability of emergency contraception the same as any other method which has been established as safe and effective") (last visited Feb. 28, 2013). The Hepler plaintiffs did not identify any legal basis for finding that a statutory definition of abortion must include emergency contraceptives. Therefore, the court concludes that the claim based upon the Weldon Amendment is not sufficient to survive a motion to dismiss.

The Church Amendment, which is included in Title 42, Subchapter VIII, relates to "Population Research and Voluntary Family Planning Programs" administered by HHS. It provides:

> No individual shall be required to perform or assist in the performance of any part of a health service program or research activity funded in whole or in part under a program administered by the Secretary of [HHS] if his performance or assistance in the performance of such part of such program or activity would be contrary to his religious beliefs or moral convictions.

42 U.S.C. § 300a-7(d). The Church Amendment is part of a larger statutory scheme that gives authority to the HHS Secretary to "make grants and to enter into contracts with public or nonprofit private entities to assist in the establishment and operation of voluntary family planning projects which shall offer a broad range of acceptable and effective family planning methods and services." 42 U.S.C. § 300(a).

The Hepler Plaintiffs present no legal authority supporting their claim that they are "required to perform or assist in the performance" of a "health service program" covered by the statute. 42 U.S.C. § 300a-7(d). As an initial matter, only the individual Heplers are potentially covered by the Church Amendment, since it explicitly applies to individuals. The amended complaint, on the other hand, alleges that SHLC purchases its employee health insurance coverage "from a company in the health insurance market," not from HHS or an HHS-administered health service program. (ECF No. 32 ¶ 96.) The Hepler plaintiffs do not indicate how their purchase of health insurance is related to grant funding for "voluntary family planning projects." 42 U.S.C. § 300a-7(d). Without a showing of this connection between their actions and the projects and services subject to the Church Amendment, the Hepler plaintiffs lack standing to advance their claim that the mandate violates the Church Amendment. Ass'n of Data Processing Serv. Orgs., 397 U.S. at 153. The claim based upon a violation of the Church Amendment must therefore be dismissed.

## VI. CONCLUSION

For the above-stated reasons, the court concludes that defendants' motion to dismiss will be granted in part and denied in part. With respect to Geneva, the court finds that its claims are not ripe at this time, and therefore dismisses counts I through VI without prejudice. With respect to WLH, the court finds that Hepler has standing to assert WLH's claims and that WLH, which is not a separate entity, must be dismissed as a named plaintiff. With respect to Hepler, Kolesar and SHLC, the court finds that defendants' motion to dismiss is denied with respect to the RFRA claim (count VII); the Free Exercise Clause claim (count VIII); and the notice and comment claim under the APA (count XII (in part). Defendants' motion to dismiss is granted without prejudice with respect to the Establishment Clause claim (count IX); the Free Speech Clause

68

claim (count X); and the arbitrary and capricious and contrary to law claims under the APA (count XII (in part)); and is granted with prejudice (because further amendment would be futile) with respect to the Fifth Amendment Due Process Clause claim (count XI). An appropriate order follows.

## ORDER

AND NOW, this 6th day of March, 2013, for the reasons set forth above, it is HEREBY ORDERED that defendants' motion to dismiss (ECF No. 39) is GRANTED IN PART as follows:

- The claims set forth in counts I through VI are dismissed without prejudice;

- WLH is dismissed as a named plaintiff;

- The claims set forth in count IX and count X are dismissed without prejudice;

- The arbitrary and capricious and contrary to law claims set forth in count XII are dismissed without prejudice; and

- The claim set forth in count XI is dismissed with prejudice.

In all other respects the motion to dismiss is DENIED.

BY THE COURT:

/s/ Joy Flowers Conti
Joy Flowers Conti
United States District Judge