# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| GENEVA COLLEGE; WAYNE L. HEPLER; THE SENECA HARDWOOD LUMBER COMPANY, INC., a Pennsylvania Corporation; WLH ENTERPRISES, a Pennsylvania Sole Proprietorship of Wayne L. Hepler; and CARRIE E. KOLESAR | ) ) ) ) ) ) ) |
| Plaintiff, | ) ) ) ) |
| v. | ) Case No. 2:12-cv-00207 ) |
| KATHLEEN SEBELIUS *in her official capacity as Secretary of the United States Department of Health and Human Services*, HILDA SOLIS *in her official capacity as Secretary of the United States Department of Labor,* TIMOTHY GEITHNER *in his official capacity as Secretary of the United States Department of the Treasury,* UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, UNITED STATES DEPARTMENT OF LABOR, UNITED STATES DEPARTMENT OF THE TREASURY | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

**CONTI, District Judge**

Pending before the court is a Motion for Preliminary Injunction (ECF No. 75), and brief in support, (ECF No. 76), filed by plaintiffs Wayne L. Hepler ("Hepler") (individually and on behalf of WLH Enterprises ("WLH")), Carrie E. Kolesar ("Kolesar"), and Seneca Hardwood Lumber Company, Inc. ("SLHC"), (collectively, "plaintiffs"), and the response in opposition, (ECF No. 78), filed by defendants Kathleen Sebelius, Hilda Solis, Timothy Geithner, the United

States Department of Health and Human Services ("HHS"), the United States Department of Labor, and the United States Department of the Treasury (collectively, "defendants").

Plaintiffs seek an order protecting them from complying with the requirement that they include coverage for certain services as part of the health insurance that they provide to themselves, their employees, and their families in the plan year that begins on July 1, 2013. Plaintiffs object to the requirement in the new health care law mandating that they provide coverage for abortifacient products and contraceptives such as ella, Plan B, and intrauterine devices ("IUDs"), as well as sterilization procedures and patient education and counseling for women of reproductive capacity (the "objected to services"). For purposes of the present motion, plaintiffs argue that the law requiring them to provide the objected to services, 42 U.S.C. § 300gg-13(a)(4) (referred to generally as the "mandate"), violates the Religious Freedom Restoration Act of 1993, 42 U.S.C. § 2000bb-1 (the "RFRA"), and the Free Exercise Clause of the First Amendment.

On March 6, 2013, the court issued a Memorandum Opinion and Order (ECF No. 74), in which it granted in part and denied in part defendants' motion to dismiss plaintiffs' amended complaint. In pertinent part, the court granted the motion to dismiss with respect to plaintiff Geneva College and denied the motion to dismiss with respect to, among other claims, plaintiffs' claims pursuant to the RFRA and the Free Exercise Clause. The parties advised the court that they wish to proceed on the submissions that were filed, and agreed to forego a preliminary injunction hearing. To that end, the matter is ripe for disposition, and the court makes the following findings of fact and conclusions of law.

## I.     FINDINGS OF FACT[1]

---

[1] The findings of fact contained herein are all derived from the allegations in the first amended complaint (ECF No. 32), which plaintiff Wayne L. Hepler (ECF No. 76-1) and plaintiff Carrie E. Kolesar (ECF No. 76-2), aver  in

Hepler and his family (which includes Kolesar) (collectively the "Heplers"), are practicing Catholics who strive to follow Catholic beliefs and teachings in all areas of their lives, including the operation of their businesses. (ECF No. 32 ¶¶ 75-77.) The Heplers have pursued this goal by building a chapel on their business premises, displaying religious imagery in their business, making charitable donations to Catholic causes, and providing health insurance to their families and Catholic employees consistent with their beliefs. (Id. ¶¶ 82-85.) The Heplers participate extensively in both Catholic and pro-life activities. (Id. ¶¶ 86-88.) Hepler and his thirteen children are committed to the Catholic church's teachings on human life and sexuality, including the church's position against abortifacients, contraceptives, and sterilization. (Id. ¶ 88.)

SHLC is owned and directed by Hepler, Kolesar, and Kolesar's six adult siblings. (Id. ¶ 89.) Hepler owns a 58% share of SHLC and Kolesar and her six adult siblings each own a 6% share. (Id.) SHLC has twenty-two full-time employees, nineteen of whom (including Hepler and Kolesar's husband) are covered by the company's health insurance plan. (Id. ¶ 90.) Hepler also owns and operates a sawmill as the sole proprietorship WLH, which has six full-time employees, five of whom are covered under SHLC's health insurance plan. (Id. ¶ 91.)

The Heplers' sincerely held religious beliefs prohibit them from intentionally participating in, paying for, facilitating, or otherwise supporting the use of abortifacient drugs, contraception, sterilization, and related education and counseling through the health insurance coverage that SHLC provides their families and employees. (Id. ¶¶ 77-82.) The SHLC health insurance plan is currently in its July 2012 plan year, and will begin its next plan year on July 1,

---

separate affidavits are true and correct with respect to Hepler and Kolesar (and their respective families), SHLC, and WLH. Defendants did not respond to, contest, or challenge the affidavits which assert that the factual allegations set forth in the first amended complaint are true and correct. The court, therefore, accepts those affidavits as true for the purposes of the present motion. See Williams v. Curtiss-Wright Corp., 681 F.2d 161, 163 (3d Cir. 1982) (noting that "[i]t has long been recognized that a preliminary injunction may issue on the basis of affidavits and other written evidence, without a hearing, if the evidence submitted by both sides does not leave unresolved any relevant factual issue").

