# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| GENEVA COLLEGE; WAYNE L. HEPLER; THE SENECA HARDWOOD LUMBER COMPANY, INC., a Pennsylvania Corporation; WLH ENTERPRISES, a Pennsylvania Sole Proprietorship of Wayne L. Hepler; and CARRIE E. KOLESAR | ) ) ) ) ) ) ) | |
| Plaintiff, | ) ) ) ) | |
| v. | ) ) | Case No. 2:12-cv-00207 |
| KATHLEEN SEBELIUS *in her official capacity as Secretary of the United States Department of Health and Human Services*, HILDA SOLIS *in her official capacity as Secretary of the United States Department of Labor,* TIMOTHY GEITHNER *in his official capacity as Secretary of the United States Department of the Treasury,* UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, UNITED STATES DEPARTMENT OF LABOR, UNITED STATES DEPARTMENT OF THE TREASURY | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

**CONTI, District Judge**

Pending before the court is a Motion for Preliminary Injunction (ECF No. 87), and brief in support, (ECF No. 88), filed by plaintiff Geneva College ("Geneva"), and the response in opposition, (ECF No. 89), filed by defendants Kathleen Sebelius, Hilda Solis, Timothy Geithner, the United States Department of Health and Human Services ("HHS"), the United States Department of Labor, and the United States Department of the Treasury (collectively, "defendants").

Geneva seeks an order protecting it from complying with the requirement that it include coverage for certain services as part of the health insurance that it provides to its students in the plan year beginning on August 1, 2013. Geneva objects to the requirement in the new health care law mandating that it provide insurance coverage for abortifacient products and contraceptives such as ella, Plan B, and intrauterine devices ("IUDs") (collectively, the "objected to services"). For purposes of the present motion, Geneva argues that the law requiring it to provide insurance coverage for the objected to services, 42 U.S.C. § 300gg-13(a)(4) (referred to generally as the "mandate"), violates the Religious Freedom Restoration Act of 1993, 42 U.S.C. § 2000bb-1 (the "RFRA").

On March 6, 2013, the court issued a Memorandum Opinion and Order (ECF No. 74), granting in part and denying in part defendants' motion to dismiss the first amended complaint (ECF No. 32) filed by Geneva and plaintiffs Wayne L. Hepler, Carrie E. Kolesar, WLH Enterprises, and The Seneca Hardwood Lumber Company, Inc. (collectively, the "Hepler plaintiffs"). The court granted the motion to dismiss with respect to Geneva by finding that it lacked standing to challenge the mandate. The court denied the motion to dismiss with respect to the Hepler plaintiffs' claims pursuant to the RFRA and the Free Exercise Clause. Following entry of the court's Memorandum Opinion and Order, the Hepler plaintiffs filed a motion for a preliminary injunction. (ECF No. 75.) The court entered findings of fact and conclusions of law, (ECF No. 83), as well as an order preliminarily enjoining defendants from enforcing the mandate against the Hepler plaintiffs in part because the Hepler plaintiffs established a likelihood of success on the merits with respect to their RFRA claim. (ECF No. 84.)

Geneva filed a motion for reconsideration (ECF No. 81) on April 5, 2013, arguing that its claims are ripe for review because the proposed rules (discussed below) do not alleviate its

religious exercise concerns and because of concerns that Geneva would be forced to contract for its student health insurance plan before defendants' final rules were implemented. The court granted Geneva's motion for reconsideration (ECF No. 86), and held that Geneva did have standing to challenge the mandate, and that its claims are ripe for review. The court also denied defendants' motion to dismiss with respect to, among other claims, Geneva's RFRA claim.

Like the Hepler plaintiffs, Geneva advised the court that it does not desire an evidentiary hearing or oral argument on its motion and intends to proceed on the record and briefing that is presently before the court, and defendants did not object to so proceeding. (ECF No. 87 at 2.) Geneva indicated that the court must rule on its motion no later than June 20, 2013, so that it may continue to contract for its student health insurance plan for the 2013-14 plan year.  To that end, the matter is ripe for disposition, and the court makes the following findings of fact and conclusions of law.

## I.  <u>FINDINGS OF FACT</u>[1]

Geneva is a nonprofit institution of higher learning established in Beaver Falls, Pennsylvania in 1848 by the Reformed Presbyterian Church of North America ("RPCNA"). (ECF No. 32 ¶¶ 11, 25.) Geneva's mission is "to glorify God by educating and ministering to a diverse community of students in order to develop servant-leaders who will transform society for the kingdom of Christ." (<u>Id.</u> ¶ 25.) This mission is central to Geneva's institutional identity and activities. (<u>Id.</u> ¶¶ 27-29.) Geneva offers a traditional liberal arts and sciences curriculum as well

