# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

GENEVA COLLEGE; WAYNE L.
HEPLER; THE SENECA HARDWOOD
LUMBER COMPANY, INC., a
Pennsylvania Corporation; WLH
ENTERPRISES, a Pennsylvania Sole
Proprietorship of Wayne L. Hepler; and
CARRIE E. KOLESAR

      Plaintiffs,

      v.

KATHLEEN SEBELIUS
*in her official capacity as Secretary of the*
*United States Department of Health and*
*Human Services,* HILDA SOLIS
*in her official capacity as Secretary of the*
*United States Department of Labor,*
TIMOTHY GEITHNER
*in his official capacity as Secretary of the*
*United States Department of the Treasury,*
UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES,
UNITED STATES DEPARTMENT OF
LABOR, UNITED STATES
DEPARTMENT OF THE TREASURY

      Defendants

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 12-0207

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

**CONTI, Chief District Judge**

      Pending before the court is the Second Motion for Preliminary Injunction (ECF

No. 105), and brief in support and reply brief, (ECF No. 106 and 111), filed by plaintiff Geneva

College ("Geneva"), and the response in opposition, (ECF No. 107), filed by defendants

Kathleen Sebelius, Hilda Solis, Timothy Geithner, the United States Department of Health and

Human Services ("HHS"), the United States Department of Labor, and the United States Department of the Treasury (collectively, "defendants").

Geneva seeks an order protecting it from complying with the requirement that it include coverage for certain preventative services as part of the health insurance it provides to its employees. Geneva objects specifically to the requirement that it provide insurance coverage for abortifacient products such as ella, Plan B, and intrauterine devices (collectively, the "objected to services").

For purposes of the present motion, Geneva argues that the law requiring it to provide insurance coverage for the objected to services, 42 U.S.C. § 300gg-13(a)(4) (referred to generally as the "Mandate"), violates the Religious Freedom Restoration Act of 1993, 42 U.S.C. § 2000bb-1 (the "RFRA"). Under the RFRA, the government may not "substantially burden" a person's exercise of religion, unless the burden: (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest. 42 U.S.C. § 2000bb-1(a) and (b).

Geneva advised the court that it does not desire an evidentiary hearing or oral argument on the instant motion and intends to proceed on the record and briefing that is presently before the court. (ECF No. 105 at 2.) Defendants did not object to proceeding in this manner. As it did with respect to both of the prior motions for preliminary injunctive relief, the court will proceed without an evidentiary hearing or oral argument. Williams v. Curtiss-Wright Corp., 681 F.2d 161, 163 (3d Cir. 1982) (noting that "[i]t has long been recognized that a preliminary injunction may issue on the basis of affidavits and other written evidence, without a hearing, if the evidence submitted by both sides does not leave unresolved any relevant factual issue").

Geneva indicated that the court must rule on its motion no later than December 31, 2013, so that it may continue to contract for its employee health insurance plan for the 2014-15 plan year, which is scheduled to begin on January 1, 2014. The matter is ripe for disposition.

## I.     **Procedural Background**

The court previously issued findings of fact and conclusions of law, and entered orders preliminarily enjoining defendants from enforcing the Mandate against the Hepler plaintiffs, (ECF Nos. 83 and 84), and against Geneva with respect to its student health insurance plan, (ECF Nos. 91 and 92), in part because plaintiffs established a likelihood of success on the merits with respect to their RFRA claims. Geneva College v. Sebelius, 941 F.Supp.2d 672, 680-86 (W.D. Pa. 2013) (Hepler injunction); Geneva College v. Sebelius, -- F.Supp.2d --, 2013 WL 3071481, at *10-11 (W.D. Pa. Jun. 18, 2013) (Geneva student plan injunction).[1]

Since the court entered those two preliminary injunction orders three significant events occurred: (1) defendants filed interlocutory appeals in the Court of Appeals for the Third Circuit from both preliminary injunction orders. Geneva College, et al. v. Secretary United States Department of Health and Human Services, et al., Nos. 13-2814 and 13-3536 (3d Cir. 2013); (2) the relevant federal agencies issued rules finalizing the self-certification procedure to be followed by religious-based organizations which object to providing coverage for certain preventative services, such as contraceptives and abortion-inducing drugs or devices (the "Final Rules"). Coverage of Certain Preventative Services Under the Affordable Care Act, 78 FED.

---

[1] The court also issued lengthy memorandum opinions with respect to defendants' motion to dismiss, (ECF No. 74), and Geneva's motion for reconsideration, (ECF No. 86), which not only addressed foundational issues, such as standing and ripeness, but also substantively analyzed the substantial burden and compelling interest elements of plaintiffs' RFRA claims. (ECF No. 74 at 36-43); Geneva College v. Sebelius, 929 F.Supp.2d 402, 430-35 (W.D. Pa. 2013).

REG. 39,870-39,899 (Jul. 2, 2013), <u>available</u> <u>at</u> 2013 WL 3294256; and (3) the United States
Supreme Court granted certiorari in two cases in which for-profit, secular closely-held
corporations alleged that the Mandate violates the RFRA. <u>Conestoga Wood Specialties Corp. v.</u>
<u>Sebelius</u>, No. 13-356, 2013 WL 5297800 (U.S. Nov. 26, 2013), and <u>Sebelius v. Hobby Lobby</u>
<u>Stores, Inc.</u>, No. 13-354, 2013 WL 5297798 (U.S. Nov. 26, 2013).

## A. The Interlocutory Appeals

Defendants' interlocutory appeals from this court's orders preliminarily enjoining
enforcement of the Mandate against the Helper plaintiffs and Geneva's student health insurance
plan are pending before the Court of Appeals for the Third Circuit at Appeal Numbers 13-2814
(Hepler injunction) and 13-3536 (Geneva student plan injunction). <u>Geneva College, et al. v.</u>
<u>Secretary United States Department of Health and Human Services, et al.</u>, Appeal Nos. 13-2814
and 13-3536 (3d Cir. 2013). The court of appeals consolidated the cases.