2013. (Id. ¶ 98.) SHLC's health insurance plan does not have grandfathered status.[2] (Id. ¶ 97.)

Pursuant to the Heplers' stated beliefs, SHLC's health insurance plan currently does not cover

abortifacients, contraceptives and sterilization, and has not done so for several years. (Id. ¶¶ 94-

99.) Plaintiffs object to defendants' requirement that SHLC's nongrandfathered health plan

provide coverage for the objected to services because it will force them to purchase a health plan

that offers coverage for those services beginning in July 2013. (Id. ¶ 100.)

Plaintiffs must begin arranging and contracting for their 2013-2014 health insurance plan

prior to the beginning of the plan year on July 1, 2013. (Id. ¶ 98)

## II.     CONCLUSIONS OF LAW

### A.      The Relevant Statutes and Regulations Concerning the Objected to Services

#### 1.      The Patient Protection and Affordable Care Act of 2010

On March 23, 2010, the Patient Protection and Affordable Care Act of 2010, Pub. L. No.

111-148, 124 Stat. 119 (Mar. 23, 2010) ("ACA") became law and an overhaul of the nation's

healthcare system began.  Section 1001 of the ACA includes specific measures related to

preventive care for women, and provides in part:

(a) In general

A group health plan and a health insurance issuer offering group or individual
health insurance coverage shall, at a minimum provide coverage for and shall not
impose any cost sharing requirements for—

* * *

(4) with respect to women, such additional preventive care and screenings
not described in paragraph (1) as provided for in comprehensive
guidelines supported by the Health Resources and Services Administration
["HRSA"] for purposes of this paragraph.

---

[2] Grandfathered status is defined in 45 C.F.R. § 147.140; 26 C.F.R. § 54.9815-1251T; and 29 C.F.R. § 2590.715-
1251, and provides that such plans do not have to provide coverage without cost sharing of "preventive health
services," which includes "[a]ll Food and Drug Administration approved contraceptive methods, sterilization
procedures, and patient education and counseling for all women with reproductive capacity." (ECF No. 32 ¶ 53.)

42 U.S.C. § 300gg-13 (the "preventive care provision"). Because the ACA did not specifically identify which preventive care services would have to be provided without cost sharing, further rulemaking was necessary.

## 2. Preventive Care Services and Interim Final Regulations

On July 19, 2010, defendants (the Departments of Health and Human Services, Labor, and Treasury) issued interim final regulations implementing the preventive care provision. Interim Final Rules for Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the ACA, (the "first interim final regulations"), 75 FED. REG. 41,726 (Jul. 19, 2010). The first interim final regulations require all group health plans and health insurance issuers offering nongrandfathered[3] group or individual health coverage to cover, without cost sharing, the preventive care services outlined in 42 U.S.C. § 300gg-13. Id. at 41,728. The first interim final regulations directed the Department of Health and Human Services, in conjunction with the Institute of Medicine ("IOM"), to determine what preventive services are necessary and beneficial for women's health and well-being. Id. The IOM was to report its findings to the Health Resources and Services Administration ("HRSA"), which was to issue the necessary guidelines. The report issued by the IOM[4] on July 19, 2011, recommended that the HRSA guidelines include, *inter alia*: "[t]he full range of Food and Drug Administration [("FDA")]-approved contraceptive methods, sterilization procedures, and patient education and counseling for women with reproductive capacity." IOM Report at 10. FDA-approved

---

[3] The preventive services provisions do not apply to health plans that are grandfathered. A plan is grandfathered if: (1) at least one person was enrolled on March 23, 2010; (2) the plan continuously covered at least one individual since that date; (3) the plan provides annual notice of its grandfathered status; and (4) the plan has not been subject to significant changes as outlined in the regulations. See 42 U.S.C. § 18011; 26 C.F.R. §§54.9815-1251T(a), (g); 29 C.F.R. §§ 2590.715-1251(a), (g); 45 C.F.R. §§ 147.140(a), (g).

[4] INST. OF MED., CLINICAL PREVENTIVE SERVICES FOR WOMEN: CLOSING THE GAPS, available at http://www.iom.edu/Reports/2011/Clinical-Preventive-Services-for-Women-Closing-the-Gaps.aspx (Last visited Apr. 17, 2013) ("IOM Report").

contraceptive methods include the objected to services, such as the drugs ella and Plan B, as well as IUDs.

### 3. HRSA Guidelines

On August 1, 2011, HRSA adopted guidelines pursuant to the IOM recommendations[5] and on August 3, 2011, again issued interim final regulations (the "second interim final regulations"). Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the ACA, 76 FED. REG. 46,621 (Aug. 3, 2011). The second interim final regulations carve out an exemption allowing certain religious employers to avoid providing insurance coverage for the objected to services. 76 FED. REG. at 46,626 (codified at 45 C.F.R. § 147.130(a)(1)(iv)(B)). The exemption defines religious organizations as those employers that meet the following criteria:

(1) The inculcation of religious values is the purpose of the organization;

(2) The organization primarily employs persons who share the religious tenets of the organization;

(3) The organization serves primarily persons who share the religious tenets of the organization;

(4) The organization is a nonprofit organization as described in section 6033(a)(1) and section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code of 1986, as amended.

The sections of the Internal Revenue Code cited in subsection (4) define nonprofit organizations as "churches, their integrated auxiliaries, and conventions or associations of churches," and "the exclusively religious activities of any religious order" that are exempt from taxation pursuant to 26 U.S.C. § 501(a).