---

[1] The findings of fact contained herein are derived from the allegations in the first amended complaint (ECF No. 32), which Timothy R. Baird, Geneva's Associate Vice President of Operations and Human Resources, avers  in an affidavit (ECF No. 88-1) are true and correct with respect to Geneva. Where necessary, other factual averments are taken from the declaration of Kenneth A. Smith, Geneva's President, submitted in support of Geneva's motion for reconsideration. (ECF No. 81-1.) Defendants did not respond to, contest, or challenge the affidavits. The court, therefore, accepts those affidavits as true for the purposes of the present motion. <u>See</u> <u>Williams v. Curtiss-Wright Corp.</u>, 681 F.2d 161, 163 (3d Cir. 1982) (noting that "[i]t has long been recognized that a preliminary injunction may issue on the basis of affidavits and other written evidence, without a hearing, if the evidence submitted by both sides does not leave unresolved any relevant factual issue").

as student programs and services that are rooted in the Christian faith. (<u>Id.</u> ¶ 26.) Pursuant to its mission and goals, Geneva has historically promoted a diverse student population and has opposed institutions (such as slavery) that it finds inimical to its beliefs. (<u>Id.</u> ¶¶ 34-35.)

Geneva is governed by a board of corporators and a board of trustees. (<u>Id.</u> ¶¶ 30-31.) Members of the board of corporators must be members of the RPCNA and members of the board of trustees must be members of either the RPCNA or some other Reformed or Evangelical Christian congregation. (<u>Id.</u> ¶ 30-31.) Geneva's faculty, staff and administration are drawn from among those who profess faith in Christ and who otherwise agree with the college's Christian convictions. (<u>Id.</u> at ¶ 32.) Geneva does not require its students to profess a particular faith, but it does give enrollment priority to evangelical Christians and requires all students to live by standards of Christian morality. (<u>Id.</u> at ¶ 33.)

Geneva and the RPCNA firmly believe "that the procurement, participation in, facilitation of, or payment for abortion [including the use of what it alleges are abortion-causing drugs like Plan B and ella] violates the Commandment against murder." (<u>Id.</u> ¶43.) Geneva identifies several texts, including the Ten Commandments, Scripture, the articulated statements of the RPCNA, and the Westminster Larger Catechism in support of its view that human life begins at the moment of fertilization, and that any destruction of a human life thereafter constitutes murder. (<u>Id.</u> ¶¶ 38-44.) Geneva's Student Handbook expressly provides that abortion "'will not be tolerated.'" (<u>Id.</u> ¶ 49.) In furtherance of its views on abortion, Geneva's students and staff participate in a host of pro-life activities both on and off campus. (<u>Id.</u> ¶¶ 45-48.)

Geneva provides health insurance coverage to its employees and makes health insurance coverage available to its students. (Id. ¶ 51.) Geneva's student health plan does not enjoy "grandfathered status"[2] and its current plan year began on August 1, 2012. (Id. ¶¶ 73-74.)

If the court grants Geneva's motion, then Geneva will contract for a student health insurance plan for the 2013-2014 school year, which begins on August 1, 2013. (ECF No. 88-1 ¶ 6.) If the court denies Geneva's motion or does not rule until after June 20, 2013, then Geneva will not contract for a student health insurance plan for the 2013-2014 school year. (Id. ¶ 7.) If the court grants Geneva's motion, then Geneva's student health plan insurer (United HealthCare) and insurance broker (First Risk Advisors) will provide Geneva with a student plan that excludes the abortifacients to which it objects. (Id. ¶¶ 5, 9.) Many of Geneva's students rely upon the school to provide a comparatively affordable health plan, and returning students expect that Geneva will once again make health insurance available to them for the 2013-2014 school year. (Id. ¶ 10.)

Geneva deems it sinful and immoral to facilitate a student health insurance plan that includes coverage for abortifacients and participation in such a plan that entitles students to access insurance coverage of abortifacients. (Id. ¶ 8.)

On approximately June 30, 2013, Geneva will send out invoices to students and their families for the fall 2013 semester and it must know at that time whether to bill students for health insurance. (Id. ¶¶ 3-4.) Geneva must notify its insurance broker and plan issuer no later than June 20, 2013 of its intent to enter into an agreement regarding a student health plan for the 2013-2014 school year. (Id. ¶ 5.)

---

[2] Grandfathered status is defined in 45 C.F.R. § 147.140; 26 C.F.R. § 54.9815-125T; and 29 C.F.R. § 2590.7151251, and provides that such plans do not have to provide coverage without cost sharing of "preventive health services," which plaintiffs allege includes "[a]ll Food and Drug Administration approved contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity." (ECF No. 32 ¶ 53.)

Geneva currently requires that all full-time undergraduate students carry health insurance, and if they do not provide Geneva with proof of such insurance, they are enrolled in Geneva's student health insurance plan. (ECF No. 32 ¶ 70.) If Geneva is unable, for reasons of conscience, to facilitate a student health insurance plan for the 2013-2014 school year, Geneva students who would otherwise have participated in the school's student plan will be forced to obtain insurance elsewhere. (ECF No. 88-1 ¶ 11.)