The Hepler plaintiffs recently filed a motion in the court of appeals asking that
their case be held in abeyance pending the Supreme Court's decision in <u>Conestoga Wood</u>.
(Appeal No. 13-2814, Doc. 003111466403 at 1.) Geneva did not file a companion motion, but
did not object to also holding its case in abeyance. (<u>Id.</u> at 2-3.) In response, defendants argued
that the appellate court should immediately vacate the Hepler injunction pursuant to the court of
appeals' controlling decision in <u>Conestoga Wood Specialties Corp. v. Sebelius</u>, 724 F.3d 377 (3d
Cir. 2013), which held that a for-profit, secular, closely-held corporation could not assert a
RFRA challenge to the Mandate. (Appeal No. 13-2814, Doc. 003111472846 ¶ 1.) With respect
to the appeal from the Geneva injunction, defendants suggested that the appellate court hold the
matter in abeyance for ninety days so that any appeal resulting from this court's disposition of
the instant motion could be consolidated with the already-pending appeal concerning Geneva's

student plan.  (Id. ¶ 2.)  The Hepler plaintiff's motion was referred to a motions panel of the court of appeals on December 11, 2013. (Appeal No. 13-2814, at Doc. 003111478999). Although opening briefs were due January 13, 2014, briefing is stayed pending disposition of this motion. (Id.)

Although neither party addresses this court's ability to decide the instant motion while these appeals are pending, the court independently examined the scope of its jurisdiction under these circumstances.  An interlocutory appeal does not divest the district court of jurisdiction. United States v. Price, 688 F.2d 204, 215 (3d Cir. 1982) (citing 16 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 3921.2 (2d ed. 1995)). This court retains the ability to proceed with those matters not involved in the appeal. New York State Nat'l Org. for Women v. Terry, 886 F.2d 1339, 1350 (2d Cir. 1989).  The two preliminary injunction orders subject to appeal do not address application of the Final Rules to Geneva's employee health plan.  For this reason, the present motion raises novel issues and this court retains jurisdiction to decide the instant motion.

### B.  The Final Rules

This summer, various federal agencies issued the Final Rules implementing the Mandate. Coverage of Certain Preventative Services Under the Affordable Care Act, 78 FED. REG. at 39,870 (Jul. 2, 2013), available at 2013 WL 3294256.  The Final Rules were issued on June 28, 2013, published in the Federal Register on July 2, 2013, and became effective on August 1, 2013. 78 FED. REG. at 39,870; (ECF No. 98 ¶ 145.)  The Final Rules include two concessions for religious-based employers that object to providing coverage for the contraceptive services and devices required by the Mandate: (1) an absolute exemption for certain religious employers, such as churches and their related auxiliaries and associations; and (2) a self-

certification accommodation for nonprofit organizations that hold themselves out as a religious organization. 78 FED. REG. at 39,873-78.

Under the latter accommodation, if a nonprofit, religious organization, objects to providing contraceptive services due to a religious objection, it can execute a self-certification form, which notifies its insurance carrier that the organization refuses to provide coverage for certain preventative services, such as the objected to services. 78 FED. REG. at 39,874-75; 45 C.F.R. § 147.131(b). Upon receipt of a self-certification form, the insurer must offer the objected to services to employees without direct or indirect cost to the employee or the organization. 78 FED. REG. at 39,875-77; 45 C.F.R. § 147.131(c)(2)(ii) and (d). This process is referred to herein as the "eligible organization accommodation" or the "self-certification process."[2]

Plaintiffs filed a second amended complaint on October 18, 2013, which added allegations relating to the Final Rules, including, specifically, the eligible organization accommodation's self-certification process. (ECF No. 98 ¶¶ 145-82.)

## C. Supreme Court Appeals and Recent Case Law

In November 2013, the United States Supreme Court granted two petitions for a writ of certiorari in cases filed by for-profit, secular, closely-held corporations seeking to prevent enforcement of the Mandate against company health plans on the basis of the owners' religious beliefs. Conestoga Wood Specialties Corp. v. Sebelius, No. 13-356, 2013 WL 5297800 (U.S. Nov. 26, 2013), and Sebelius v. Hobby Lobby Stores, Inc., No. 13-354, 2013 WL 5297798 (U.S.

---

[2] This accommodation is also reflected in the Treasury Department's regulations, 78 FED. REG. at 39,892, 26 C.F.R. § 54.9815-2713A, and the Labor Department's regulations, 78 FED. REG. at 39,894-95, 29 C.F.R. § 2590.713-2715A. The court refers only to the amended regulations of the Department of Health and Human Services. 78 FED. REG. at 39,896-97, 45 C.F.R. § 147.131(c)(2)(ii) and (d).

Nov. 26, 2013). In <u>Conestoga Wood</u> the Court of Appeals for the Third Circuit held that

Conestoga Wood Specialties could not assert a RFRA claim because corporations have no First

Amendment free exercise rights, and the rights of the individual owners could not pass through

to the corporation. <u>Conestoga Wood Specialties Corp. v. Sebelius</u>, 724 F.3d 377 (3d Cir. 2013).

In contrast, in <u>Hobby Lobby</u>, the Court of Appeals for the Tenth Circuit held that corporations

have First Amendment free exercise rights, and, as a result, Hobby Lobby could assert a RFRA

claim. The court of appeals went on to conclude that the Mandate imposed a substantial burden

on the corporation's free exercise rights, which could not be justified by any compelling state

interest. <u>Hobby Lobby Stores, Inc. v. Sebelius</u>, 723 F.3d 1114 (10th Cir. 2013). The Supreme

Court consolidated the <u>Conestoga Wood</u> and <u>Hobby Lobby</u> appeals. The publicly available

docket does not reflect a briefing schedule, although customary Supreme Court procedure would

dictate that the parties' opening merits briefs be filed in mid-January and mid-February, with

petitioner's reply brief due in mid-March. The Supreme Court docket does reflect that <u>amicus</u>

<u>curiae</u> briefs, in support of any party, must be filed by January 28, 2014. It does not appear that

the Supreme Court will hear oral argument on these cases before the March 2014 sitting.

　　　　Three other courts of appeals have recently ruled on the same, or very similar,

issues as were decided in <u>Conestoga Wood</u> and <u>Hobby Lobby</u>:

　　(1) In <u>Autocam Corp. v. Sebelius</u>, the Court of Appeals for the Sixth Circuit held that a

　　　　for-profit, secular, closely-held corporation could not assert a RFRA challenge to the

　　　　Mandate because it was not a "person" within the meaning of the statute. <u>Autocam</u>

　　　　<u>Corp. v. Sebelius</u>, 730 F.3d 618, 625-26 (6th Cir. Sep. 17, 2013). In reaching this

　　　　holding, the court emphasized that the free exercise rights of "religious entities" are

　　　　different than those of for-profit, secular corporations. <u>Id.</u> at 627. The Court of

Appeals for the Third Circuit made this same distinction. Conestoga Wood, 724 F.3d at 385-86, discussed, infra p. 21.