### 4. Temporary Enforcement Safe Harbor Provision

---

[5] The HRSA guidelines are available at http://www.hrsa.gov/womensguidelines/ (last visited Apr. 17, 2013).

After allowing the public and interested groups to comment on the second interim final regulations, defendants adopted the definition of religious employer contained in those regulations without change on February 15, 2012. Group Health Plans and Health Issuers Relating to Coverage of Preventive Services Under the ACA, 77 FED. REG. 8,725, 8,727-28 (Feb. 15, 2012). The adopted final regulations (the "final regulations") contain a temporary enforcement safe harbor provision for nongrandfathered plans that do not qualify for the religious employer exemption. Id. HHS issued supplemental guidance ("HHS Guidance") with respect to the safe harbor provision.[6] The safe harbor provision provides that defendants will not take any enforcement action against an employer, a group health plan, or a group health insurance issuer with respect to nonexempt, nongrandfathered group health plans that fail to cover some or all of the recommended preventive services "until the first plan year that begins on or after August 1, 2013." HHS Guidance, at 3. To qualify for the safe harbor provision, an organization must meet the following criteria:

(1) The organization is organized and operates as a non-profit entity.

(2) From February 10, 2012 onward, contraceptive coverage has not been provided at any point by the group health plan established or maintained by the organization, consistent with any applicable State law, because of the religious beliefs of the organization.

(3) . . . [T]he group health plan established or maintained by the organization (or another entity on behalf of the plan, such as a health insurance issuer or third-party administrator) must provide [notice] to participants . . . which states that contraceptive coverage will not be provided under the plan for the first plan year beginning on or after August 1, 2012.

(4) The organization self-certifies that it satisfies criteria 1-3 above, and documents its self-certification in accordance with the procedures detailed [elsewhere in the HHS Guidance].

---

[6] HHS, Guidance on the Temporary Enforcement Safe Harbor for Certain Employers, Group Health Plans and Group Health Insurance Issuers with Respect to the Requirement to Cover Contraceptive Services Without Cost Sharing, at 3 (Feb. 10, 2012), available at http://cciio.cms.gov/resources/files/Files2/02102012/20120210-Preventive-Services-Bulletin.pdf (last visited Apr. 17, 2013).

HHS Guidance, at 3.

### 5. Advance Notice of Proposed Rulemaking

Following the adoption of the final regulations and the HHS Guidance in February 2012, defendants issued an Advance Notice of Proposed Rulemaking ("ANPRM") on March 21, 2012. Certain Preventive Services Under the ACA, 77 FED. REG. 16,501 (Mar. 21, 2012). The ANPRM seeks additional public comments and sets forth "questions and ideas" on how to best provide women with access to contraceptive services without cost-sharing, while accommodating the religious liberty concerns articulated by nonexempt religious organizations. Id. at 16,503. By its own terms, the ANPRM aims to "protect . . . religious organizations from having to contract, arrange, or pay for contraceptive coverage." Id. The ANPRM provided a ninety-day comment period ending June 19, 2012. Id.

### 6. Updated Guidance

The HHS updated its guidance bulletin (the "Updated HHS Guidance") on August 15, 2012 by clarifying three points: "(1) that the safe harbor is also available to non-profit organizations with religious objections to some but not all contraceptive coverage . . .; (2) that group health plans that took some action to try to exclude or limit contraceptive coverage that was not successful as of February 10, 2012, are not for that reason precluded from eligibility for the safe harbor . . .; and (3) that the safe harbor may be invoked without prejudice by non-profit organizations that are uncertain whether they qualify for the religious employer exemption."[7] The safe harbor is aimed at providing an additional year—until the first plan year beginning on

---

[7] Department of Health and Human Services, Revised Guidance on the Temporary Enforcement Safe Harbor for Certain Employers, Group Health Plans and Group Health Insurance Issuers with Respect to the Requirement to Cover Contraceptive Services Without Cost Sharing, at n.1, available at http://cciio.cms.gov/resources/files/prev-services-guidance-08152012.pdf (last visited Apr. 17, 2013) ("updated HHS Guidance").

or after August 1, 2013—for health plans and health insurance issuers to comply with the preventive care requirement. Updated HHS Guidance at 3.

### 7. Proposed Rules

On February 6, 2013, defendants issued proposed rules (the "proposed rules") broadening the universe of organizations eligible for an exemption from the contraceptive requirement. Coverage of Certain Preventive Services Under the Affordable Care Act, 78 FED. REG. 8,456, 8,462 (Feb. 6, 2013). In the proposed rules, defendants proposed an accommodation for religious organizations that object to providing contraceptive coverage. The proposed rules exclude from the contraceptive requirement those organizations that meet certain criteria: (1) "The organization opposes providing coverage for some or all of the contraceptive services required to be covered under [the final regulations] on account of religious objections;" (2) "The organization is organized and operates as a nonprofit entity;" (3) "The organization holds itself out as a religious organization;" and (4) "The organization self-certifies that it satisfies the first three criteria." 78 FED. REG. at 8,462. In an effort to also accommodate those plan beneficiaries who may not share the beliefs of the organizations claiming the accommodation, the proposed rules also set forth proposed ways "to provide women with contraceptive coverage without cost sharing and to protect eligible organizations from having to contract, arrange, pay, or refer for contraceptive coverage to which they object on religious grounds." Id. at 8,462-64.