## II.    CONCLUSIONS OF LAW

### A.    The Relevant Statutes and Regulations Concerning the Objected to Services

#### 1.    The Patient Protection and Affordable Care Act of 2010

On March 23, 2010, the Patient Protection and Affordable Care Act of 2010, Pub. L. No. 111-148, 124 Stat. 119 (Mar. 23, 2010) ("ACA"), became law and an overhaul of the nation's healthcare system began.  Section 1001 of the ACA includes specific measures related to preventive care for women, and provides in part:

(a) In general

A group health plan and a health insurance issuer offering group or individual health insurance coverage shall, at a minimum provide coverage for and shall not impose any cost sharing requirements for—

\* \* \*

(4) with respect to women, such additional preventive care and screenings not described in paragraph (1) as provided for in comprehensive guidelines supported by the Health Resources and Services Administration ["HRSA"] for purposes of this paragraph.

42 U.S.C. § 300gg-13 (the "preventive care provision"). Because the ACA did not specifically identify which preventive care services would have to be provided without cost sharing, further rulemaking was necessary.

#### 2.    Preventive Care Services and Interim Final Regulations

On July 19, 2010, defendants (the Departments of Health and Human Services, Labor, and Treasury) issued interim final regulations implementing the preventive care provision. Interim Final Rules for Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the ACA (the "first interim final regulations"), 75 FED. REG. 41,726 (Jul. 19, 2010). The first interim final regulations require all group health plans and health insurance issuers offering nongrandfathered[3] group or individual health coverage to cover, without cost sharing, the preventive care services outlined in 42 U.S.C. § 300gg-13. Id. at 41,728. The first interim final regulations directed the HHS, in conjunction with the Institute of Medicine ("IOM"), to determine what preventive services are necessary and beneficial for women's health and well-being. Id. The IOM was to report its findings to the Health Resources and Services Administration ("HRSA"), which was to issue the necessary guidelines. The report issued by the IOM[4] on July 19, 2011, recommended that the HRSA guidelines include, *inter alia*: "[t]he full range of Food and Drug Administration [("FDA")]-approved contraceptive methods, sterilization procedures, and patient education and counseling for women with reproductive capacity." IOM Report at 10. FDA-approved contraceptive methods include the objected to services, such as the drugs ella and Plan B, as well as IUDs.

### 3. HRSA Guidelines

On August 1, 2011, the HRSA adopted guidelines pursuant to the IOM recommendations[5] and on August 3, 2011, again issued interim final regulations (the "second

---

[3] The preventive services provisions do not apply to health plans that are grandfathered. A plan is grandfathered if: (1) at least one person was enrolled on March 23, 2010; (2) the plan continuously covered at least one individual since that date; (3) the plan provides annual notice of its grandfathered status; and (4) the plan has not been subject to significant changes as outlined in the regulations. See 42 U.S.C. § 18011; 26 C.F.R. §§54.9815-1251T(a), (g); 29 C.F.R. §§ 2590.715-1251(a), (g); 45 C.F.R. §§ 147.140(a), (g).

[4] INST. OF MED., CLINICAL PREVENTIVE SERVICES FOR WOMEN: CLOSING THE GAPS, available at http://www.iom.edu/Reports/2011/Clinical-Preventive-Services-for-Women-Closing-the-Gaps.aspx (Last visited Apr. 17, 2013) ("IOM Report").

[5] The HRSA guidelines are available at http://www.hrsa.gov/womensguidelines/ (last visited Apr. 17, 2013).

interim final regulations"). Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the ACA, 76 FED. REG. 46,621 (Aug. 3, 2011). The second interim final regulations carve out an exemption allowing certain religious employers to avoid providing insurance coverage for the objected to services. 76 FED. REG. at 46,626 (codified at 45 C.F.R. § 147.130(a)(1)(iv)(B)). The exemption defines religious organizations as those employers that meet the following criteria:

(1) The inculcation of religious values is the purpose of the organization;

(2) The organization primarily employs persons who share the religious tenets of the organization;

(3) The organization serves primarily persons who share the religious tenets of the organization;

(4) The organization is a nonprofit organization as described in section 6033(a)(1) and section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code of 1986, as amended.

The sections of the Internal Revenue Code cited in subsection (4) define nonprofit organizations as "churches, their integrated auxiliaries, and conventions or associations of churches," and "the exclusively religious activities of any religious order" that are exempt from taxation pursuant to 26 U.S.C. § 501(a).

### 4. Temporary Enforcement Safe Harbor Provision

After allowing the public and interested groups to comment on the second interim final regulations, defendants adopted the definition of religious employer contained in those regulations without change on February 15, 2012. Group Health Plans and Health Issuers Relating to Coverage of Preventive Services Under the ACA, 77 FED. REG. 8,725, 8,727-28 (Feb. 15, 2012). The adopted final regulations (the "final regulations") contain a temporary enforcement safe harbor provision for nongrandfathered plans that do not qualify for the religious employer exemption. Id. HHS issued supplemental guidance ("HHS Guidance") with

respect to the safe harbor provision.[6] The safe harbor provision provides that defendants will not take any enforcement action against an employer, a group health plan, or a group health insurance issuer with respect to nonexempt, nongrandfathered group health plans that fail to cover some or all of the recommended preventive services "until the first plan year that begins on or after August 1, 2013." HHS Guidance, at 3. To qualify for the safe harbor provision, an organization must meet the following criteria:

(1) The organization is organized and operates as a non-profit entity.