(2) In Gilardi v. United States Department of Health and Human Services, the Court of Appeals for the District of Columbia Circuit held that a for-profit, secular, closely-held corporation did not possess free exercise rights, and could not assert a RFRA claim, but that the owners of the corporation unquestionably possessed such individual rights and could assert them under the RFRA. Gilardi v. United States Department of Health and Human Services, 733 F.3d 1208, 1212-16 (D.C. Cir. Nov. 1, 2013). The court of appeals concluded that the Mandate substantially burdened the owners' religious exercise, and could not survive the compelling government interest/least restrictive means test set forth in the RFRA. Id. at 1216-24.

(3) In Korte v. Sebelius, the Court of Appeals for the Seventh Circuit held that for-profit, secular, closely-held corporations were "persons" within the statutory language of the RFRA. Korte v. Sebelius, 735 F.3d 654, 673-82 (7th Cir. Nov. 8, 2013). The appellate court concluded that the Mandate substantially burdened the plaintiffs' exercise of religion and failed the RFRA's compelling government interest/least restrictive means test. Id. at 682-87.

Although the Supreme Court will address a RFRA challenge to the Mandate, neither of the cases under consideration, nor any of the appellate decisions set forth above, involve a nonprofit, religious organization's challenge to the eligible organization accommodation and its self-certification process. The court is unaware of any court of appeals to have considered such a challenge. Three federal district courts have considered such a challenge to date. Two of those courts held that the eligible organization accommodation's self-

certification process violates the RFRA. <u>The Roman Catholic Archdiocese of New York v.</u>

<u>Sebelius</u>, -- F.Supp.2d --, No. 12-2541, 2013 WL 6579764 (E.D.N.Y. Dec. 16, 2013); <u>Zubik v.</u>

<u>Sebelius</u>, -- F.Supp.2d --, Nos. 13-1459 (Pitts.) and 13-303 (Erie), 2013 WL 6118696 (W.D. Pa.

Nov. 21, 2013) (J. Schwab).  The other district court held that the accommodation did not violate

the RFRA, or any Constitutional provision.  <u>Priests for Life, et al. v. United States Dep't of</u>

<u>Health and Human Services</u>, -- F.Supp.2d --, No. 13-1261, 2013 WL 6672400 (D.D.C. Dec. 19,

2013).


## II.  <u>FINDINGS OF FACT</u>[3]

Geneva is a nonprofit institution of higher learning established in Beaver Falls,

Pennsylvania, in 1848 by the Reformed Presbyterian Church of North America ("RPCNA").

(ECF Nos. 91 at 3; 98 ¶¶ 12, 25.)  Geneva's mission is "to glorify God by educating and

ministering to a diverse community of students in order to develop servant-leaders who will

transform society for the kingdom of Christ." (ECF Nos. 91 at 3; 98 ¶ 25.)  This mission is

central to Geneva's institutional identity and activities. (ECF Nos. 91 at 3; 98 ¶¶ 27-29.)  Geneva

offers a traditional liberal arts and sciences curriculum as well as student programs and services

that are rooted in the Christian faith. (ECF Nos. 91 at 3-4; 98 ¶ 26.)  Pursuant to its mission and

goals, Geneva has historically promoted a diverse student population and has opposed

institutions (such as slavery) that it finds inimical to its beliefs. (ECF Nos. 91 at 4; 98 ¶¶ 36-37.)

Geneva is governed by a board of corporators and a board of trustees. (ECF Nos.

91 at 4; 98 ¶¶ 30, 33.)  Members of the board of corporators must be members of the RPCNA

---

[3] The findings of fact contained herein are derived from the court's previous findings of fact,
(ECF Nos. 83 and 91), as well as the allegations of the second amended complaint (ECF No. 98).
Because the factual background has not changed, many of the factual findings are identical to
those made with respect to Geneva's previous preliminary injunction motion.

and members of the board of trustees must be members of either the RPCNA or some other Reformed or Evangelical Christian congregation. (Id.) Geneva's faculty, staff, and administration are drawn from among those who profess faith in Christ and who otherwise agree with the college's Christian convictions. (ECF Nos. 91 at 4; 98 ¶ 34.) Geneva has approximately 350 employees, about 280 of which are full-time. (ECF No. 98 ¶ 39.) There are approximately 95 full-time faculty members. (Id.) Geneva does not require its students to profess a particular faith, but it does give enrollment priority to Evangelical Christians and requires all students to live by standards of Christian morality. (ECF Nos. 91 at 4; 98 ¶ 35.)

Geneva and the RPCNA firmly believe "that the procurement, participation in, facilitation of, or payment for abortion [including the use of what it alleges are abortion-causing drugs like Plan B and ella] violates the Commandment against murder." (ECF Nos. 91 at 4; 98 ¶ 45.) Geneva identifies several texts, including the Ten Commandments, Scripture, the articulated statements of the RPCNA, and the Westminster Larger Catechism in support of its view that human life begins at the moment of fertilization, and that any destruction of a human life thereafter constitutes murder. (ECF Nos. 91 at 4; 98 ¶¶ 40-46.) Geneva's Student Handbook expressly provides that abortion "will not be tolerated." (ECF Nos. 91 at 4; 98 ¶ 51.) In furtherance of its views on abortion, Geneva's students and staff participate in a host of pro-life activities both on and off campus. (ECF Nos. 91 at 4; 98 ¶¶ 47-50.)

Geneva provides health insurance coverage to its employees and makes health insurance coverage available to its students. (ECF Nos. 91 at 5; 98 ¶ 52.) Geneva considers providing health care to its employees to be part of its religious duty. (ECF No. 98 ¶ 52.) Geneva's contract for employee health coverage states that it excludes "[a]ny drugs used to abort a pregnancy." (ECF No. 98 ¶ 54.) The next plan year for the employee health plan is scheduled

to begin on January 1, 2014.  (Id. ¶ 53.)   Although Geneva is permitted to exclude morally objectionable abortion-inducing drugs and devices from its current employee health insurance plan under the Temporary Enforcement Safe Harbor provision, that provision will expire with respect to Geneva's employee plan when the new plan year commences on January 1, 2014. (ECF No. 106 at 1 n.1); 78 FED. REG. 39,870, 39,872.

Without the relief requested, Geneva will be forced to choose between: (a) violating its religious convictions by acquiescing to a government requirement that it facilitate access to abortion-inducing drugs and devices; and (b) violating its religious convictions by cancelling all health care coverage for its employees.  (ECF No. 111 at 1.)  Geneva's religious convictions forbid it from participating in providing free access to the objected to services through its employee health care plan. (ECF No. 98 ¶ 186.)  Geneva has a religious duty to provide for the well-being of its employees and their families.  (Id. at ¶¶ 52, 183-84.)  Because Geneva has more than 50 full-time employees, it is required under the ACA to provide health insurance to its employees or incur substantial penalties, or be subject to legal action.  (ECF No. 98 ¶ 39, 109-10); 26 U.S.C. §§ 4980D(b)(1) and H(c)(1); 29 U.S.C. § 1132; 42 U.S.C. § 18011. Dropping its employee health insurance plan would not only violate Geneva's religious duty to provide for its employee's well-being, but also subject Geneva to crippling penalties and place Geneva at a severe competitive disadvantage in its efforts to recruit and retain employees.  (ECF No. 98 ¶¶ 9, 52, 109, 183-84, 187, 197.)