### B. Claims Presented in the Amended Complaint

### 1. Substantial Burdens

Plaintiffs argue that the statutory scheme outlined above violates their religious beliefs by requiring them to provide coverage for the objected to services. (ECF No. 32 ¶ 110-11.) Specifically, the Heplers, SHLC, and WLH are being forced to choose between providing health

insurance that is inconsistent with their beliefs or providing no insurance at all, a choice that puts them at a competitive disadvantage and forces their employees to purchase health insurance, which includes coverage for the objected to services, on their own. (Id. ¶¶ 116-22.)

The mandate imposes substantial burdens on plaintiffs' religious beliefs that they are unable to avoid by self-insuring. (Id. ¶¶ 124-26.) Plaintiffs, as individuals and for-profit entities, are not eligible for the religious employer exemption provided in the HRSA Guidelines, 76 FED. REG. at 46,626, because defendants have not, to date, included individuals or for-profit entities within the definition of a religious employer. (ECF No. 32 ¶¶ 127-39.)

Based upon the uncertainty, plaintiffs argue that the mandate fails to protect their statutory and constitutional rights to not provide or facilitate the provision of the objected to services. (Id. ¶ 141-43.) Plaintiffs assert that the mandate impermissibly coerces them to provide coverage for the objected to services in violation of their sincerely held religious beliefs, lest they be subject to substantial fines. (Id. ¶¶ 144-45, 148-52.)

The safe harbor provision does not apply to plaintiffs because SHLC and WLH, the employers, are for-profit entities. (Id. ¶ 176.)

**C.  Preliminary Injunction Standard**

The court considers four factors in determining whether to grant a preliminary injunction. A party seeking a preliminary injunction must show: "(1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief." Kos Pharmaceuticals, Inc. v. Andrx Corp., 369 F.3d 700, 708 (3d Cir. 2004) (citing Allegheny Energy, Inc. v. DQE, Inc., 171 F.3d 153, 158 (3d Cir. 1999)).

Although a party seeking preliminary injunctive relief must make "a clear showing that [it] is entitled to such relief," Winter v. Natural Res. Defense Council, 555 U.S. 7, 22 (2008), demonstrating a likelihood of success on the merits requires only that the party "prove a prima facie case, not a certainty that he or she will win." Highmark, Inc. v. UPMC Health Plan, Inc., 276 F.3d 160, 173 (3d Cir. 2001) (citing 11A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2948.3 (2d ed. 1995)).

Both parties indicated that they wish to reassert the arguments set forth in their briefing with respect to the motion to dismiss. To the extent that defendants assert new arguments in their briefing,[8] the court will address those arguments where appropriate.

## 1.    Likelihood of Success on the Merits[9]

### a.    Plaintiffs' Claims Pursuant to the RFRA

Pursuant to the RFRA, the government may not "substantially burden a person's exercise of religion, 'even if the burden results from a rule of general applicability.'" Gonzales v. O

---

[8] Defendants' brief in opposition to the present motion essentially asks the court to reconsider its decision with respect to the motion to dismiss, but does not set forth any additional facts or precedential caselaw to support its prior arguments. To the extent that defendants simply disagree with the court's reasoning in its prior decision, those arguments are not appropriate for a motion to reconsider. See Williams v. City of Pittsburgh, 32 F. Supp. 2d 236, 238 (W.D. Pa. 1998).

[9] Defendants devote a considerable amount of time in their briefing to the recent motion panel decision of the Court of Appeals for the Third Circuit in Conestoga Wood Specialties Corp. v. Sebelius, No. 13-1144 (3d Cir. Feb. 7, 2013) (order denying expedited motion for injunction pending appeal). The motion in Conestoga resulted in three opinions—the opinion of the motion panel, authored by Judge Rendell, a concurring opinion authored by Judge Garth, and a lengthy dissenting opinion authored by Judge Jordan. As defendants' implicitly concede in their briefing, however, the motion panel's decision is not binding upon this court. See (ECF No. 78 at 4) ("the Third Circuit's analysis is **persuasive** . . ." (emphasis added)). Precedential opinions of the Court of Appeals for the Third Circuit are labeled as such according to Internal Operating Procedure 5.1, and the motion panel decision in Conestoga is not so labeled. Motion panel decisions are also not binding on subsequent panels, even in the same case. Lambert v. Blackwell, 134 F.3d 506, 512 n.17 (3d Cir. 1997) (citing Third Circuit I.O.P. 9.1). The court concludes, therefore, that the panel decision, which was before this court for consideration as part of the motion to dismiss, is merely persuasive authority and is not binding upon this court. The reasoning set forth in Judge Jordan's dissent is compelling and consistent with several other decisions of courts of appeals and district courts that have granted injunctive relief in similar cases involving challenges to the mandate. See ECF No. 76 at 4 (citing cases). The court also notes the recent decision by the Court of Appeals for the District of Columbia Circuit in Gilardi v. United States Department of Health & Human Services, No. 13-5069 (D.C. Cir. Mar. 29, 2013), in which the court of appeals reversed itself and granted, sua sponte, an injunction pending appeal despite having previously denied the same motion only days earlier.

Centro Espirita Beneficiente Uniao do Vegetal, 546 U.S. 418, 424 (2006) (quoting 42 U.S.C. § 2000bb-1(a)). The government may, however, substantially burden the exercise of religion if the burden: "(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(b). The Hepler plaintiffs bear the initial burden under the RFRA of establishing that application of the mandate would substantially burden a sincere religious exercise. O Centro, 546 U.S. at 426.

The court already concluded that SHLC has standing to assert the RFRA and First Amendment rights of its owners, (ECF No. 74 at 30-36), and need not readdress that issue in the context of the present motion.