(2) From February 10, 2012 onward, contraceptive coverage has not been provided at any point by the group health plan established or maintained by the organization, consistent with any applicable State law, because of the religious beliefs of the organization.

(3) . . . [T]he group health plan established or maintained by the organization (or another entity on behalf of the plan, such as a health insurance issuer or third-party administrator) must provide [notice] to participants . . . which states that contraceptive coverage will not be provided under the plan for the first plan year beginning on or after August 1, 2012.

(4) The organization self-certifies that it satisfies criteria 1-3 above, and documents its self-certification in accordance with the procedures detailed [elsewhere in the HHS Guidance].

HHS Guidance, at 3.

### 5.    Advance Notice of Proposed Rulemaking

Following the adoption of the final regulations and the HHS Guidance in February 2012, defendants issued an Advance Notice of Proposed Rulemaking ("ANPRM") on March 21, 2012. Certain Preventive Services Under the ACA, 77 FED. REG. 16,501 (Mar. 21, 2012). The ANPRM seeks additional public comments and sets forth "questions and ideas" on how to best provide women with access to contraceptive services without cost-sharing, while accommodating the

---

[6] HHS, Guidance on the Temporary Enforcement Safe Harbor for Certain Employers, Group Health Plans and Group Health Insurance Issuers with Respect to the Requirement to Cover Contraceptive Services Without Cost Sharing, at 3 (Feb. 10, 2012), <u>available at</u> http://cciio.cms.gov/resources/files/Files2/02102012/20120210-Preventive-Services-Bulletin.pdf (last visited Apr. 17, 2013).

religious liberty concerns articulated by nonexempt religious organizations. Id. at 16,503. By its own terms, the ANPRM aims to "protect . . . religious organizations from having to contract, arrange, or pay for contraceptive coverage." Id. The ANPRM provided a ninety-day comment period ending June 19, 2012. Id.

### 6.    Updated Guidance

The HHS updated its guidance bulletin (the "Updated HHS Guidance") on August 15, 2012 by clarifying three points: "(1) that the safe harbor is also available to non-profit organizations with religious objections to some but not all contraceptive coverage . . .; (2) that group health plans that took some action to try to exclude or limit contraceptive coverage that was not successful as of February 10, 2012, are not for that reason precluded from eligibility for the safe harbor . . .; and (3) that the safe harbor may be invoked without prejudice by non-profit organizations that are uncertain whether they qualify for the religious employer exemption."[7] The safe harbor is aimed at providing an additional year—until the first plan year beginning on or after August 1, 2013—for health plans and health insurance issuers to comply with the preventive care requirement. Updated HHS Guidance at 3.

### 7.    Proposed Rules

On February 6, 2013, defendants issued proposed rules (the "proposed rules") broadening the universe of organizations eligible for an exemption from the contraceptive requirement. Coverage of Certain Preventive Services Under the Affordable Care Act, 78 FED. REG. 8,456, 8,462 (Feb. 6, 2013). In the proposed rules, defendants proposed an accommodation for religious organizations that object to providing contraceptive coverage. The proposed rules exclude from

---

[7] Department of Health and Human Services, Revised Guidance on the Temporary Enforcement Safe Harbor for Certain Employers, Group Health Plans and Group Health Insurance Issuers with Respect to the Requirement to Cover Contraceptive Services Without Cost Sharing, at n.1, available at http://cciio.cms.gov/resources/files/prev-services-guidance-08152012.pdf (last visited Apr. 17, 2013) ("updated HHS Guidance").

the contraceptive requirement those organizations that meet certain criteria: (1) "The organization opposes providing coverage for some or all of the contraceptive services required to be covered under [the final regulations] on account of religious objections;" (2) "The organization is organized and operates as a nonprofit entity;" (3) "The organization holds itself out as a religious organization;" and (4) "The organization self-certifies that it satisfies the first three criteria." 78 FED. REG. at 8,462. In an effort to also accommodate those plan beneficiaries who may not share the beliefs of the organizations claiming the accommodation, the proposed rules also set forth proposed ways "to provide women with contraceptive coverage without cost sharing and to protect eligible organizations from having to contract, arrange, pay, or refer for contraceptive coverage to which they object on religious grounds." Id. at 8,462-64.

**B.** **Claims Presented in the Amended Complaint**

Geneva argues that the statutory scheme outlined above substantially burdens its religious beliefs by requiring it to provide or facilitate coverage for the objected to services against its conscience. (ECF No. 32 ¶¶ 142, 149-51.) Geneva argues that the mandate burdens its employee and student recruitment efforts by creating uncertainty about whether or on what terms it will be able to offer or facilitate health insurance, which puts Geneva at a competitive disadvantage in its efforts to recruit and retain employees and students. (Id. ¶¶ 146-47.)