III.     **CONCLUSIONS OF LAW**

    A.     **The Relevant Statutes and Regulations Concerning the Objected to Services**

        1.     **The Patient Protection and Affordable Care Act of 2010**

On March 23, 2010, the Patient Protection and Affordable Care Act of 2010, Pub. L. No. 111-148, 124 Stat. 119 (Mar. 23, 2010) ("ACA"), became law and an overhaul of the nation's healthcare system began.  Section 1001 of the ACA includes specific measures related to preventive care for women, and provides in part:

> (a) In general
>
> A group health plan and a health insurance issuer offering group or individual health insurance coverage shall, at a minimum provide coverage for and shall not impose any cost sharing requirements for—
>
> * * *
>
> > (4) with respect to women, such additional preventive care and screenings not described in paragraph (1) as provided for in comprehensive guidelines supported by the Health Resources and Services Administration ["HRSA"] for purposes of this paragraph.

42 U.S.C. § 300gg-13 (the "preventive care provision").  Because the ACA did not specifically identify which preventive care services would have to be provided without cost sharing, further rulemaking was necessary.

        2.     **Preventive Care Services and Interim Final Rules**

On July 19, 2010, defendants (the Departments of Health and Human Services, Labor, and Treasury) issued interim Final Rules implementing the preventive care provision.  Interim Final Rules for Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the ACA (the "first interim Final Rules"), 75 FED. REG. 41,726 (Jul. 19, 2010).  The first interim Final Rules required all group health plans and health insurance

issuers offering nongrandfathered[4] group or individual health coverage to cover, without cost-sharing, the preventive care services outlined in 42 U.S.C. § 300gg-13. Id. at 41,728. The first interim Final Rules directed the HHS, in conjunction with the Institute of Medicine ("IOM"), to determine what preventive services are necessary and beneficial for women's health and well-being. Id. The IOM was to report its findings to the Health Resources and Services Administration ("HRSA"), which was to issue the necessary guidelines. The report issued by the IOM[5] on July 19, 2011, recommended that the HRSA guidelines include, *inter alia*: "[t]he full range of Food and Drug Administration [("FDA")]-approved contraceptive methods, sterilization procedures, and patient education and counseling for women with reproductive capacity." IOM Report at 10. FDA-approved contraceptive methods include the objected to services, such as the drugs ella and Plan B, as well as intrauterine devices.

### 3. HRSA Guidelines

On August 1, 2011, the HRSA adopted guidelines pursuant to the IOM recommendations[6] and on August 3, 2011, again issued interim Final Rules (the "second interim Final Rules"). Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the ACA, 76 FED. REG. 46,621 (Aug. 3, 2011). The second interim Final Rules carved out an exemption allowing certain religious employers to avoid providing

---

[4] The preventive services provisions do not apply to health plans that are grandfathered. A plan is grandfathered if: (1) at least one person was enrolled on March 23, 2010; (2) the plan continuously covered at least one individual since that date; (3) the plan provides annual notice of its grandfathered status; and (4) the plan has not been subject to significant changes as outlined in the regulations. See 42 U.S.C. § 18011; 26 C.F.R. §§54.9815-1251T(a), (g); 29 C.F.R. §§ 2590.715-1251(a), (g); 45 C.F.R. §§ 147.140(a), (g). There is no dispute that Geneva's employee health plan is not entitled to grandfather status.
[5] INST. OF MED., CLINICAL PREVENTIVE SERVICES FOR WOMEN: CLOSING THE GAPS, available at http://www.iom.edu/Reports/2011/Clinical-Preventive-Services-for-Women-Closing-the-Gaps.aspx (last visited Dec. 19, 2013) ("IOM Report").
[6] The HRSA guidelines are available at http://www.hrsa.gov/womensguidelines/ (last visited Dec. 19, 2013).

insurance coverage for the objected to services. 76 FED. REG. at 46,626 (codified at 45 C.F.R. § 147.130(a)(1)(iv)(B)). The "religious employer exemption" defines religious organizations as those employers that meet the following criteria:

(1) The inculcation of religious values is the purpose of the organization;

(2) The organization primarily employs persons who share the religious tenets of the organization;

(3) The organization serves primarily persons who share the religious tenets of the organization;

(4) The organization is a nonprofit organization as described in section 6033(a)(1) and section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code of 1986, as amended.

The sections of the Internal Revenue Code cited in subsection (4) define nonprofit organizations as "churches, their integrated auxiliaries, and conventions or associations of churches," and "the exclusively religious activities of any religious order" that are exempt from taxation pursuant to 26 U.S.C. § 501(a).

### 4.        Temporary Enforcement Safe Harbor Provision

After allowing the public and interested groups to comment on the second interim Final Rules, defendants adopted the definition of religious employer contained in those regulations without change on February 15, 2012. Group Health Plans and Health Issuers Relating to Coverage of Preventive Services Under the ACA, 77 FED. REG. 8,725, 8,727-28 (Feb. 15, 2012).  These regulations contained a temporary enforcement safe harbor provision for nongrandfathered plans that do not qualify for the religious employer exemption. Id.  HHS issued

supplemental guidance ("HHS Guidance") with respect to the safe harbor provision.[7] The safe harbor provision provides that defendants will not take any enforcement action against an employer, a group health plan, or a group health insurance issuer with respect to nonexempt, nongrandfathered group health plans that fail to cover some or all of the recommended preventive services "until the first plan year that begins on or after August 1, 2013." HHS Guidance, at 3. To qualify for the safe harbor provision, an organization must meet the following four criteria:

(1) The organization is organized and operates as a nonprofit entity.

(2) From February 10, 2012 onward, contraceptive coverage has not been provided at any point by the group health plan established or maintained by the organization, consistent with any applicable State law, because of the religious beliefs of the organization.

(3) . . . [T]he group health plan established or maintained by the organization (or another entity on behalf of the plan, such as a health insurance issuer or third-party administrator) must provide [notice] to participants . . . which states that contraceptive coverage will not be provided under the plan for the first plan year beginning on or after August 1, 2012.

(4) The organization self-certifies that it satisfies criteria 1-3 above, and documents its self-certification in accordance with the procedures detailed [elsewhere in the HHS Guidance].