### i.       Substantial Burden

Under the RFRA, exercise of religion is defined as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000bb-2 (citing 42 U.S.C. § 2000cc-5). Other courts have been clear that "it is not the province of the court to tell the plaintiffs what their religious beliefs are, i.e. whether their beliefs about abortion should be understood to extend to how they run their corporations or the like, or to decide whether such beliefs are fundamental to their belief system." Hobby Lobby Stores, Inc. v. Sebelius, 870 F. Supp. 2d 1278, 1293 (W.D. Okla. 2012); cf. Thomas v. Review Bd. of Ind. Emp't Sec. Div., 450 U.S. 707, 715 (1981) (noting that courts should be reluctant to "dissect religious beliefs" when engaging in substantial burden analysis). Therefore, the court must tread lightly when considering whether the mandate's requirements substantially burden the plaintiffs' exercise of religion.

A challenged law substantially burdens the free exercise of religion if it compels plaintiffs "to perform acts undeniably at odds with fundamental tenets of their religious beliefs."

Wisconsin v. Yoder, 406 U.S. 205, 218 (1972). A substantial burden also exists where a law

"put[s] substantial pressure on an adherent to modify his behavior and violate his beliefs."

Thomas v. Review Bd., 450 U.S. at 718. Even "onerous" financial costs can rise to the level of a

substantial burden. See Jimmy Swaggart Ministries v. Bd. of Equalization of Cal., 493 U.S. 378,

392 (1990) (declining to find a substantial burden, but recognizing that one could exist under

certain circumstances).

     Defendants do not question the sincerity of the individual plaintiffs' religious beliefs, but

they do dispute whether the mandate's requirements impose a substantial burden on the exercise

of those beliefs. Defendants argue that the mandate's requirements do not burden plaintiffs'

exercise of religion because the regulations only apply to group health plans and health insurance

issuers, not to individuals. Without a direct requirement that the individual plaintiffs provide

insurance coverage for the objected to services, defendants maintain that any burden is too

attenuated to be cognizable under the RFRA. [10] Plaintiffs respond that even indirect compulsion

is sufficient under the RFRA if it requires them to abandon their religious beliefs and provide the

objectionable coverage in fear of being subject to financial penalties. They reject defendants'

argument that a burden on SHLC is not a burden on the individual owners and employees, as in

this case the individual plaintiffs are essentially providing themselves and their own families

with the objectionable coverage.

     Plaintiffs rely upon several Supreme Court decisions that they argue support their claims

that they have suffered a substantial burden under the RFRA.[11] First, in Yoder, 406 U.S. at 234-

---

[10] Defendants make this same argument in their most recent brief. See (ECF No. 78 at 7-8.) In support, defendants
cite several court decisions which actually cut against their position, insofar as courts of appeals in four of those
cases granted motions for preliminary injunctive relief pending appeal. (Id. at 7) (citing decisions granting injunctive
relief from the Courts of Appeals for the Seventh and Eighth Circuits).

[11] The Court of Appeals for the Third Circuit has instructed that courts should look to free exercise decisions issued
prior to Employment Division, Department of Human Resources of Oregon v. Smith, 494 U.S. 872 (1990), when
interpreting the RFRA, since it was enacted to codify the standard used prior to the Smith decision. Conestoga, 2013

35, the Supreme Court held that a state compulsory education law imposing criminal fines for failing to remain in school until age sixteen violated the free exercise rights of the Old Order Amish. In Sherbert v. Verner, 374 U.S. 398, 410 (1963), the Supreme Court held that a state could not withhold unemployment benefits from a worker who refused employment on grounds that working on Saturdays violated the worker's religious beliefs. Finally, in Thomas v. Review Board, 450 U.S. at 719, the Supreme Court again found that a state could not deny unemployment benefits to a worker who terminated his employment because his religious beliefs forbade his participation in the production of tanks. Plaintiffs maintain that these decisions support their argument that even indirect burdens on religious exercise are substantial enough to be cognizable under the RFRA.

Plaintiffs are faced with having to choose between violating their deeply held religious beliefs and being forced to cause SHLC—a closely held corporation controlled by the Heplers—to terminate their health insurance coverage, which also burdens their religious exercise. (ECF No. 32 ¶¶ 116-24.) This kind of Hobson's choice is similar to that faced by the plaintiff in Sherbert, who was "force[d] . . . to choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion in order to accept work, on the other hand." Sherbert, 374 U.S. at 404. Here, the Hepler plaintiffs are unable to enjoy the benefits of providing the Heplers and their families health insurance that is free of the coverage for the objected to services. Like in Yoder, plaintiffs contend that they would be subject to a financial penalty if they were forced to drop the SHLC health insurance plan and compensate the Hepler Entities' employees for the purchase of their own equivalent plans. (ECF No. 32 ¶ 123.) In the context of a small, closely-held corporation and a sole

WL 140110, at *10 n.13 (citing Adams v. Comm'r of Internal Revenue, 170 F.3d 173, 176 (3d Cir. 1999)).

proprietorship, these choices and the attendant consequences can have a significant impact on the health of those businesses and their owners.

Thomas is also instructive with respect to defendants' argument that the burden on the Hepler plaintiffs is too attenuated to be substantial. In addressing whether a pacifist's objection to war was too remote from his former occupation assembling tanks, the Supreme Court noted that "Thomas drew a line, and it is not for [the Court] to say that the line he drew was an unreasonable one." Thomas, 450 U.S. at 715. The Court instructed that "[c]ourts should not undertake to dissect religious beliefs" when analyzing substantial burden questions. Id. In the present case, the Heplers cause SHLC (which the court found could assert the rights of its owners) to purchase insurance for its employees and provide that coverage to WLH's employees. In this way, the coverage is provided to the Heplers and their families, who's sincerely held religious beliefs prevent them from providing coverage which violates their exercise of religion.