**C.** **Preliminary Injunction Standard**

The court considers four factors in determining whether to grant a preliminary injunction. A party seeking a preliminary injunction must show: "(1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief." Kos Pharmaceuticals, Inc. v. Andrx Corp., 369 F.3d 700, 708 (3d Cir. 2004)

(citing Allegheny Energy, Inc. v. DQE, Inc., 171 F.3d 153, 158 (3d Cir. 1999)).

Although a party seeking preliminary injunctive relief must make "a clear showing that [it] is entitled to such relief," Winter v. Natural Res. Defense Council, 555 U.S. 7, 22 (2008), demonstrating a likelihood of success on the merits requires only that the party "prove a prima facie case, not a certainty that he or she will win." Highmark, Inc. v. UPMC Health Plan, Inc., 276 F.3d 160, 173 (3d Cir. 2001) (citing 11A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2948.3 (2d ed. 1995)).

### 1. Likelihood of Success on the Merits

#### a. Geneva's Claims Pursuant to the RFRA

Pursuant to the RFRA, the government may not "substantially burden a person's exercise of religion, 'even if the burden results from a rule of general applicability.'" Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal, 546 U.S. 418, 424 (2006) (quoting 42 U.S.C. § 2000bb-1(a)). The government may, however, substantially burden the exercise of religion if the burden: "(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(b). Geneva bears the initial burden under the RFRA of establishing that application of the mandate would substantially burden a sincere religious exercise. O Centro, 546 U.S. at 426.

#### i. Substantial Burden

Under the RFRA, exercise of religion is defined as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000bb-2 (citing 42 U.S.C. § 2000cc-5). The Supreme Court has cautioned courts to be reluctant to "dissect religious beliefs" when engaging in substantial burden analysis. Thomas v. Review Bd. of Ind. Emp't Sec. Div., 450 U.S. 707, 715 (1981). As the court acknowledged with respect to the Hepler plaintiffs,

it must tread lightly when considering whether the mandate's requirements substantially burden Geneva's exercise of religion.

A challenged law substantially burdens Geneva's free exercise of religion if it compels Geneva "to perform acts undeniably at odds with fundamental tenets of their religious beliefs." Wisconsin v. Yoder, 406 U.S. 205, 218 (1972). A substantial burden also exists where a law "put[s] substantial pressure on an adherent to modify his behavior and violate his beliefs." Thomas v. Review Bd., 450 U.S. at 718. Even "onerous" financial costs can rise to the level of a substantial burden. See Jimmy Swaggart Ministries v. Bd. of Equalization of Cal., 493 U.S. 378, 392 (1990) (declining to find a substantial burden, but recognizing that one could exist under certain circumstances).

Defendants do not question the sincerity of Geneva's religious beliefs, but they do dispute whether the mandate's requirements impose a substantial burden on the exercise of those beliefs. Defendants argue that the mandate's requirements do not burden Geneva's exercise of religion because the regulations with respect to Geneva have not been finalized, and it would be "impossible for the Court to meaningfully evaluate whether the yet-to-be amended regulations will impose any burden—much less a substantial one—on Geneva's religious exercise." (ECF No. 89 at 1.) In essence, defendants' response sets forth the same argument[8] they already raised in opposition to Geneva's motion for reconsideration (ECF No. 85), which this court recently granted. (ECF No. 86.) Geneva, for its part, argues that this court's prior ruling with respect to the Hepler plaintiffs' motion for preliminary injunction is applicable to its objections to the

---

[8] As the court already noted, defendants' argument that the proposed rules are not final does not alleviate the burdens Geneva is facing and will continue to face while it attempts to contract for health insurance, which it must do before the August 1, 2013 deadline for issuing defendants' final rules. In light of these facts, and Geneva's stated objections to the accommodation in the proposed rules (ECF No. 81-1 ¶ 3-4), defendants' argument lacks merit insofar as the court has already found that Geneva is currently suffering a real harm as a result of a ripe controversy. The court is, therefore, able to fashion appropriate injunctive relief that will allow Geneva to continue to plan for the upcoming student health plan year without fear that the proposed rules, as they currently stand, will be enforced against them.

mandate, particularly in light of its stated opposition to the accommodation set forth in the proposed rules. (ECF No. 81-1 ¶ 3-4.) Because Geneva objects to the proposed rules as they currently stand, the court will grant Geneva's motion, allowing it to continue the process of contracting for a student health plan for the 2013-2014 plan year.

As this court previously noted, three Supreme Court decisions support Geneva's argument that there is a likelihood of success on the merits with respect to its assertion that it will suffer a substantial burden under the RFRA.[9] First, in <u>Yoder</u>, 406 U.S. at 234-35, the Supreme Court held that a state compulsory education law imposing criminal fines for failing to remain in school until age sixteen violated the free exercise rights of the Old Order Amish. Second, in <u>Sherbert v. Verner</u>, 374 U.S. 398, 410 (1963), the Supreme Court held that a state could not withhold unemployment benefits from a worker who refused employment on grounds that working on Saturdays violated the worker's religious beliefs. Third, in <u>Thomas v. Review Board</u>, 450 U.S. at 719, the Supreme Court again found that a state could not deny unemployment benefits to a worker who terminated his employment because his religious beliefs forbade his participation in the production of tanks. Like the Hepler plaintiffs, Geneva maintains that these decisions support its argument that even indirect burdens on religious exercise are substantial enough to be cognizable under the RFRA.