HHS Guidance, at 3.

---

[7] HHS, Guidance on the Temporary Enforcement Safe Harbor for Certain Employers, Group Health Plans and Group Health Insurance Issuers with Respect to the Requirement to Cover Contraceptive Services Without Cost Sharing (reissued bulletin), at 3 (Feb. 10, 2012), available at http://www.cms.gov/CCIIO/Resources/Regulations-and-Guidance/Downloads/preventive-services-guidance-6-28-2013.pdf (last visited Dec. 19, 2013).

### 5.     Advance Notice of Proposed Rulemaking

Following the adoption of the regulations and the HHS Guidance in February

2012, defendants issued an Advance Notice of Proposed Rulemaking ("ANPRM") on March 21,

2012. Certain Preventive Services Under the ACA, 77 FED. REG. 16,501 (Mar. 21, 2012).  The

ANPRM sought additional public comments and set forth "questions and ideas" on how to best

provide women with access to contraceptive services without cost-sharing, while

accommodating the religious liberty concerns articulated by nonexempt religious organizations.

Id. at 16,503.  By its own terms, the ANPRM aimed to "protect . . . religious organizations from

having to contract, arrange, or pay for contraceptive coverage." Id. The ANPRM provided a

ninety-day comment period ending June 19, 2012. Id.

### 6.     Updated Guidance

The HHS updated its guidance bulletin (the "Updated HHS Guidance") on August

15, 2012 by clarifying three points: "(1) that the safe harbor is also available to nonprofit

organizations with religious objections to some but not all contraceptive coverage . . .; (2) that

group health plans that took some action to try to exclude or limit contraceptive coverage that

was not successful as of February 10, 2012, are not for that reason precluded from eligibility for

the safe harbor . . .; and (3) that the safe harbor may be invoked without prejudice by nonprofit

organizations that are uncertain whether they qualify for the religious employer exemption."[8]

The safe harbor was aimed at providing an additional year—until the first plan year beginning on

---

[8] Department of Health and Human Services, Revised Guidance on the Temporary Enforcement Safe Harbor for Certain Employers, Group Health Plans and Group Health Insurance Issuers with Respect to the Requirement to Cover Contraceptive Services Without Cost Sharing, at n.1, available at http://wayback.archive-it.org/2744/20130514175209/http://cciio.cms.gov/resources/files/prev-services-guidance-08152012.pdf (last visited Dec. 19, 2013) ("updated HHS Guidance").

or after August 1, 2013—for health plans and health insurance issuers to comply with the preventive care requirement. Updated HHS Guidance at 3.

### 7. Proposed Rules

On February 6, 2013, defendants issued proposed rules (the "proposed rules") broadening the universe of organizations eligible for an exemption from the contraceptive requirement. Coverage of Certain Preventive Services under the Affordable Care Act, 78 FED. REG. 8,456, 8,462 (Feb. 6, 2013). In the proposed rules, defendants recommended an accommodation for religious organizations that object to providing contraceptive coverage. The proposed rules exclude from the contraceptive requirement those organizations that meet certain criteria:

> (1) The organization opposes providing coverage for some or all of the contraceptive services required to be covered under [the Final Rules] on account of religious objections;
>
> (2) The organization is organized and operates as a nonprofit entity;
>
> (3) The organization holds itself out as a religious organization; and
>
> (4) The organization self-certifies that it satisfies the first three criteria.

78 FED. REG. at 8,462. In an effort to also accommodate those plan beneficiaries who may not share the beliefs of the organizations claiming the accommodation, the proposed rules also set forth possible ways "to provide women with contraceptive coverage without cost sharing and to protect eligible organizations from having to contract, arrange, pay, or refer for contraceptive coverage to which they object on religious grounds." Id. at 8,462-64.

### 8. Final Rules

On June 28, 2013, the pertinent federal agencies issued the Final Rules. 78 FED. REG. at 39,870-39,899.  The Final Rules modify the language used to define an exempt "religious employer" to be "an organization that is organized and operates as a nonprofit entity and is referred to in § 6033(a)(3)(A)(1) or (iii) of the Internal Revenue Code of 1986, as amended." 78 FED. REG. at 39,874; 45 C.F.R. § 147.131(a).  Because the Internal Revenue Code sections list churches, their integrated auxiliaries, and conventions or associations of churches, and the exclusively religious activities of any religious order, the new language used did not change the substance of the exemption. 26 U.S.C. § 6033(a)(3)(A)(i) and (iii).  These employers are absolutely exempt from the Mandate.

The Final Rules include the same accommodation for "eligible organizations" that originally appeared in the February 6, 2013 proposed rules, and make it applicable to all group health plans for plan years beginning on or after January 1, 2014.  78 FED. REG. at 8,462, 38,872, 39,874-75; 45 C.F.R. § 147.131(b).  The Final Rules utilize the same four criteria set forth in the proposed rules to determine whether an entity qualifies as an "eligible organization," thus allowing it to take advantage of the "self-certification" work-around:

(1) The organization opposes providing coverage for some or all of any contraceptive services required to be covered under s 147.130(a)(1)(iv) on account of religious objections.

(2)  The organization is organized and operates as a nonprofit entity.

(3)  The organization holds itself out as a religious organization.

(4) The organization self-certifies, in a form and manner specified by the Secretary, that it satisfies the criteria in paragraphs (b)(1) through (3) of this section, and makes such self-certification available for examination upon request by the first day of the first plan year to which the accommodation in paragraph (c) of this section applies…..

45 C.F.R. § 147.131(b).  A self-certification form must be signed by an authorized representative of the organization and provided to the organization's insurer. Id. at § 147.131(b)(4).  Upon receipt of the self-certification form, the group health insurer must notify plan participants of the availability of separate payments for any contraceptive services required to be covered under § 147.130(a)(1)(iv). Id. at § 147.131(d).  Such payments are to be made without any cost-sharing requirements or premium, fee, or other charge to the eligible organization, the group health plan, or the plan participants or beneficiaries.  Id. at § 147.131(c)(2); 78 FED. REG. at 39,879-80.