It is also important to note that plaintiffs' position with respect to the mandate's requirements is more subtle than defendants and many courts recognize. (ECF No. 62 at 3) Compare Tyndale House Publishers, Inc. v. Sebelius, No. 12-1635, 2012 WL 5817323 at *13 (D. D.C. Nov. 16, 2012) ("[t]he plaintiffs' specific objection is not simply to the use of the contraceptives at issue, but to 'providing coverage for abortifacients and related education and counseling in [the plaintiffs'] health insurance plan"); Grote Indus., LLC v. Sebelius, No. 12-134, 2012 WL 6725905 at *6 (S.D. Ind. Dec. 27, 2012) ("[w]e acknowledge that Plaintiffs object not just to the **use** of contraceptives, but to the **coverage** itself" (emphasis in original)) with Conestoga Wood Specialties Corp. v. Sebelius, No. 12-6744, 2013 WL 140110 at *13 (E.D. Pa. Jan. 11, 2013) ("the core of the [plaintiffs'] religious objection is the effect of particular contraceptives on a fertilized egg"); O'Brien v. United States Dep't of Health and Human

Services, No. 12-cv-476, 2012 WL 4481208 at *6 (E.D. Mo. Sept. 28, 2012) ("[t]he burden of which plaintiffs complain is that funds, which plaintiffs will contribute to a group health plan, might, after a series of independent decisions by health care providers and patients covered by [plaintiffs'] plan, subsidize **someone else's** participation in an activity that is condemned by plaintiffs' religion" (emphasis in original)). Plaintiffs object to providing coverage for the objected to services, not the payment for or use of such items. The objection, therefore, is less attenuated than defendants maintain.

The Heplers explicitly object to the requirement that they through the Hepler Entities provide the objectionable coverage to themselves and their families. (ECF No. 32 ¶ 80.) Regardless of who purchases the insurance in question in this case—whether it be SHLC (acting on behalf of the Heplers), or the Heplers themselves—that insurance will necessarily include coverage for the objected to services, thus imposing a substantial pressure on the Heplers to "modify [their] behavior and to violate their beliefs" by either giving up their health insurance generally or providing the objectionable coverage. Thomas, 450 U.S. at 718. It is not, as defendants suggest, merely a question whether plaintiffs object to third parties' decisions with respect to using or purchasing the objected to services. Instead, plaintiffs' objection relates to whether the Heplers and SHLC will be forced to provide coverage for the objected to services in the first place. This is a quintessential substantial burden, and plaintiffs demonstrated that they are likely to succeed on the merits with respect to the substantial burden issue.

### ii.    Compelling Government Interest/Least Restrictive Means

Plaintiffs demonstrated that they are likely to succeed in showing that the mandate's requirements impose a substantial burden on their exercise of religion, and now the court must determine whether the mandate's requirements serve "interests of the highest order." Yoder, 406

U.S. at 215. The government bears the burden of demonstrating a compelling interest at this stage, since "the burdens at the preliminary injunction stage track the burdens at trial." O Centro, 546 U.S. at 429-30 (analyzing the applicable burdens under the RFRA). Defendants argue that the mandate's requirements serve two complementary compelling interests—namely the need to promote public health and the need to promote gender equality. Few would argue that promoting the public health is not a compelling government interest. See Mead v. Holder, 766 F. Supp. 2d 16, 43 (D. D.C. 2011) (acknowledging that, in the context of the ACA, "the Government clearly has a compelling interest in safeguarding the public health by regulating the health care and insurance markets"). Plaintiffs do not appear to seriously dispute that public health and gender equality can, in certain circumstances, be compelling government interests.

Plaintiffs instead argue that defendants' proffered interests are too vague and general to satisfy a strict scrutiny analysis. In construing claims pursuant to the RFRA, courts must look "beyond broadly formulated interests justifying the general applicability of government mandates and [scrutinize] the asserted harm of granting specific exemptions to particular religious claimants." O Centro, 546 U.S. at 431. Under the RFRA, the government must "demonstrate that the compelling interest test is satisfied through application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened." Id. at 420 (citing 42 U.S.C. § 2000bb-1(b)). Defendants in the present case fail to show how exempting SHLC from the mandate will "seriously compromise [the government's] ability to administer the program." Id. at 435.

In O Centro, the Supreme Court found that the government failed to make a showing that a ban on the use of a hallucinogenic substance served a compelling interest as applied to a Native American tribe that used the substance as part of its religious services. Id. at 439. The Court

relied heavily on similar religious exemptions granted with respect to the use of peyote by "hundreds of thousands" of members of the Native American Church, and found that such broad exemptions weighed heavily against finding a compelling interest. Id. at 433-34. In light of the myriad exemptions to the mandate's requirements already granted and conceding that the requirement does not include small employers similarly situated to SHLC, the requirement is "woefully underinclusive" and therefore does not serve a compelling government interest. Republican Party of Minn. v. White, 536 U.S. 765, 780 (2002).