Under the proposed rules, Geneva is faced with having to choose between violating its deeply held religious beliefs and being forced to terminate its student health insurance coverage, which it alleges also burdens its religious exercise. (ECF No. 32 ¶¶ 116-24.) This kind of Hobson's choice is similar to that faced by the plaintiff in <u>Sherbert</u>, who was "force[d] . . . to

---

[9] The Court of Appeals for the Third Circuit has instructed that courts should look to free exercise decisions issued prior to <u>Employment Division, Department of Human Resources of Oregon v. Smith</u>, 494 U.S. 872 (1990), when interpreting the RFRA, since it was enacted to codify the standard used prior to the <u>Smith</u> decision. <u>Conestoga</u>, 2013 WL 140110, at *10 n.13 (citing <u>Adams v. Comm'r of Internal Revenue</u>, 170 F.3d 173, 176 (3d Cir. 1999)).

choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion in order to accept work, on the other hand." Sherbert, 374 U.S. at 404. Here, Geneva is unable to enjoy the benefits of providing its students with health insurance that is free of the coverage for the objected to services. Geneva maintains that any objected to services provided under the accommodation proposed by defendants would not be "free" in the sense that any costs for such services would be passed on to it through "premiums and/or administrative charges." (ECF No. 32 ¶ 162.) If Geneva were forced to drop its student health insurance plan, it would equally frustrate Geneva's religious desire to support the physical well-being of its students. (Id. ¶ 51.) Like in Yoder, Geneva will suffer a financial hardship if it were forced to drop its student health plan because lack of such a plan will burden its student recruitment efforts, leading to reduced enrollment. (Id. ¶ 146); see Jimmy Swaggart Ministries, 493 U.S. at 392.

Thomas is also instructive with respect to defendants' previously asserted argument that the burden in the present case is too attenuated to be substantial. In addressing whether a pacifist's objection to war was too remote from his former occupation assembling tanks, the Supreme Court noted that "Thomas drew a line, and it is not for [the Court] to say that the line he drew was an unreasonable one." Thomas, 450 U.S. at 715. The Court instructed that "[c]ourts should not undertake to dissect religious beliefs" when analyzing substantial burden questions. Id. Here, Geneva facilitates the provision of its student health insurance, and to force it to choose whether or not to facilitate a student health plan would be, like in Thomas, a line which it should not be forced to cross.

Geneva explicitly objects to the requirement that it facilitate the objectionable coverage to its students, despite the accommodation proposed by defendants. (ECF No. 88-1 ¶ 8.) In light

of this fact, Geneva will be forced to "modify [its] behavior and to violate [its] beliefs" by either giving up its student health insurance generally or providing the objectionable coverage. Thomas, 450 U.S. at 718. As discussed above, this is a quintessential substantial burden, and Geneva demonstrated that it is likely to succeed on the merits with respect to the substantial burden issue.

### ii.    Compelling Government Interest/Least Restrictive Means

Geneva demonstrated that it is likely to succeed in showing that the mandate's requirements impose a substantial burden on its exercise of religion, and now the court must determine whether the mandate's requirements serve "interests of the highest order." Yoder, 406 U.S. at 215. The government bears the burden of demonstrating a compelling interest at this stage, since "the burdens at the preliminary injunction stage track the burdens at trial." O Centro, 546 U.S. at 429-30 (analyzing the applicable burdens under the RFRA). Defendants do not make an argument with respect to this prong of the RFRA analysis beyond stating that the court's previous ruling with respect to the Hepler plaintiffs "cannot be extended to *different* regulations." (ECF No. 89 at 7 n.2.) Defendants have, therefore, failed to meet their burden. O Centro, 546 U.S. at 429-30. Nevertheless, to the extent that defendants' previous arguments remain applicable, they will be discussed herein.

Defendants previously argued that the mandate's requirements serve two complementary compelling interests—namely the need to promote public health and the need to promote gender equality. Few would argue that promoting the public health is not a compelling government interest. See Mead v. Holder, 766 F. Supp. 2d 16, 43 (D. D.C. 2011) (acknowledging that, in the context of the ACA, "the Government clearly has a compelling interest in safeguarding the public health by regulating the health care and insurance markets"). Geneva does not appear to

seriously dispute that public health and gender equality can, in certain circumstances, be compelling government interests.