## B.    Claims Presented in the Second Amended Complaint

Geneva avers that the Final Rules' self-certification requirement substantially burdens its religious exercise by requiring it to act as the "sole trigger" of access to the objected to services. (ECF No. 98 ¶¶ 139, 159-60, 167, 174, 179, 181-82, 186, 188-90.)  According to Geneva, under the self-certification accommodation, Geneva is the "central cog" in the government's scheme to expand access to the objected to services, against its conscience and religious beliefs. (Id. ¶ 140.)  Geneva asserts that it would play a central role in facilitating free access to the objected to services by coordinating notices with and providing employee information to its insurer. (Id. ¶¶ 160, 162, 164-65, 167.)  Geneva argues that the Final Rules burden its employee recruitment and retention efforts by putting it at a competitive disadvantage were it to choose not to offer health insurance, rather than violate its beliefs by participating in the self-certification process. (Id. ¶¶ 187.)  Geneva avers that eliminating health care coverage entirely would result in the imposition of significant monetary penalties, and would, itself, violate its religious duty to provide for the well-being of its employees and their families.  (ECF No. 98 ¶¶ 52, 109-10, 183.)

## C.     Preliminary Injunction Standard

The court considers four factors in determining whether to grant a preliminary injunction. A party seeking a preliminary injunction must show: "(1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief." Kos Pharmaceuticals, Inc. v. Andrx Corp., 369 F.3d 700, 708 (3d Cir. 2004) (citing Allegheny Energy, Inc. v. DQE, Inc., 171 F.3d 153, 158 (3d Cir. 1999)).

Although a party seeking preliminary injunctive relief must make "a clear showing that [it] is entitled to such relief," Winter v. Natural Res. Defense Council, Inc., 555 U.S. 7, 22 (2008), demonstrating a likelihood of success on the merits requires only that the party "prove a prima facie case, not a certainty that he or she will win." Highmark, Inc. v. UPMC Health Plan, Inc., 276 F.3d 160, 173 (3d Cir. 2001) (citing 11A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2948.3 (2d ed. 1995)).

### 1.     Likelihood of Success on the Merits

#### a.     Geneva's Claim Pursuant to the RFRA

Pursuant to the RFRA, the government may not "substantially burden a person's exercise of religion, 'even if the burden results from a rule of general applicability.'" Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal, 546 U.S. 418, 424 (2006) (quoting 42 U.S.C. § 2000bb-1(a)). The government may, however, substantially burden the exercise of religion if the burden: "(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(b). Geneva bears the initial burden under the RFRA of establishing that application of the Mandate would substantially burden a sincere religious exercise. O Centro, 546 U.S. at 426.

Before proceeding the court must consider the effect, if any, that the Court of Appeals for the Third Circuit's precedential decision in <u>Conestoga Wood</u> has on the court's substantive analysis of Geneva's RFRA claim. <u>Conestoga Wood</u>, 724 F.3d 377 (3d Cir. 2013). Although the court of appeals' decision was issued more than three months before the first brief on the instant motion was filed, neither party cited to it. Defendants cite only to the district court opinion in that case. (ECF No. 107 at 4-5.)

To reiterate, in <u>Conestoga Wood</u>, the Court of Appeals for the Third Circuit held that a for-profit, secular, closely-held corporation could not assert a RFRA claim because courts have not historically provided First Amendment free exercise protection to corporations. <u>Conestoga Wood</u>, 724 F.3d at 384. In doing so, the court explicitly distinguished the "rights of religious organizations." <u>Id.</u> at 385-86. The holding in <u>Conestoga Wood</u> applies, by its own language, only to certain for-profit, secular, closely-held corporations,[9] which the court distinguished from "religious organizations." The appellate court did not decide on which side of the ledger nonprofit, non-secular corporations would fall. For this reason, <u>Conestoga Wood</u> does not conclusively bar this court's consideration of Geneva's RFRA claim.

Given that defendants presuppose Geneva's right to bring a claim pursuant the RFRA in this case, and given that the eligible employer accommodation is premised on this same fundamental presumption, the court will proceed with a substantive analysis of Geneva's claim. <u>Korte</u>, 735 F.3d at 674-75 (noting that the religious employer exemption and self-certification

---

[9] This court previously noted the limited scope of the holding in <u>Conestoga Wood</u> in denying defendants' motion for an indicative ruling. <u>Geneva College v. Sebelius</u>, No. 12-207, 2013 WL 5704948 (W.D. Pa. Oct. 18, 2013). This court found that the court of appeals' decision in <u>Conestoga Wood</u> did not require that the Hepler injunction be vacated because the corporate structure of the Hepler corporate plaintiffs differed from Conestoga Wood Specialties Corp., and because <u>Conestoga</u> did not consider claims brought by individual family member-employees. <u>Id.</u> at *2.

accommodation assume that certain religious organizations have free exercise rights, but noting that the lines drawn by the government are "nowhere to be found in the text of RFRA," and recognizing that the government analogizes these exemptions and accommodations to exemptions for religious employers under the Americans with Disabilities Act, 42 U.S.C. § 12113(d)(1)-(2), and Title VII, 42 U.S.C. § 2000e-2).

### i.      Substantial Burden

Under the RFRA, exercise of religion is defined as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000bb-2 (citing 42 U.S.C. § 2000cc-5). The Supreme Court has cautioned courts to be reluctant to "dissect religious beliefs" when engaging in a substantial burden analysis. Thomas v. Review Bd. of Ind. Emp't Sec. Div., 450 U.S. 707, 715 (1981). As the court acknowledged in its previous orders and factual and legal findings, a court must tread lightly when considering whether the mandate's requirements substantially burden Geneva's exercise of religion. (ECF Nos. 83 at 12 and 91 at 12-13); Geneva College, 2013 WL 3071481, at *7; Geneva College, 941 F.Supp.2d at 681. The court's role is not to decide whether the commands of one's faith have been correctly perceived; instead, it is enough that a claimant has an "honest conviction" that what the government is requiring, prohibiting, or pressuring him to do conflicts with his religion. Korte, 735 F.3d at 683 (quoting Thomas, 450 U.S. at 716). Two appellate courts considering the exact Mandate at issue in this case explained that a court must assess the intensity of the coercion and pressure from the government, not the merit of the belief. Korte, 735 F.3d at 683; Hobby Lobby, 723 F.3d at 1137.