Plaintiffs and several other courts addressing similar challenges to the mandate's requirements point out that over 190 million individuals have already been exempted from the mandate's requirements as a result of the grandfathering provisions in the ACA. E.g. Newland v. Sebelius, 881 F. Supp. 2d 1287, 1298 (D. Colo. 2012) ("[t]he government has exempted over 190 million health plan participants . . . from the preventive care coverage mandate"); Tyndale House, 2012 WL 5817323, at *18 ("Indeed, the 191 million employees excluded from the contraceptive coverage mandate include those covered by grandfathered plans **alone**." (emphasis in original)). Defendants argue that the grandfathering provision is merely temporary, and is aimed at easing in the requirements imposed by the ACA.[12] While true, the mere fact that defendants granted such a broad exemption in the first place severely undermines the legitimacy of defendants' claim of a compelling interest.

In addition to the grandfathering exemption, the ACA contains several other provisions that explicitly or implicitly exclude many other individuals and entities from the mandate. First, the ACA recognizes an exemption for members of a "religious sect or division" that objects to

---

[12] Defendants argue that 190 million is a "vast overstatement of the total number of individuals in grandfathered plans." (ECF No. 78 at 9 n.6.) Accepting the estimates provided by defendants, more than 90 million employees will remain exempt from the mandate by the end of 2013. See Interim Final Rules for Group Health Plans and Health Insurance Coverage Relating to Status as a Grandfathered Health Plan Under the Patient Protection and Affordable Care Act, 75 FED. REG. 34,538, 34,552 (Jun. 17, 2010).

accepting public or private insurance funds. 26 U.S.C. § 5000A(d)(2)(A).[13] Defendants point to

no evidence indicating why granting an exemption for entities like SHLC would severely

undermine its alleged compelling interest. As defendants suggest in their briefing, the number of

individuals and entities subject to narrow religious exemptions like plaintiffs seek in this case,

and like the exemption contained in 26 U.S.C. § 5000A(d)(2)(A), is often discrete and "'readily

identifiable.'" (ECF No. 78 at 10-11.)

Second, defendants exempted more traditional religious employers from the requirement

under pressure from other religious groups. 76 FED. REG. at 46,625 (acknowledging that

amendments to the interim final rules were necessary in light of comments by religious

employers objecting to the mandate). Third, SHLC itself even qualifies to be excused from

providing any kind of health insurance insofar as it is defined as a small employer under the

ACA. See 42 U.S.C. § 18024(b)(2). As a small employer, SHLC is exempt from the requirement

that it provide health insurance to its employees at all. 26 U.S.C. § 4980H(c)(2)(A) (imposing

penalties on employers with fifty or more full-time employees that fail to provide health

insurance coverage).[14] Fourth, in response to intense public pressure, defendants proposed rules

in an attempt to broaden the religious institutions' exemption. 78 FED. REG. at 8,462. In light of

the myriad exemptions, the "[mandate] cannot be regarded as protecting an interest 'of the

highest order,'" particularly in a case like this where "it leaves appreciable damage to that

supposedly vital interest unprohibited." Church of the Lukumi Babalu Aye, Inc. v. City of

Hialeah, 508 U.S. 520, 547 (1993). The tens of millions of individuals who remain unaffected by

---

[13] Defendants argue that this provision does not apply to the mandate; however, the provision provides an exemption to the requirement that individuals maintain a certain level of health insurance coverage under the ACA. To the extent that those exempted individuals would otherwise purchase insurance pursuant to a group health plan that is subject to the mandate, they are, in essence, exempt from the mandate's requirements.

[14] Defendants argue that this provision also does not provide an exemption to the mandate. To the extent that small employers are not required to choose between providing health insurance coverage subject to the mandate and paying substantial financial penalties, this provision implicates the mandate by excusing some employers from being forced to make that choice.

the mandate's requirements contradict any notion that the government's interests are as compelling as defendants argue.

As shown above, defendants failed to meet their burden with respect to the compelling interest prong and the court's analysis could end with that conclusion. O Centro, 546 U.S. at 429-30 (where the government fails to meet its burden under the compelling interest test, the court need not address the least restrictive means prong of the analysis). The court notes, however that the scheme set forth in the proposed rules calls into serious question whether the mandate is the least restrictive means of achieving the government's allegedly compelling interest.

Although defendants suggest that an exemption for entities like SHLC would prevent female employees of exempt entities from receiving coverage for the objected to services, the scheme in the proposed rules will provide coverage for those services to female employees who choose to use them. 78 Fed. Reg. at 8,462-64. For example, with respect to self-insured plans, the proposed rules suggest several approaches for providing coverage for female employees, each involving separate health insurance issuers that will provide individual health insurance policies for contraceptive coverage for female plan participants. Id. at 8,643-44. Defendants offer no reason why the scheme outlined in that proposed rule could not be applied to entities like SHLC. In light of the proposed rules, which show there is a less restrictive means of imposing the mandate, and that defendants did not show that the mandate furthers a compelling government interest with respect to plaintiffs, plaintiffs demonstrated that they are likely to succeed on the merits of their claim pursuant to the RFRA.

### b.      Plaintiffs' Free Exercise Clause Claims

In light of the court's conclusion that plaintiffs showed a likelihood of success on the merits of their claim pursuant to the RFRA, the court will refrain from addressing plaintiffs'

claims pursuant to the Free Exercise Clause. Hagans v. Lavine, 415 U.S. 528, 546 n.12, 547 (1974) (acknowledging the "ordinary rule that a federal court should not decide federal constitutional questions where a dispositive nonconstitutional ground is available"); see Tyndale House, 2012 WL 5817323, at *4 n.7 (where the court found that the plaintiffs had made a showing of likelihood of success on the merits under the RFRA, as well as strong showings with respect to the other preliminary injunction requirements, it only addressed the merits of the RFRA claim).