Geneva instead argues that defendants' proffered interests are too vague and general to satisfy a strict scrutiny analysis. In construing claims pursuant to the RFRA, courts must look "beyond broadly formulated interests justifying the general applicability of government mandates and [scrutinize] the asserted harm of granting specific exemptions to particular religious claimants." O Centro, 546 U.S. at 431. Under the RFRA, the government must "demonstrate that the compelling interest test is satisfied through application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened." Id. at 420 (citing 42 U.S.C. § 2000bb-1(b)). Defendants in the present case fail to show how exempting Geneva from the mandate will "seriously compromise [the government's] ability to administer the program," particularly where defendants are actively trying to exempt entities like Geneva. Id. at 435.

In O Centro, the Supreme Court found that the government failed to make a showing that a ban on the use of a hallucinogenic substance served a compelling interest as applied to a Native American tribe that used the substance as part of its religious services. Id. at 439. The Court relied upon similar religious exemptions granted with respect to the use of peyote by "hundreds of thousands" of members of the Native American Church, and found that such broad exemptions weighed heavily against finding a compelling interest. Id. at 433-34. In light of the myriad exemptions to the mandate's requirements already granted, the requirement is "woefully underinclusive" and therefore does not serve a compelling government interest. Republican Party of Minn. v. White, 536 U.S. 765, 780 (2002).

Several other courts addressing similar challenges to the mandate's requirements point out that over 190 million individuals have already been exempted from the mandate's requirements as a result of the grandfathering provisions in the ACA. E.g. Newland v. Sebelius, 881 F. Supp. 2d 1287, 1298 (D. Colo. 2012) ("[t]he government has exempted over 190 million health plan participants . . . from the preventive care coverage mandate"); Tyndale House, 2012 WL 5817323, at *18 ("Indeed, the 191 million employees excluded from the contraceptive coverage mandate include those covered by grandfathered plans **alone**." (emphasis in original)). Defendants argue that the grandfathering provision is merely temporary, and is aimed at easing in the requirements imposed by the ACA.[10] While true, the mere fact that defendants granted such a broad exemption in the first place severely undermines the legitimacy of defendants' claim of a compelling interest.

In addition to the grandfathering exemption, the ACA contains several other provisions that explicitly or implicitly exclude many other individuals and entities from the mandate. First, the ACA recognizes an exemption for members of a "religious sect or division" that objects to accepting public or private insurance funds. 26 U.S.C. § 5000A(d)(2)(A).[11] Second, defendants exempted more traditional religious employers from the requirement under pressure from other religious groups. 76 FED. REG. at 46,625 (acknowledging that amendments to the interim final rules were necessary in light of comments by religious employers objecting to the mandate). Third, in response to intense public pressure, defendants proposed rules in an attempt to broaden

---

[10] Defendants argue that 190 million is a "vast overstatement of the total number of individuals in grandfathered plans." (ECF No. 78 at 9 n.6.) Accepting the estimates provided by defendants, more than 90 million employees will remain exempt from the mandate by the end of 2013. See Interim Final Rules for Group Health Plans and Health Insurance Coverage Relating to Status as a Grandfathered Health Plan Under the Patient Protection and Affordable Care Act, 75 FED. REG. 34,538, 34,552 (Jun. 17, 2010).

[11] Defendants argue that this provision does not apply to the mandate; however, the provision provides an exemption to the requirement that individuals maintain a certain level of health insurance coverage under the ACA. To the extent that those exempted individuals would otherwise purchase insurance pursuant to a group health plan that is subject to the mandate, they are, in essence, exempt from the mandate's requirements.

the religious institutions' exemption. 78 FED. REG. at 8,462. This exemption is most significant with respect to Geneva, since it is aimed directly at accommodating institutions exactly like it, even though Geneva argues that it does not go far enough toward protecting its religious interests. In light of these myriad exemptions, the "[mandate] cannot be regarded as protecting an interest 'of the highest order,'" particularly in a case like this where "it leaves appreciable damage to that supposedly vital interest unprohibited." Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 547 (1993). The tens of millions of individuals who remain unaffected by the mandate's requirements—including those institutions that have no objection to the accommodation—contradict any notion that the government's interests are as compelling as defendants argue.

As discussed above, defendants failed to meet their burden with respect to the compelling interest prong by failing to assert any applicable argument and the court will therefore end its analysis with that conclusion. O Centro, 546 U.S. at 429-30 (where the government fails to meet its burden under the compelling interest test, the court need not address the least restrictive means prong of the analysis).

### 2.  **Irreparable Harm to Geneva**

Irreparable harm is an injury that cannot be adequately compensated at a later date in the ordinary course of litigation. The Supreme Court has held, and defendants concede, that "[t]he loss of First Amendment freedoms," or a violation of the RFRA, "for even minimal periods of time, unquestionably constitutes irreparable injury." Elrod v. Burns, 427 U.S. 347, 373 (1976).[12] This is particularly true when Geneva made a strong showing that is likely to succeed on the

---

[12] As noted in Tyndale House, 2012 WL 5817323, at *18, the same rights are at issue in both the RFRA and in First Amendment cases, because RFRA "covers the same types of rights as those protected under the Free Exercise Clause of the First Amendment. Id. (citing O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft, 389 F.3d 973, 995 (10th Cir. 2004), aff'd, 546 U.S. 429 (2006); see Kikumura v. Hurley, 242 F.3d 950, 963 (10th Cir. 2001) (citing Jolly v. Coughlin, 76 F.3d 468, 482 (2d Cir. 1996)).

merits of its constitutional claim. See Trefelner v. Burrell Sch. Dist., 655 F. Supp. 2d 581, 596

(W.D. Pa. 2009) (citing 11A CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & MARY KAY KANE,

FEDERAL PRACTICE AND PROCEDURE § 2948.1 (2d ed. 1995)).