A challenged law substantially burdens Geneva's free exercise of religion if it compels Geneva "to perform acts undeniably at odds with fundamental tenets of their religious beliefs." Wisconsin v. Yoder, 406 U.S. 205, 218 (1972). A substantial burden also exists where a law "put[s] substantial pressure on an adherent to modify his behavior and violate his beliefs." Thomas, 450 U.S. at 718. Even "onerous" financial costs can rise to the level of a substantial burden. See Jimmy Swaggart Ministries v. Bd. of Equalization of Cal., 493 U.S. 378, 392 (1990) (declining to find a substantial burden, but recognizing that one could exist under certain circumstances). The courts of appeals to reach the merits of RFRA challenges to the Mandate specifically found that the substantial fines and penalties imposed upon an entity that either refuses to offer health care coverage to its employees at all, or refuses to provide coverage for the mandated preventative services constitutes a substantial burden. Korte, 735 F.3d at 683-84; Gilardi, 733 F.3d at 1217-18; Hobby Lobby, 723 F.3d at 1140-41.[10]

Defendants do not question the sincerity of Geneva's religious beliefs, but they do dispute whether the Mandate and the Final Rules impose a substantial burden on the exercise of those beliefs. Defendants argue that the Final Rules' self-certification accommodation does not substantially burden Geneva's exercise of religion because it requires Geneva to do no more than submit a form informing its insurer that it refuses to provide coverage to its employees for contraceptive services and ensures that Geneva is not responsible for contracting, arranging, paying, or referring for such coverage. (ECF No. 109 at 11.) Defendants contend that Geneva

---

[10] In Priests for Life, the district court explained, based on targeted supplemental briefing submitted by the government after oral argument, that if an eligible organization refuses to take advantage of the self-certification accommodation process, its insurer has an independent legal obligation under the ACA to *include* the objected to services in the organization's group policy. Priests for Life, 2013 WL 66722400, at * 3 n.2. In other words, an eligible organization's refusal to complete the self-certification process does not result in a $100 per employee, per day fine for failing to provide coverage for the objected to services; it results in the organization actually paying, through its group health insurance policy, for the objected to services. Id.

need not modify its behavior in any way under the Final Rules because Geneva would notify its insurer of this refusal before the ACA became law. (Id. at 11, 19.) Defendants assert that the self-certification accommodation "require[s] virtually nothing of Geneva" making any burden on Geneva de minimus, and that, in any event, any burden on Geneva's free exercise rights is too attenuated to qualify as substantial. (Id. at 11, 18.)

Geneva argues that this court's prior rulings with respect to the Hepler plaintiffs' motion for a preliminary injunction and Geneva's motion for a preliminary injunction concerning its student health plan dictate that Geneva's instant motion be granted. (ECF No. 106 at 1, 2.) Geneva emphasizes that this court previously rejected defendants' attenuation argument and ruled that the self-certification accommodation, which at the time was only a proposal, did not eliminate the Mandate's substantial burden on Geneva's religious desire to avoid complicity in grave moral evil. (Id. at 2, 7; ECF No. 111 at 8); Geneva College, 2013 WL 3071481, at *7-9. Geneva explains that under the Final Rules it is forced to become the "central cog" in "facilitating access" to the objected to services because the services only become available to its employees if Geneva: (1) offers a health insurance plan to its employees, as it is now required by law to do; and (2) submits the self-certification form to its insurer, which itself, by law, requires that the objected to services will be provided to employees. (ECF No. 106 at 5-6.)[11]

In its reply brief, Geneva responds directly to defendants' claim that Geneva is required to do no more than it did before the Mandate became law, i.e, notify an insurer of its refusal to provide coverage for the objected to services. Geneva convincingly explains that the

_____

[11] According to briefing filed by the government in Priests for Life, under the ACA, Geneva's employees will obtain insurance coverage for the objected to services so long as Geneva offers a health insurance plan to its employees, because if Geneva refuses to execute a self-certification form, then Geneva's insurer is required, by law, to include the objected to services in the group plan, *at Geneva's expense*. See supra note 10.

consequence of its prior notification was that its employees could not obtain coverage for the objected to services, while the consequence of the Final Rules' self-certification notification is that its employees must be provided access to the objected to services. See Archdiocese of N.Y., 2013 WL 6579764, at *14 & n.11 (noting that the self-certification form transforms a voluntary act that plaintiffs believe to be consistent with their religious beliefs into a compelled act that they believe forbidden); Zubik, 2013 WL 6118696, at *25 (analogizing that a person might be willing to provide a neighbor with a knife to cut meat, but not to commit murder). The purpose for which the notification is provided, and the compulsion to file it, makes all the difference.[12]

Geneva is correct that, under the authority of Thomas, this court previously rejected defendants' recurrent argument that the burden in the present case is too attenuated to be substantial. Geneva College, 2013 WL 3071481, at *9. Defendants identified no change in factual or legal circumstances that would compel a different result here. The court is again convinced by Geneva's well-founded argument that its submission of the self-certification form is not too attenuated from the provision of the objected to services. Instead, it is the necessary stimulus behind their provision. See Korte, 735 F.3d at 684-85 (rejecting attenuation argument); Gilardi, 733 F.3d at 1217-18 (same); Hobby Lobby, 723 F.3d at 1189-90 (same). Courts should not undertake to dissect religious beliefs and second-guess where an objector draws the line

---

[12] For this reason, the court respectfully disagrees with the district court's conclusion, in Priests for Life, that the self-certification process cannot substantially burden an eligible organization's religious exercise because it "need not do anything more than it did prior to the promulgation of the challenged regulations – this is, to inform its issuer that it objects to providing contraceptive coverage." Priests for Life, 2013 WL 6672400, at *7. Prior to the ACA, the result of that notification was that employees could not obtain insurance coverage for the objected to services. After the ACA, the result of that notification is that employees must be provided insurance coverage for those same services. Under the ACA, Geneva has two choices: (1) provide insurance coverage to its employees, which will result in coverage for the objected to services; or (2) refuse to provide insurance coverage for its employees, which will result in fines, harm to its employees' well-being, and competitive disadvantages. Both options require Geneva to act contrary to its religious duties and beliefs. See supra p. 11.

when analyzing substantial burden questions. Hobby Lobby, 723 F.3d at 1141. Here, Geneva draws the line at providing health insurance to its employees that includes coverage for the objected to services. The Mandate forces Geneva to facilitate access to the objected to services through the self-certification process. The court previously found that this is a not a line that the government can compel Geneva to cross. The court makes the same finding again.

In granting preliminary injunctive relief to the Hepler plaintiffs and to Geneva with respect to its student plan, this court explained how the Supreme Court's decisions in Yoder, Sherbert and Thomas supported a finding that the Mandate, including the self-certification accommodation, imposed a substantial burden under the RFRA. As it was under the proposed rules, under the Final Rules, Geneva is faced with having to choose between violating its deeply held religious beliefs and terminating its employee health insurance coverage entirely in order to avoid the ACA's regulatory scheme, which it alleges also burdens its religious duty to care for the well-being of its employees, and will, in any event, result in substantial fines. (ECF No. 98 ¶¶ 109-10, 183.); Thomas, 450 U.S. at 718. Like in Yoder, Geneva will suffer a severe, direct financial hardship if forced to drop its employee health plan because of the fines that would be imposed on it. Geneva will also suffer indirect hardship in that a burden would be placed on its efforts to recruit and retain employees if it fails to offer health insurance at all. (ECF No. 98 ¶ 187); see Jimmy Swaggart Ministries, 493 U.S. at 392. These burdens are substantial.