### 2. **Irreparable Harm to Plaintiffs**

Irreparable harm is an injury that cannot be adequately compensated at a later date in the ordinary course of litigation. The Supreme Court has held, and defendants concede, that "[t]he loss of First Amendment freedoms," or a violation of the RFRA, "for even minimal periods of time, unquestionably constitutes irreparable injury." Elrod v. Burns, 427 U.S. 347, 373 (1976).[15] This is particularly true when plaintiffs have made a strong showing that they are likely to succeed on the merits of a constitutional claim. See Trefelner v. Burrell Sch. Dist., 655 F. Supp. 2d 581, 596 (W.D. Pa. 2009) (citing 11A CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2948.1 (2d ed. 1995)).

As demonstrated by the discussion above, the court concludes that because coverage must be obtained by July 1, 2013, plaintiffs will be irreparably harmed if they are forced either to forgo providing coverage or to violate their sincerely held religious beliefs by contracting for and including the objected to services in the health care insurance that they provide to themselves, their employees, and their families. Because the harm that plaintiffs will suffer is a result of at

---

[15] As noted in Tyndale House, 2012 WL 5817323, at *18, the same rights are at issue in both the RFRA and in First Amendment cases, because RFRA "covers the same types of rights as those protected under the Free Exercise Clause of the First Amendment. Id. (citing O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft, 389 F.3d 973, 995 (10th Cir. 2004), aff'd, 546 U.S. 429 (2006); see Kikumura v. Hurley, 242 F.3d 950, 963 (10th Cir. 2001) (citing Jolly v. Coughlin, 76 F.3d 468, 482 (2d Cir. 1996)).

least a statutory violation, denial of the requested relief will result in the loss of those freedoms, which "for even minimal periods of time, unquestionably constitutes irreparable injury." Elrod, 427 U.S. 373. This factor weighs strongly in favor of granting the requested relief.

### 3. Irreparable Harm to Defendants

Defendants will suffer little, if any, harm should the requested relief be granted. Defendants have already granted significant exemptions to the mandate, and continue to exempt others for limited periods of time pursuant to the non-enforcement safe harbor provision. The requested relief in the present case will maintain the status quo until the statutory and constitutional questions raised by plaintiffs and other similarly-situated individuals and entities can be resolved. Kos Pharms., 369 F.3d at 708 (quoting Opticians Ass'n of Am. v. Indep. Opticians of Am., 920 F.2d 187, 197 (3d Cir. 1990)).

As plaintiffs point out in their notice of supplemental authorities (ECF No. 79), defendants, in other cases where similarly-situated individuals and entities have challenged the mandate, have acquiesced to the imposition of injunctive relief. Id. (citing Sharpe Holdings, Inc. v. U.S. Dep't of Health & Human Servs., No. 2:12-cv-00092, ECF No. 41 (E.D. Mo. Mar. 11, 2013); Sioux Chief Mfg. Co. v. Sebelius, No. 4:13-cv-0036, ECF No. 9 (W.D. Mo. Feb. 28, 2013)); see also Hall v. Sebelius, No. 13-0295, ECF No. 10 (D. Minn. Apr. 2, 2013); Bick Holding, Inc. v. Sebelius, No. 4:13-cv-00462, ECF No. 18 (E.D. Mo. Apr. 1, 2013. It strikes the court that defendants cannot claim irreparable harm in this case while acquiescing to preliminary injunctive relief in several similar cases. In light of the exemptions granted, and defendants' position with respect to injunctive relief in other cases, this factor weighs strongly in favor of granting the requested relief.

### 4. Public Interest

The public interest will likewise benefit if the court grants the requested relief, because "[t]here is a strong public interest in protecting fundamental First Amendment rights." Trefelner, 655 F. Supp. 2d at 598. That strong interest includes fundamental religious rights codified by statute in the RFRA. Kikumura, 242 F.3d at 963. "'As a practical matter, if a plaintiff demonstrates both a likelihood of success on the merits and irreparable injury, it almost always will be the case that the public interest will favor the plaintiff.'" Ramsey v. City of Pittsburgh, 764 F. Supp. 2d 728, 734-35 (W.D. Pa. 2011) (citing Am. Tel. and Tel. Co. v. Winback & Conserve Program, Inc., 42 F.3d 1421, 1427 n.8 (3d Cir. 1994)).

Defendants argue that the public interest will be harmed if those individuals covered by SHLC's health insurance plan are "deprived of the benefits of obtaining a health plan through their employer that covers the full range of recommended contraceptive services." (ECF No. 78 at 14.) Defendants overlook, however, the fact that SHLC's health insurance plan already does not cover the objected to services. If the requested relief is granted, nothing will change. The government already provides the objected to services for free or at a reduced cost to many individuals—and may continue to do so. This factor, therefore, weighs in favor of granting preliminary injunctive relief.

### 5. Balancing Harms

Plaintiffs showed that they are likely to succeed on the merits of their RFRA claim; they will suffer irreparable harm absent injunctive relief; and the public interest favors granting injunctive relief. In light of the exemptions granted and the position taken by defendants in other similar cases, the harm to defendants is not significant. These showings lead the court to conclude that the balance of the factors weighs heavily in favor of granting the requested relief.

## III. CONCLUSION

For the reasons set forth herein, plaintiffs' motion for a preliminary injunction will be GRANTED. An appropriate order will follow.

April 19, 2013

BY THE COURT:

 /s/Joy Flowers Conti
Joy Flowers Conti
United States District Judge