As demonstrated by the discussion above, the court concludes that because coverage

must be obtained by August 1, 2013 (before the proposed rules must be finalized), Geneva will

be irreparably harmed if it is forced either to forgo providing student health insurance coverage

or to violate its sincerely held religious beliefs by contracting for coverage that requires it to pay,

albeit by indirect means, to include the objected to services in its student health care insurance.

Because the harm Geneva will suffer is a result of at least a statutory violation, denial of the

requested relief will result in the loss of vital religious freedoms, which "for even minimal

periods of time, unquestionably constitutes irreparable injury." Elrod, 427 U.S. 373. This factor

weighs strongly in favor of granting the requested relief.

### 3.      Irreparable Harm to Defendants

Defendants will suffer little, if any, harm should the requested relief be granted.

Defendants have already granted significant exemptions to the mandate, and continue to exempt

others for limited periods of time pursuant to the non-enforcement safe harbor provision. The

requested relief in the present case will maintain the status quo until the statutory and

constitutional questions raised by Geneva and other similarly-situated individuals and entities

can be resolved. Kos Pharms., 369 F.3d at 708 (quoting Opticians Ass'n of Am. v. Indep.

Opticians of Am., 920 F.2d 187, 197 (3d Cir. 1990)).

As noted in the court's prior decision, defendants, in other cases involving challenges to

the mandate, have acquiesced to the imposition of injunctive relief. Id. (citing Sharpe Holdings,

Inc. v. U.S. Dep't of Health & Human Servs., No. 2:12-cv-00092, ECF No. 41 (E.D. Mo. Mar.

11, 2013); <u>Sioux Chief Mfg. Co. v. Sebelius</u>, No. 4:13-cv-0036, ECF No. 9 (W.D. Mo. Feb. 28, 2013)); <u>see also</u> <u>Hall v. Sebelius</u>, No. 13-0295, ECF No. 10 (D. Minn. Apr. 2, 2013); <u>Bick Holding, Inc. v. Sebelius</u>, No. 4:13-cv-00462, ECF No. 18 (E.D. Mo. Apr. 1, 2013. Defendants cannot claim irreparable harm in this case while acquiescing to preliminary injunctive relief in other cases. Because defendants are also in the process of seeking to accommodate institutions just like Geneva, granting the present motion will simply maintain the status quo and will impose no hardship on defendants. In light of the exemptions granted, the attempts to accommodate Geneva, and defendants' position with respect to injunctive relief in other cases, defendants stand to suffer little harm and this factor weighs strongly in favor of granting the requested relief.

### 4.    <u>Public Interest</u>

The public interest will likewise benefit if the court grants the requested relief, because "[t]here is a strong public interest in protecting fundamental First Amendment rights." <u>Trefelner</u>, 655 F. Supp. 2d at 598. That strong interest includes fundamental religious rights codified by statute in the RFRA. <u>Kikumura</u>, 242 F.3d at 963. "'As a practical matter, if a plaintiff demonstrates both a likelihood of success on the merits and irreparable injury, it almost always will be the case that the public interest will favor the plaintiff.'" <u>Ramsey v. City of Pittsburgh</u>, 764 F. Supp. 2d 728, 734-35 (W.D. Pa. 2011) (citing <u>Am. Tel. and Tel. Co. v. Winback & Conserve Program, Inc.</u>, 42 F.3d 1421, 1427 n.8 (3d Cir. 1994)).

Apart from the broader policy reasons for granting Geneva's requested relief, pragmatic concerns dictate the same outcome. Forcing Geneva to drop its student health insurance out of fear that the current proposed regulations will continue to violate its religious beliefs will impose a substantial burden on those students who rely upon school-provided health insurance. (ECF

No. 88-1 ¶¶ 10-11.) This consideration, along with the public interest in preserving religious liberties, leads this factor to weigh heavily in favor of granting the requested relief.

5.    **Balancing Harms**

Geneva showed that it is likely to succeed on the merits of its RFRA claim; that it will suffer irreparable harm absent injunctive relief; and that the public interest favors granting injunctive relief. In light of the exemptions granted and the position taken by defendants in other similar cases, the harm to defendants is not significant. These showings lead the court to conclude that the balance of the factors weighs heavily in favor of granting the requested relief.

III.    **CONCLUSION**

For the reasons set forth herein, plaintiffs' motion for a preliminary injunction will be GRANTED. An appropriate order will follow.

June 18, 2013

BY THE COURT:

 /s/ Joy Flowers Conti
Joy Flowers Conti
United States District Judge