The court concludes, again, that Geneva demonstrated that it is likely to succeed on the merits with respect to the substantial burden issue.

### ii.    Compelling Government Interest/Least Restrictive Means

Because Geneva demonstrated that it is likely to succeed in showing that the Mandate's and the Final Rules' requirements impose a substantial burden on its exercise of religion, the court must determine whether these requirements serve "interests of the highest order." Yoder, 406 U.S. at 215. The government bears the burden of demonstrating a compelling interest at this stage, since "the burdens at the preliminary injunction stage track the burdens at trial." O Centro, 546 U.S. at 429-30 (analyzing the applicable burdens under the RFRA). Defendants assert that the Mandate and the self-certification accommodation of the Final Rules advance the compelling government interest in safeguarding public health and ensuring that women have equal access to health care.  (ECF. No. 109 at 15.)  These can be compelling governmental interests. (ECF No. 91 at 16-17.)  Defendants concede, however, as they must, that this court previously concluded that a previous version of the regulations, which furthered the same governmental interests, did not satisfy strict scrutiny "[i]n light of the myriad exemptions" applicable to the Mandate.  (Id. at 17-19.)  Defendants, therefore, relegate their arguments in this regard to a footnote "merely to preserve them for appeal." (ECF No. 109 at 27 n.11.)

Given defendants' concession, and given that they failed to identify any factual or legal distinctions between the current circumstances and the court's prior rulings, defendants cannot establish that the Mandate and the Final Rules serve a compelling governmental interest. In particular, even though this deficiency in their position was identified in this court's prior rulings, defendants still fail to show how exempting Geneva from the mandate will "seriously compromise [the government's] ability to administer the program," particularly where defendants have exempted religious employers and are actively trying to exempt entities like Geneva. O Centro, 546 U.S. at 435.  The "myriad exemptions" to the Mandate's requirements

still exist and demonstrate that the requirement is "woefully underinclusive" and therefore does not serve a compelling government interest. <u>Republican Party of Minn. v. White</u>, 536 U.S. 765, 780 (2002).

### 2. Irreparable Harm to Geneva

Irreparable harm is an injury that cannot be adequately compensated at a later date in the ordinary course of litigation. The Supreme Court has held, and defendants concede, that "[t]he loss of First Amendment freedoms," or a violation of the RFRA, "for even minimal periods of time, unquestionably constitutes irreparable injury." <u>Elrod v. Burns</u>, 427 U.S. 347, 373 (1976). This is particularly true when Geneva made a strong showing that is likely to succeed on the merits of its RFRA claim. <u>See</u> <u>Trefelner v. Burrell Sch. Dist.</u>, 655 F.Supp.2d 581, 596 (W.D. Pa. 2009) (citing 11A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2948.1 (2d ed. 1995)).

As demonstrated by the discussion above, the court concludes that because coverage must be obtained by January 1, 2014, Geneva will be irreparably harmed if it is forced either to forgo providing employee health insurance coverage or to violate its sincerely held religious beliefs by contracting for coverage that requires it to facilitate the provision of the objected to services to its employees. Although the fines imposed on Geneva should it chose to cancel its employee health insurance entirely could be compensable by monetary relief, the detrimental effect on Geneva's recruitment and retention of employees by doing so, not to mention on the health and well-being of its employees, would be irreparable. This factor weighs strongly in favor of granting the requested relief.

### 3.    Irreparable Harm to Defendants

Defendants will suffer little, if any, harm should the requested relief be granted. Defendants have already granted significant exemptions to the Mandate.  The requested relief in the present case will maintain the status quo until the statutory and constitutional questions raised by Geneva and other similarly-situated individuals and entities can be resolved. Kos Pharms., 369 F.3d at 708 (citing Opticians Ass'n of Am. v. Indep. Opticians of Am., 920 F.2d 187, 197 (3d Cir. 1990)).  In that vein, although the court already found that the court of appeals' decision in Conestoga Wood does not control this case, the Supreme Court's imminent consideration of that case, and Hobby Lobby, could provide guidance to this court and to the Court of Appeals for the Third Circuit on some of the relevant questions to be answered on the merits.

As noted in the court's prior decisions, defendants, in other cases involving challenges to the Mandate, have acquiesced to the imposition of injunctive relief. (ECF No. 91 at 20.)  Defendants cannot claim irreparable harm in this case while acquiescing to preliminary injunctive relief in other cases.  In light of these considerations, defendants stand to suffer little harm and this factor weighs strongly in favor of granting the requested relief.

### 4.    Public Interest

The public interest will likewise benefit if the court grants the requested relief, because "[t]here is a strong public interest in protecting fundamental First Amendment rights." Trefelner, 655 F.Supp.2d at 598. That strong interest includes fundamental religious rights codified by statute in the RFRA. Kikumura v. Hurley, 242 F.3d 950, 963 (10th Cir. 2001).  "'As a practical matter, if a plaintiff demonstrates both a likelihood of success on the merits and irreparable injury, it almost always will be the case that the public interest will favor the plaintiff.'" Ramsey v. City of Pittsburgh, 764 F.Supp.2d 728, 734-35 (W.D. Pa. 2011) (citing

Am. Tel. and Tel. Co. v. Winback & Conserve Program, Inc., 42 F.3d 1421, 1427 n.8 (3d Cir. 1994)).

Apart from the broader policy reasons for granting Geneva's requested relief, pragmatic concerns dictate the same outcome. Forcing Geneva to drop its employee health insurance out of fear that the Final Rules, which Geneva asserts violate its religious beliefs, will impose a substantial burden on its employees, and their dependents, who rely upon employer-provided health insurance. (ECF No. 91 at 22.) This consideration, along with the public interest in preserving religious liberties, leads this factor to weigh heavily in favor of granting the requested relief.

### 5.  Balancing Harms

Geneva showed that it is likely to succeed on the merits of its RFRA claim; that it will suffer irreparable harm absent injunctive relief; and that the public interest favors granting injunctive relief. In light of the exemptions granted and the position taken by defendants in other similar cases, the harm to defendants is not significant. These showings lead the court to conclude that the balance of the factors weighs heavily in favor of granting the requested relief.

## IV.  CONCLUSION

For the reasons set forth herein, Geneva's motion for a preliminary injunction will be GRANTED. An appropriate order will follow.

December 23, 2013                                    BY THE COURT:

                                            /s/ *Joy Flowers Conti*
                                            Joy Flowers Conti
                                            Chief United States District Judge